MATHESON, Circuit Judge.
Table of Contents
I. Background...982
A. Factual Background...982
1. Mr. Williams's Arrest and Transfer to TCSO Custody...982
2. Mr. Williams's Injury and Lack of Treatment...982
a. October 22-Response to initial injury and transfer to medical unit...982
b. October 23-24-Continued paralysis and arrival of mental health staff...983
c. October 25-Transfer to monitored cell and visit from Dr. Harnish...984
d. October 26-Lack of medical examination or treatment...984
e. October 27-Mr. Williams's first medical exam...984
3. Mr. Williams's Death...985
4. McKelvey and OSBI Reports...985
5. TCSO Policies and Practices...985
a. 2007 audit...986
b. 2009 inspection and Gondles Report...986
c. Prior inmate deaths...987
d. 2010 NCCHC probation...987
e. Homeland Security inspection...988
B. Procedural Background...988
1. Complaint...988
2. Pre-Trial Motions, CHC Settlement, and Replacement of Sheriff Glanz with Sheriff Regalado...989
3. Trial and Verdict...989
4. Post-Trial Motions...989
II. Discussion...990
A. Judgment as a Matter of Law...990 *978 1. Denial of Judgment as a Matter of Law under Rule 50(b)...990
a. Additional procedural background...991
b. Standard of review...991
c. Sufficiency of evidence showing underlying constitutional violation...991
i. Legal background...991
1) Deliberate indifference-Objective and subjective components...992
2) Gatekeeping function...992
ii. Analysis...993
d. Sufficiency of evidence showing supervisory and municipal liability...995
i. Legal background...996
1) Constitutional violations by TCSO or CHC employees as the basis for the Sheriffs' liability...996
2) Supervisory liability under § 1983...997
3) Municipal liability under § 1983...998
4) Supervisory and municipal liability-Same elements in this case...998
ii. Analysis...999
1) Supervisory liability-Sheriff Glanz...999
2) Municipal liability-Sheriff Regalado...1001
2. Qualified Immunity...1001
a. Legal background...1001
i. Qualified immunity...1001
ii. Waiver...1002
b. Analysis...----
i. Denial of summary judgment based on disputed issues of fact not appealable...1003
ii. Failure to raise qualified immunity in Rule 50 motions...1003
B. New Trial...1003
1. Challenges to Pretrial Order...1003
a. Additional procedural background...1003
b. Standard of review...1005
c. Legal background...1005
d. Analysis...1005
i. No objections to the complaint...1006
ii. Adequate notice of allegations in the pretrial order...1007
2. Challenge to Jury Instructions...1008
a. Additional procedural background...1009
b. Standard of review...1009
c. Legal background...1009
d. Analysis...1010
3. Evidentiary Rulings...1011
a. Investigative reports and interview transcripts...1011
i. Additional procedural background...1011
ii. Additional legal background...1013
1) Hearsay...1013
2) Waiver and inadequate briefing...1014
3) Forfeiture...1014
iii. Analysis...1014
1) The McKelvey Report-Waiver...1014
2) The OSBI Report-Forfeiture...1015
3) Transcript of interview with Mr. Latham...1016
4) Transcript of interview with Mr. Johnson...1016
b. Sheriff Glanz's misdemeanors...1017
i. Additional procedural background...1017
ii. Additional legal background...1017
iii. Analysis...1018
c. Mr. Williams's background...1019 *979 i. Additional procedural background...1019
ii. Additional legal background...1019
iii. Analysis...1019
d. Insurance coverage...1020
i. Standard of review...1020
ii. Additional procedural background...1020
iii. Additional legal background...1021
iv. Analysis...1021
e. Branstetter email...1021
i. Additional procedural background...1022
ii. Analysis...1022
f. Wyrick memo and testimony...1022
i. Additional procedural background...1023
ii. Additional legal background...1023
iii. Analysis...1023
g. Redirect examination of Chief Robinette and memo about Dr. Adusei...1023
i. Additional procedural background...1024
ii. Additional legal background...1024
iii. Analysis...1025
4. Closing Argument...1025
a. Additional procedural background...1025
i. Counsel's allegedly improper statements during closing argument...1025
ii. District court ruling...1025
b. Standard of review...1026
c. Legal background...1026
d. Analysis...1027
i. First Whittenburg factor-Extent of improper remarks...1027
1) Statements urging the jury to award damages for deterrence...1027
2) Additional legal background...1028
3) Contested statements...1027
4) Statements contrary to the evidence...1029
5) Statements urging the jury to disregard the court's instructions...1030
6) Statements violating the Golden Rule...1030
7) Statements expressing counsel's own opinion...1031
8) Pervasiveness of improper comments...1032
ii. Second Whittenburg factor-Curative action...1033
iii. Third Whittenburg factor-Size of the verdict...1033
iv. Balancing the Whittenburg factors...1034
C. Compensatory and Punitive Damages...1034
5. Remittitur as to Compensatory Damages...1034
a. Additional procedural background...1034
b. Standard of review...1035
c. Legal background...1035
d. Analysis...1035
6. Punitive Damages...1036
a. Additional procedural background...1036
b. Standard of review...1037
c. Legal background...1037
i. Degree of reprehensibility...1037
ii. Relationship to actual harm...1038
iii. Comparison to similar cases...1038
d. Analysis...1039
7. Setoff...1040
a. Legal background...1040
i. Preservation and waiver of setoff defense...1040
ii. Setoff law in § 1983 cases...1041 *980 iii. Oklahoma setoff statute...1042
b. Additional procedural background...1042
i. Settlement and dismissal of CHC defendants...1042
ii. Pretrial order and motion at trial...1042
iii. Post-trial motions for disclosure of the settlement and a setoff...1043
c. Standard of review...1044
d. Analysis...1044
i. Waiver...1045
ii. Error in application of step three of the § 1988 analysis...1045
1) Policy goals of § 1983...1045
2) State law consistency-Case-specific or categorical analysis...1046
3) Error in the district court's categorical rejection of setoff statute...1047
iii. Disclosure of the settlement agreement...1047
D. Disqualification...1048
8. Disqualification of District Court Judge...1048
a. 28 U.S.C. § 455...1048
b. Additional background...1049
i. The Sheriffs' disqualification motion...1050
1) 2008 suit against the County and Sheriff Glanz...1050
2) Summary judgment order...1050
ii. District court ruling...1051
iii. Summary of factual background...1051
c. Standard of review and legal background...1052
i. Timeliness...1053
ii. Disqualification under § 455(a)...1053
d. Analysis...1054
i. Timeliness...1055
ii. 2008 Case...1056
1) The 2008 case was unrelated to this case...1056
2) The Sheriffs' other arguments...1058
9. Reassignment on Remand...1058
III. Conclusion...1059
The Tulsa County Sheriff's Office ("TCSO") runs the Tulsa County Jail ("the jail"). In 2011, Elliott Williams was jailed there. Shortly after his booking, he severely injured his neck, causing lower body paralysis. No one treated his injury. Despite his frequent complaints of pain and paralysis, no one transported him to a hospital. He remained immobile for five days, lying on his back in various cells at the jail, and died of complications from the neck injury.
The administrator of Mr. Williams's estate, Robbie Emery Burke, filed a complaint under 42 U.S.C. § 1983. It alleged detention officers and medical providers at the jail violated Mr. Williams's Fourteenth Amendment right by acting with deliberate indifference to his serious medical needs. It further alleged Tulsa County Sheriff Stanley Glanz was liable in his individual supervisory capacity and in his official capacity for his subordinates' violations. During pretrial litigation, Sheriff Glanz resigned and his successor, Sheriff Vic Regalado, was substituted as the defendant on the official-capacity claim. By the time of trial, Sheriffs Glanz and Regalado ("the Sheriffs") were the only defendants remaining.
A jury awarded Ms. Burke $10 million in compensatory damages against Sheriff Glanz and Sheriff Regalado and $250,000 in punitive damages against Sheriff Glanz in his individual supervisory capacity. On appeal, the Sheriffs challenge the verdict, various evidentiary rulings, and several pre- and post-trial decisions of the district court.
*981 The following summarizes the 11 issues presented on appeal and our dispositions. We organize them under the four types of relief sought by the Sheriffs.
A. Judgment as a Matter of Law
1. Were the Sheriffs entitled to judgment as a matter of law under Federal Rule of Civil Procedure 50(b) on Ms. Burke's constitutional claims because the evidence for the verdict was insufficient?
No. The evidence was sufficient for a reasonable jury to conclude that one or more jail detention officer or medical provider was deliberately indifferent to Mr. Williams's serious medical needs and that Sheriff Glanz maintained a custom or practice of neglecting to remedy deficient medical services at the jail.
2. Was Sheriff Glanz entitled to dismissal of the individual supervisory liability claim against him based on qualified immunity?
Sheriff Glanz has waived this issue for appellate review because he did not properly preserve it in district court.
B. New Trial
3. Did the pretrial order impermissibly broaden the allegations against the Sheriffs from those contained in the Second Amended Complaint?
No. The Sheriffs did not challenge the specificity of the complaint and both the discovery process and summary judgment briefing provided adequate notice of the allegations in the pretrial order.
4. Did the jury instructions permit a finding of liability based on the collective actions of jail detention officers and medical providers?
No. The jury instructions required the jury to find that one or more of the Sheriffs' individual subordinates was deliberately indifferent to Mr. Williams's serious medical needs.
5. Did the district court make erroneous evidentiary rulings that prejudiced the Sheriffs?
No. We affirm each of the seven evidence rulings that the Sheriffs challenge.
6. Did Ms. Burke's counsel engage in improper closing argument that affected the jury's verdict?
No. Although some of counsel's comments may have been improper, they did not affect the verdict and did not warrant a new trial.
C. Compensatory and Punitive Damages
7. Were the Sheriffs entitled to remittitur of compensatory damages?
No. The district court did not abuse its discretion in denying remittitur in light of the evidence presented at trial.
8. Was the punitive damages award against Sheriff Glanz excessive?
No. Sheriff Glanz has failed to show that the award violated due process under the evidence and applicable Supreme Court precedent.
9. Are the Sheriffs entitled to setoff from the verdict in the amount of Ms. Burke's settlement with Correctional Healthcare Companies, Inc. ("CHC"), the company hired to provide medical services at the jail?
We do not determine whether the Sheriffs are entitled to a setoff. We reverse and remand because the district court abused its discretion by failing to consider the terms of *982 the settlement agreement and to order disclosure of the agreement.
D. Disqualification
10. Should the district court judge have recused himself?
No. The judge did not abuse his discretion when he denied the Sheriffs' disqualification motion.
11. Should the case be reassigned to another judge on remand?
No. The Sheriffs have failed to meet their burden for reassignment.
Exercising jurisdiction under 28 U.S.C. § 1291, we therefore affirm in part, reverse in part, and remand to the district court for further consideration of whether the Sheriffs are entitled to a setoff to reflect Ms. Burke's pre-trial settlement with the jail's medical provider.
I. BACKGROUND
In this section, we describe (1) Mr. Williams's arrest, injury, and experiences while in TCSO custody; (2) the TCSO's policies and practices regarding medical care at the jail; and (3) the proceedings in district court.
A. Factual Background[1]
1. Mr. Williams's Arrest and Transfer to TCSO Custody
On October 21, 2011, Owasso Police Department ("OPD") officers responded to a call about Mr. Williams's disruptive behavior and arrested him for obstructing an officer. They took him to the Owasso jail. The booking report shows the officers believed Mr. Williams was "suicidal." App. at 11240-41.
Early the next morning, Mr. Williams was transferred to TCSO custody and booked into the jail.
2. Mr. Williams's Injury and Lack of Treatment
a. October 22-Response to initial injury and transfer to medical unit
After arriving at the jail, Mr. Williams was forcibly taken to holding cell #10 following a confrontation with staff over his refusal to change his clothes. Shortly thereafter, while alone in the holding cell, Mr. Williams hit his head and became partially paralyzed. Nurse Kimberly Hughes and two detention officers first observed Mr. Williams lying face-up, complaining that he "broke his neck." Id. at 11876; see also id. at 7327-30. He said, "I can't move, I can't move" and "My neck hurts." Id. at 11899; see also id. at 7331. He told Nurse Hughes he had head-butted the door of the holding cell. Nurse Hughes said she "visually checked and there was nothing wrong with his neck." Id. at 11900. She did not provide Mr. Williams any medical treatment.
More than ten hours later, Nurse Faye Taylor and detention officers found Mr. Williams in holding cell #10 still unable to get up. They declared a "medical emergency." Id. at 7349; see also id. at 7380-81. Nurse Earnie Chappell recorded a note, stating: "[Mr. Williams] is awake, laying on floor in holding cell. states 'I cannot move my legs and there is something in my rectum.['] Asking nurse to cut him open & kill him. Admitted to medical ...." Id. at 10870.
When Mr. Williams arrived in the jail's medical unit, Nurse Mary Hudson took his vital signs and blood pressure and scraped the bottom of his foot with a pen to test his reflexes. Mr. Williams moved his legs in response to this stimulus. Nurse Chappell also was present. At least one of the nurses stated she believed Mr. Williams was faking his paralysis. The nurses did not *983 provide Mr. Williams any medical treatment. They asked detention officers to take him to the shower because he had defecated on himself in the holding cell.
Detention Officers Tommy Fike and Doug Hinshaw took Mr. Williams to the shower on a gurney. When Mr. Williams told them he could not get up, they laid him face up in the shower, removed his pants and shirt, turned on the water, and left. They left Mr. Williams in the shower for at least an hour, returning at some point to turn him over before leaving again. Detention Officer Christopher Leverich, who helped move Mr. Williams from the shower to a cell in the medical unit, said Mr. Williams was screaming, "Help me." Id. at 6905, 11911. His skin was purple, suggesting oxygen deprivation. The officers remarked "that something's wrong with Williams." Id. at 11911.
That night, Officers Carmelita Norris and Dakota Walsh were assigned to check on Mr. Williams. Officer Norris did not see Mr. Williams walk, stand, or sit up by himself during her 12-hour shift. Officer Walsh said Williams "was making it very clear through the whole night that he was unable to move." Id. at 11924.
Nurse Raymond Stiles also checked on Mr. Williams overnight. His notes reported Mr. Williams "state[d] that he cannot walk. However booking staff states he did not use wheel chair or any other walking aid when brought into jail. Continues to tell Nursing staff here that he just cannot walk, or even pull blankets over his shoulder. Wants to be waited on." Id. at 10865.
b. October 23-24-Continued paralysis and arrival of mental health staff
Mr. Williams received no medical treatment or evaluation on October 23.
Detention Officer Leticia Glover recalled that during the night of the 23rd, Mr. Williams yelled out that he could not feel his legs. Officer Glover informed "Nurse Paul or Nurse Ray" that Mr. Williams "wants something" and asked that they "at least go down there and look at him," but no one did. Id. at 11910; see also id. at 7449-50.
Nurse Stiles's notes from the morning of October 24 recorded Mr. Williams "stat[ing] he cannot walk," adding, "[b]ut when his suicide blanket slides off he manages to get it back over his body without asst. Can't remembeif [sic] he is suicidal or not." Id. at 10866. Nurse Charity Chumley's notes from about the same time described Mr. Williams's breathing as "even/unlabored" and his position as "lying on bed with out [sic] clothes refusing to answer any questions." Id.
On October 24, Dr. Stephen Harnish, the jail's part-time psychiatrist, first learned of Mr. Williams's condition. He testified that other members of the jail's mental health staff informed him during a routine meeting that they "[had] some questions about [Mr. Williams]." Id. at 8479. Dr. Harnish did not see or examine Mr. Williams that day. Rather, John Bell, a counselor and member of the jail's mental health staff, visited Mr. Williams. He noted that Mr. Williams would "lie on bed and not respond to ... questions," "acted as if paralyzed," and said, "I want water." Id. at 10866. Mr. Bell did not treat Mr. Williams but provided him "education" regarding "coping skills." Id.
The same day, Dr. Harnish "set forth a plan" to determine whether Mr. Williams was paralyzed. Id. at 8489. He ordered Mr. Williams be placed in a video-monitored cell[2] where detention officers and nurses could regularly check on him.
*984 c. October 25-Transfer to monitored cell and visit from Dr. Harnish
At 8:27 a.m. on October 25, detention officers placed Mr. Williams on a blanket and dragged him, naked, into Medical Cell 1. A few minutes later, a detention officer placed a small cup of water at his feet.
Dr. Harnish met with Mr. Williams for the first time that morning. Patricia Benoit, a counselor and mental health team member, accompanied him. When Mr. Williams requested "a bucket of ice water and a tube to drink threw [sic]," id. at 11304, Dr. Harnish moved the water cup within reach of Mr. Williams's right arm. He described Mr. Williams as moving his arms, hands, and neck during the visit. Although Dr. Harnish conducted no medical evaluation, he recorded that he "doubt[ed the] medical etiology of [Williams's] claimed paralysis." Id. at 10868. Dr. Harnish testified he was aware Mr. Williams may be paralyzed. Ms. Benoit stated, "It was really hard to tell if [Mr. Williams's paralysis] was psychosomatic or if it was physical." Id. at 11939.
Video showed that about an hour after Dr. Harnish's visit, a detention officer opened the door to Mr. Williams's cell and tossed a food container on the floor, out of his reach. The container remained untouched for two days. Mr. Williams unsuccessfully attempted to lift the water cup and to open a second food container that landed within his reach.
d. October 26-Lack of medical examination or treatment
Nurse Hughes wrote a note shortly after midnight on October 26 reporting that Mr. Williams was "muttering, can't understand a word," and that he was "lying on the floor, covered by blanket-will not get up for [vital signs] & cannot understant [sic] his 'mutters.' " Id. at 10867. When she returned several hours later, she "could see on his mouth where he had slobbered something, a white residue, on the mouth." Id. at 11901. Mr. Williams asked for water, but when Nurse Hughes told him to come to the door with his cup, Mr. Williams told her he could not move. Nurse Hughes asked Detention Officers Steven Smith and Crystal Rich to open the door to Mr. Williams's cell, but they refused, citing safety reasons. Nurse Hughes left without relaying her concerns to other medical personnel.
The evidence regarding Mr. Williams's mobility during the night of October 25-26 consisted of (1) Nurse Hughes's notes describing Mr. Williams lying on the floor of his cell; (2) Ms. Benoit's notes relating that Mr. Williams "reportedly was given water by the [detention officer] overnight and was told to come to the [slot in the door] to get the water and he did," id. at 10867; and (3) a video that captured all movement in Mr. Williams's cell, which did not show he moved his lower body at all.
On the morning of October 26, Ms. Benoit noted that Mr. Williams was "still refusing to move or admit he can move." Id. She thought Mr. Williams suffered from "psychosomatic paralysis." Id. Nurse Carmen Luca recorded that Mr. Williams was "stating that he cannot move." Id. She administered no care and did not examine Mr. Williams or take his vital signs. That evening, Nurse Devorsha Stewart wrote that Mr. Williams was "laying on floor partially covered by blanket, shaking." Id. at 10868.
e. October 27-Mr. Williams's first medical exam
Detention Officers Carmelita Norris and Ronald Reynolds stated they checked on Mr. Williams 22 times between 7:00 p.m. on October 26 and 7:00 a.m. on October 27. When they asked if he was okay, Mr. Williams said he was. The officers delivered breakfast at 5:15 a.m. on October 27 and recorded that Mr. Williams was able *985 to feed himself. The video from Mr. Williams's cell refutes this account, however. The video showed a food container being dropped near Mr. Williams's feet around that time. It also showed that, when medical staff arrived three hours later, the container was untouched.
Nurse Luca, Mr. Bell, and Dr. Khadga Limbu, a resident in family medicine who was assigned to a behavioral rotation at the jail, examined Mr. Williams. Mr. Bell's note reported that at 8:36 a.m. on October 27 Mr. Williams was "laying on floor with some spittle on cheek" and stated, "I want my phone, Iwant [sic] my phone." Id. at 10868. The note also recorded that Mr. Williams's speech was unclear and his memory and "insight/judgment/impulse control" were "poor." Id.
When Nurse Luca ran her pen across the bottoms of Mr. Williams's feet to test his reflexes, there was no response, but there was a little response when Dr. Limbu did the same. Dr. Limbu and Mr. Bell informed Dr. Phillip Washburn, the jail's medical director, that Mr. Williams needed medical attention. Dr. Limbu told Dr. Washburn, "I think we might need to get a CT Scan of the head or something like that just to rule out any medical conditions and [Dr. Washburn] said he would look at him later." Id. at 11890. Dr. Washburn never followed up on Dr. Limbu's recommendations.
3. Mr. Williams's Death
At approximately 11:30 a.m. on October 27, 2011, jail personnel discovered Mr. Williams was unresponsive. Several nurses, including Julie Hightower, attempted CPR until paramedics arrived. Attempts to resuscitate Mr. Williams were unsuccessful.
The medical examiner determined Mr. Williams died from "complications of a [sic] vertebral spinal injuries due to blunt force trauma." Id. at 7567. The post-mortem examination showed Mr. Williams was dehydrated. Ms. Burke's expert, Dr. Zeeshaan Khan, opined that the jail's failure to stabilize Mr. Williams's neck caused a hematoma that travelled up his spine and shut down his spinal cord, which in turn caused Mr. Williams's respiratory muscles to stop working. He testified that if the jail had stabilized Mr. Williams's neck and referred him to an appropriate medical facility, his death likely would have been avoided.
4. McKelvey and OSBI Reports
After Mr. Williams's death, investigators produced two reports. Officer Billy McKelvey, then a TCSO internal affairs investigator, authored the "McKelvey Report." It contained a statement of "undisputed facts," id. at 11880-92, and summaries of and quotations from interviews with OPD officers, TCSO employees, CHC medical providers, and inmates. The Oklahoma State Bureau of Investigation prepared the "OSBI Report." It similarly contained summaries of interviews with OPD officers, TCSO employees, CHC providers, inmates, and Mr. Williams's relatives.
5. TCSO Policies and Practices
Stanley Glanz served as Tulsa County Sheriff from 1988 until 2015. In 2005, TCSO retained a private contractor, Correctional Healthcare Companies, Inc., to provide medical care at the jail. The nurses and physicians working at the jail are employees of CHC, not Tulsa County or TCSO. CHC's contract provided that "TCSO is charged with the responsibility for administering, managing[,] and supervising the health care delivery system" at the jail. Id. at 11824. Sheriff Glanz testified that he was "ultimately responsible for the inmate health care of those inmates at the Tulsa County Jail." Id. at 7676.[3]
*986 a. 2007 audit
In 2007, the National Commission on Correctional Health Care ("NCCHC") conducted an on-site audit of the jail's health services. Before the auditors arrived, Sheriff Glanz met with jail department heads. Diane Maloy, who handled the jail's medical records, testified that Pam Hoisington, the jail's Health Services Administrator, told staff to alter medical charts to help the jail pass the audit:
She originally gave us a list of charts to pull to basically hide because she didn't want the auditors to pull what was called the "troubled inmates" or the inmates that had a lot of medical issues.
Then she had us pull another set of charts that were low-maintenance charts. And the low-maintenance charts, she disassembled and took out all of the sick calls or medications that had not been given. Anything that wasn't addressed, she took it out, and we reassembled the charts and we placed them into a basket for the auditors to have these charts to pick from when they came.
Id. at 8724. These manipulated charts were created to pass the NCCHC audit. Ms. Maloy added that one of the supervisors at the meeting stated that "heads were going to roll if [the jail] didn't pass this audit." Id. at 8723.
After the audit, the NCCHC placed the jail on probation. Its report identified several deficiencies in the jail's medical care, including:
• "health needs identified during receiving screening ... are not addressed in a timely manner," id. at 12062;
• "the follow-up of inmates with mental health needs is not of sufficient frequency to meet their needs," id. at 12066;
• "once mental health issues were identified, ... there was no consistent follow-up by the mental health staff," id. ; and
• "there was a noted delay in responding to routine mental health-related requests submitted by the inmates," id.
Ms. Maloy testified the jail submitted "corrective action statements" to NCCHC describing how it planned to fix the deficiencies, but the action plans were not implemented. At trial, Sheriff Glanz testified he did not know what was changed in response to the audit but said the jail ultimately received accreditation.
b. 2009 inspection and Gondles Report
In August 2009, the American Correctional Association ("ACA") conducted a "mock audit" of the jail. The ACA discovered the jail was non-compliant with "mandatory health care standards" and suggested "substantial changes." Id. at 12075. Based on these and other "deficiencies" in the jail's medical services, TCSO sought advice from Elizabeth Gondles, a correctional consultant.
In October 2009, Ms. Gondles produced a report (the "Gondles Report"), which addressed:
• understaffing of medical personnel,
• deficiencies in "doctor/[physician assistant] coverage,"
• a lack of health services oversight and supervision,
• failure to provide new health staff with formal training, *987 • delays in provision of necessary medication,
• nurses failing to document the delivery of health services,
• systemic nursing shortages,[4]
• failure to provide timely health appraisals to inmates, and
• 313 health-related grievances within the preceding 12 months.
Id. at 12075, 12078-87. Ms. Gondles concluded "[m]any of the health service delivery issues ... [were] a result of the lack of understanding of correctional healthcare issues by jail administration and contract oversight and monitoring of the private provider." Id. at 12090.
Ms. Gondles made 16 recommendations to TCSO about how it could improve its medical services. According to Captain Rick Weigel, the jail implemented only three: (1) holding monthly meetings between jail administrators and CHC providers, (2) establishing a "kiosk" system for inmates to report medical issues, and (3) refurbishing and cleaning the medical unit.
c. Prior inmate deaths
Inmates died in the jail in March, June, and December of 2010. In March 2010, an inmate reported chest pain over the course of a week. He went into cardiac arrest and died of a pulmonary embolus. A private consultant hired to investigate after Mr. Williams's death described this incident, noting there was "a 42 minute delay in calling [emergency medical services]" for the inmate, and adding the "[p]atient had medical criteria ... that should have prompted a 911 call." Id. at 11867. Also in March 2010, an inmate committed suicide eight days after requesting someone to "talk" with him in the jail and two days after a mental health exam had ruled out suicidal ideation. In June 2010, an inmate died of cardiac arrest. The consultant's report noted "several standard of care issues." Id. at 11868. It stated the inmate should have had repeated blood tests after his first blood test showed an elevated potassium level that "could lead to cardiac arrest." Id. It faulted "inadequate system protocols, and real time auditing of protocols, for treatment, monitoring, [and] referral" and concluded that "[w]ithout such protocols, risk of similar episodes for other inmates, in the future, is quite high." Id.
On October 28, 2010, Assistant District Attorney Andrea Wyrick wrote an email to TCSO's "Risk Manager" voicing concerns about CHC's compliance with its contract. She stated, "This is very serious, especially in light of the three cases we have now-what else will be coming?" Id. at 12278.
In December 2010, another inmate died at the jail. Notes from more than five months before the inmate's death showed he had been prescribed medication for a heart condition. Although the jail contacted a hospital to confirm the inmate's prescription, jail notes did not show whether he received the medication. He died of cardiac arrest.
d. 2010 NCCHC probation
In November 2010, the NCCHC conducted another audit and again placed the jail on probation. The jail met only 65 percent of NCCHC's "essential standards." Id. at 11638. The NCCHC's report found:
• "There have been several inmate deaths in the past year. ... The clinical mortality reviews were poorly performed." Id. at 11643.
*988 • "[T]he responsible physician does not conduct clinical chart reviews to determine if clinically appropriate care is ordered and implemented by attending health staff." Id. at 11650.
• "[D]iagnostic tests and specialty consultations are not completed in a timely manner and are not ordered by the physician." Id.
• "[I]f changes in treatment are indicated, the changes are not implemented, nor is clinical justification for an alternative course noted." Id.
• "Training for custody staff has been limited. Follow up [with suicidal inmates] has been poor." Id. at 11653.
Sheriff Glanz read only the first three pages of the 2010 NCCHC Report when he received it.[5] At trial, neither Sheriff Glanz nor Michelle Robinette, the jail's Detention Chief Deputy, could name a specific change the jail implemented in response to the 2010 audit.
NCCHC renewed the jail's accreditation in March 2011.
e. Homeland Security inspection
In 2011, the U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") inspected the jail's medical system. An Immigration and Customs Enforcement ("ICE") officer emailed the results in September 2011 to TCSO Undersheriff Brian Edwards. According to the ICE officer, "CRCL found a prevailing attitude among clinic staff of indifference ...." Id. at 11834. CRCL also noted that "[n]urses are undertrained" and were "[n]ot documenting or evaluating patients properly." Id. In one case, a lack of training had resulted in an inmate's appendix perforating. The inspection also "[f]ound two ICE detainees with clear mental/medical problems that have not seen a doctor." Id.
Although he did not receive the email, Sheriff Glanz discussed it with Undersheriff Edwards. The ICE supervisor also gave him a briefing on the audit, at which Sheriff Glanz "personally sat there and listened to all their findings." Id. at 7843.
B. Procedural Background
This section provides a summary of the district court proceedings. We provide additional procedural background where relevant to the issues on appeal.
1. Complaint
On November 17, 2011, Mr. Williams's estranged wife, Elia Lara-Williams, filed a complaint under 42 U.S.C. § 1983 against Sheriff Glanz in his individual supervisory and official capacities, CHC, and 20 unidentified detention officers and medical providers.
In April 2012, Robbie Emery Burke, the administrator of Mr. Williams's estate, replaced Ms. Williams as the plaintiff and filed a Second Amended Complaint (the "complaint"), the operative pleading on appeal. It named Sheriff Glanz in both his individual supervisory and official capacities, CHC, Nurse Chappell, Nurse Luca, Nurse Hightower, four Owasso Police Department ("OPD") officers, and an unspecified number of unidentified detention officers and medical providers.[6] Ms. Burke *989 alleged the defendants violated Mr. Williams's rights under the Eighth and Fourteenth Amendments by acting with deliberate indifference to his serious medical needs.[7] She further alleged Sheriff Glanz was liable in his individual supervisory and in his official capacity for the constitutional violations committed by his subordinates because he had promulgated a policy that encouraged such violations. Ms. Burke sought compensatory and punitive damages.
2. Pre-Trial Motions, CHC Settlement, and Replacement of Sheriff Glanz with Sheriff Regalado
On January 29, 2014, Sheriff Glanz filed a motion for summary judgment asserting qualified immunity. While the motion was pending, Ms. Burke and CHC reached a settlement. The district court dismissed CHC and the individual nurse defendants on September 3, 2014. The settlement terms were not disclosed. Sheriff Glanz resigned from office on November 1, 2015. The new Sheriff, Vic Regalado, took Sheriff Glanz's place as the official-capacity defendant. Sheriff Glanz remained a defendant in his individual supervisory capacity.
On July 20, 2016, the district court granted summary judgment for the OPD officers, denied qualified immunity for Sheriff Glanz, and denied summary judgment for both Sheriff Glanz and Sheriff Regalado. This left only Sheriffs Glanz and Regalado ("the Sheriffs") as defendants.
On February 9, 2017, the Sheriffs moved to disqualify the district court judge on the ground that his impartiality could reasonably be questioned. The district court denied the motion.
3. Trial and Verdict
Trial began on February 23, 2017, and lasted more than three weeks. At the close of evidence, the Sheriffs moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). The district court denied the motion.
The jury returned a verdict for Ms. Burke. It found Sheriff Glanz liable in his individual supervisory capacity and Sheriff Regalado liable in his official capacity, awarding Ms. Burke $10 million in compensatory damages against both Sheriffs and $250,000 in punitive damages against Sheriff Glanz.
4. Post-Trial Motions
The Sheriffs filed two post-trial motions challenging the jury's verdict. The first was a joint filing arguing the compensatory damages verdict was the product of an inflammatory closing argument. In that motion, the Sheriffs sought a new trial under Federal Rule of Civil Procedure 59(a) or, in the alternative, remittitur of compensatory damages. The second motion-filed by Sheriff Glanz alone-argued for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), a new trial, or remittitur of the punitive damages award. Although Sheriff Glanz's motion was styled as a challenge to the punitive damages award, it also asserted *990 (1) no jail subordinate had violated Mr. Williams's constitutional rights and (2) Ms. Burke had failed to establish Sheriff Glanz's supervisory liability.
Finally, the Sheriffs filed motions (1) to disclose Ms. Burke's confidential settlement agreement with CHC and (2) to amend the judgment under Federal Rule of Civil Procedure 59(e) by applying a dollar-for-dollar, or "pro tanto," setoff of the compensatory damages award in the amount of the CHC settlement.
II. DISCUSSION
The Sheriffs argue that each of their appeal issues entitles them to one of the following types of relief:[8]
A. Judgment as a Matter of Law
1. Were the Sheriffs entitled to judgment as a matter of law on Ms. Burke's constitutional claim because the evidence for the verdict was insufficient?
2. Was Sheriff Glanz entitled to dismissal of the individual liability claim against him based on qualified immunity?
B. New Trial
3. Did the pretrial order impermissibly broaden the allegations against the Sheriffs from those contained in the Second Amended Complaint?
4. Did the jury instructions permit a finding of liability based on the jail personnel's collective actions?
5. Did the district court make erroneous evidentiary rulings that prejudiced the Sheriffs?
6. Did Ms. Burke's counsel engage in improper closing argument that affected the jury's verdict?
C. Compensatory and Punitive Damages
7. Were the Sheriffs entitled to remittitur of compensatory damages?
8. Was the punitive damages award against Sheriff Glanz excessive?
9. Are the Sheriffs entitled to setoff from the verdict in the amount of Ms. Burke's settlement with CHC?
D. Disqualification
10. Should the district court judge have recused himself?
11. Should the case be reassigned to another judge on remand?
We affirm the judgment and all rulings except the denial of the setoff. We remand that issue to the district court for further consideration.
A. Judgment as a Matter of Law
1. Denial of Judgment as a Matter of Law under Rule 50(b)
The Sheriffs argue on appeal they were entitled to judgment as a matter of law because there was insufficient evidence to support the verdicts against them. We disagree and hold that a reasonable jury could have found (1) at least three of the Sheriffs' subordinates were deliberately indifferent to Mr. Williams's medical needs, and (2) the evidence adequately supported the Sheriffs' liability on the individual supervisory and official-capacity claims.
*991 a. Additional procedural background
At the close of evidence, the Sheriffs moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). They argued the TCSO detention officers had relied on the CHC medical providers' judgment in declining to seek treatment for Mr. Williams and that no evidence established subjective knowledge that Mr. Williams was paralyzed. As to the CHC medical providers, the Sheriffs contended Ms. Burke had presented evidence that might establish medical malpractice but not deliberate indifference to Mr. Williams's medical needs. They also contended that Ms. Burke had presented a "collective case" that did not establish deliberate indifference on behalf of any individual. App. at 10525. The district court denied the motion.
After trial, Sheriff Glanz moved for judgment as a matter of law under Rule 50(b), again arguing the evidence did not support the jury's supervisory liability verdict. The district court also denied that motion. We affirm.
b. Standard of review
"We review de novo a district court's decision to grant or deny a motion for judgment as a matter of law, applying the same legal standards as the district court." Etherton v. Owners Ins. Co. , 829 F.3d 1209, 1224 (10th Cir. 2016). "Judgment as a matter of law is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may support the nonmoving party's position." Elm Ridge Exploration Co. v. Engle , 721 F.3d 1199, 1216 (10th Cir. 2013) (quotations omitted). "When a new trial motion asserts that the jury verdict is not supported by the evidence, the verdict must stand unless it is clearly, decidedly, or overwhelmingly against the weight of the evidence." Ryan Dev. Co. v. Indiana Lumbermens Mut. Ins. Co. , 711 F.3d 1165, 1172 (10th Cir. 2013) (quotations omitted). "We draw all inferences from the evidence in favor of the non-moving party, and do not weigh the evidence or judge witness credibility." Henry v. Storey , 658 F.3d 1235, 1238 (10th Cir. 2011).
c. Sufficiency of evidence showing underlying constitutional violation
Under 42 U.S.C. § 1983, a person acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." Courts have found § 1983 liability for the type of constitutional claims asserted in this case. See, e.g. , Estelle v. Gamble , 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ; Lopez v. LeMaster , 172 F.3d 756, 764 (10th Cir. 1999).
i. Legal background
"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." Farmer v. Brennan , 511 U.S. 825, 828, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ; see also Estelle , 429 U.S. at 104, 97 S.Ct. 285. The constitutional protection against deliberate indifference to a pretrial detainee's serious medical condition springs from the Fourteenth Amendment's Due Process Clause. See Bell v. Wolfish , 441 U.S. 520, 535 n.16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ; Lopez , 172 F.3d at 759 n.2. In evaluating such Fourteenth Amendment claims, "we apply an analysis identical to that applied in Eighth Amendment cases." Lopez , 172 F.3d at 759 n.2.[9]
*992 1) Deliberate indifference-Objective and subjective components
The "[d]eliberate indifference [standard] has objective and subjective components." Callahan v. Poppell , 471 F.3d 1155, 1159 (10th Cir. 2006). The objective component of deliberate indifference is met if the "harm suffered rises to a level 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause." Mata v. Saiz , 427 F.3d 745, 753 (10th Cir. 2005) (quoting Farmer , 511 U.S. at 834, 114 S.Ct. 1970 ). We have held that "death, [is], without doubt, sufficiently serious to meet the objective component." Martinez v. Beggs , 563 F.3d 1082, 1088 (10th Cir. 2009).
To satisfy the subjective component, the plaintiff must show the official "knows of and disregards an excessive risk to inmate health or safety." Farmer , 511 U.S. at 837, 114 S.Ct. 1970. The official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Self v. Crum , 439 F.3d 1227, 1231 (10th Cir. 2006) (quotations omitted). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence ...." Farmer , 511 U.S. at 842, 114 S.Ct. 1970. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id.
A medical professional's "accidental or inadvertent failure to provide adequate medical care, or negligent diagnosis or treatment of a medical condition do not constitute a medical wrong under the Eighth Amendment." Ramos v. Lamm , 639 F.2d 559, 575 (10th Cir. 1980) (citing Estelle , 429 U.S. at 105-06, 97 S.Ct. 285 ); see also Whitley v. Albers , 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (holding Eighth Amendment liability requires "more than ordinary lack of due care for the prisoner's interests or safety"). "Where the necessity for treatment would not be obvious to a lay person, the medical judgment of the physician, even if grossly negligent, is not subject to second-guessing in the guise of an Eighth Amendment claim." Mata , 427 F.3d at 751.
2) Gatekeeping function
We distinguish a medical professional's negligent failure to treat a serious medical condition properly, which does not constitute deliberate indifference, from "prison officials [who] prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment," which may constitute deliberate indifference.
*993 Sealock v. Colorado , 218 F.3d 1205, 1211 (10th Cir. 2000). In the latter scenario, if the official knows "his role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, and if he delays or refuses to fulfill that gatekeeper role due to deliberate indifference, ... he also may be liable for deliberate indifference." Id.
We have found deliberate indifference when jail officials confronted with serious symptoms took no action to treat them. In Sealock , for example, a jail employee refused to drive an inmate experiencing severe chest pain to the hospital. Id. at 1210. He instead offered the inmate an antacid. Id. at 1208. We held the facts "demonstrate for summary judgment purposes that [the employee] knew of and disregarded the excessive risk" to the inmate's health. Id. at 1210 ; see also id. at 1211-12 (stating that if an employee was aware of the chest pain, "failure to summon an ambulance would have disregarded" the serious risk to the inmate's health). By contrast, we held a jail nurse who misdiagnosed the source of the inmate's symptoms after conducting a physical examination was entitled to summary judgment. See id. at 1208, 1211.
In Mata , an inmate sought medical attention for severe chest pain. 427 F.3d at 750. The nurse on duty told the inmate to return in the morning because the infirmary was closed for the evening. Id. In the morning, a second nurse assessed the inmate, performed an EKG, and, after determining the results were normal, gave her no treatment beyond permission to skip work for the day. Id. The inmate's chest pain did not subside, so she returned the following day. Two more nurses conducted tests on the inmate before referring her EKG results to a doctor, who ordered her to go to the emergency room. The inmate had suffered a heart attack and permanent heart damage. Id.
We held that the first nurse, who turned the inmate away, acted with deliberate indifference because she "was ... aware Ms. Mata was suffering from severe chest pains and required medical attention." Id. at 756. "More importantly," the nurse "refused to perform her gatekeeping role in a potential cardiac emergency by not seeking a medical evaluation for Ms. Mata" as required by state standards. Id. Rather, she "completely refused to assess or diagnose Ms. Mata's medical condition at all." Id. at 758. By contrast, we held that the other nurses were not deliberately indifferent because they either observed that the inmate's EKG results were "normal" and thus did not have subjective knowledge that the inmate was at risk of a heart attack, id. at 760, or "fulfilled [their] gatekeeper dut[ies]" by communicating the inmate's symptoms to a higher-up, id. at 759-60.
Benavides v. County of Wilson , 955 F.2d 968 (5th Cir. 1992), involved an inmate who banged his head and shoulder on a cell door and ultimately suffered a "fractured spinal column that rendered him a permanent quadriplegic." Id. at 970. When detention officers came to check on the inmate, he told them several times that "he was paralyzed and request[ed] hospitalization" and "that he could not move and wished to go to the hospital." Id. The detention officers "left him lying in his cell." Id. The Fifth Circuit held that "a jury could reasonably conclude that the three ... deputies purposely denied Benavides due process of law and his right to be free from cruel and unusual punishment under the [E]ighth [A]mendment." Id. at 972.
ii. Analysis
The Sheriffs' liability depends on one or more of their subordinates having violated Mr. Williams's constitutional rights. See , e.g. , *994 Dodds v. Richardson , 614 F.3d 1185, 1194-95 (10th Cir. 2010) ("To impose § 1983 liability the plaintiff first had to establish the supervisor's subordinates violated the [C]onstitution." (quotations omitted)). The trial evidence permitted the jury to find that various jail personnel-both detention officers and medical providers-were deliberately indifferent to Mr. Williams's serious medical needs and thereby violated his Fourteenth Amendment rights.[10]
The parties agree that Mr. Williams's death was sufficiently serious to satisfy the objective component of deliberate indifference. An inmate's death meets this requirement "without doubt." Martinez , 563 F.3d at 1088.
As to the subjective component, a reasonable jury could find both detention officers and medical providers understood that Mr. Williams was experiencing a medical crisis. Despite his obvious need, they either dismissed Mr. Williams as a malingerer without undertaking any investigation into his condition or abdicated their gatekeeping roles by failing to relay the problem to medical staff.
A few examples will suffice.[11] On October 26, Mr. Williams's fourth day at the jail, Nurse Luca wrote that he "stat[ed] that he cannot move." App. at 10867. As in Benavides , an inmate told her he was experiencing paralysis. But Nurse Luca did not attempt to determine Mr. Williams's condition or administer care. Her nursing note did not reflect any effort to examine him or gather vital signs. And she did not alert anyone that he could not move. Indeed, the video of Mr. Williams's cell does not show anyone entering it on October 26. Instead, Nurse Luca left Mr. Williams immobile in his cell. A reasonable jury could find her inaction was deliberate indifference.
A reasonable jury could also conclude that Detention Officers Smith and Rich acted with deliberate indifference. They refused to allow Nurse Hughes to enter Mr. Williams's cell despite her telling them she needed to tend to Mr. Williams. Contrary to the Sheriffs' assertions, Officers Smith and Rich did not defer to medical staff. See Aplt. Br. at 36-38. Rather, the officers summarily disregarded Nurse Hughes's request for unspecified safety reasons and made no attempt to determine the severity of Mr. Williams's medical need or the safety risk he might have posed.[12] A reasonable jury could conclude that, in so doing, Officers Smith and Rich failed to fulfill their gatekeeping role.
The evidence was therefore sufficient to find that at least Nurse Luca, Officer Smith, and Officer Rich were deliberately indifferent to the serious risk that Mr. Williams was suffering from a medical issue that demanded attention. As in Benavides , Mr. Williams complained to each of these three individuals about his paralysis.
*995 They failed to act on his obvious need for medical attention.[13] And like the first nurse in Mata , Nurse Luca disregarded Mr. Williams's complaints of paralysis without performing any examination or offering any treatment. The jury had sufficient evidence that a subordinate of the Sheriffs violated Mr. Williams's constitutional rights.[14]
d. Sufficiency of evidence showing supervisory and municipal liability
Neither of the Sheriffs' two post-trial motions challenging the jury's verdict addressed the liability of Sheriff Regalado or Tulsa County. The Sheriffs' joint filing under Rule 59(a) sought a new trial based on an allegedly inflammatory closing argument. It did not argue there was insufficient evidence to support the Sheriffs' liability. And although Sheriff Glanz's Rule 50(b) motion asserted (1) no jail subordinate had violated Mr. Williams's constitutional rights and (2) Ms. Burke had failed to establish a policy or custom of providing deficient medical care, neither Sheriff Regalado nor the County joined that motion.
Because the Sheriffs did not challenge municipal liability in the district court, they have forfeited this issue. See Paycom Payroll, LLC v. Richison , 758 F.3d 1198, 1203 (10th Cir. 2014) ("[I]f [a] theory simply wasn't raised before the district court, we usually hold it forfeited."). They also may have waived their argument on appeal because their briefing does not explicitly challenge municipal liability, see Anderson v. U.S. Dep't of Labor , 422 F.3d 1155, 1174 (10th Cir. 2005) ("The failure to raise an issue in an opening brief waives that issue."), or argue plain error, see Richison v. Ernest Grp., Inc. , 634 F.3d 1123, 1131 (10th Cir. 2011) (hereafter short-cited as Richison ).[15]
As we explain below, however, the elements of supervisory and municipal liability merge in this case, and our discussion of the former benefits from comparison with the latter. Moreover, because we conclude the evidence supported supervisory liability, we would reach the same conclusion with regard to Sheriff Regalado's municipal liability. We therefore discuss municipal liability despite the Sheriffs' forfeiture in the district court to shed light on our supervisory liability analysis.
*996 i. Legal background
1) Constitutional violations by TCSO or CHC employees as the basis for the Sheriffs' liability
The Sheriffs' supervisory and official-capacity liability may be premised on the constitutional violations of either TCSO or CHC employees, provided the remaining elements for these theories of liability are met. The Sheriffs do not argue otherwise on appeal.[16]
In analyzing supervisory or municipal liability, courts generally refer to the person who committed the underlying constitutional violation as a "subordinate." See , e.g. , Dodds , 614 F.3d at 1194-95 ("To impose § 1983 liability the plaintiff first had to establish the supervisor's subordinates violated the [C]onstitution" (quotations omitted)); see also Perkins v. Hastings , 915 F.3d 512, 524 (8th Cir. 2019) ("The plaintiff must show that the supervisor ... had notice of a pattern of unconstitutional acts committed by subordinates ...." (quotations omitted)); Starr v. Baca , 652 F.3d 1202, 1216 (9th Cir. 2011) ("Starr specifically alleges numerous incidents in which inmates in Los Angeles County jails have been killed or injured because of the culpable actions of the subordinates of Sheriff Baca."). Black's Law Dictionary defines "subordinate" as "[s]ubject to another's authority or control." Subordinate , Black's Law Dictionary 1562 (9th ed. 2009). This reading of subordinate is consistent with cases holding that a private citizen who works with law enforcement is acting "under color of state law for purposes of § 1983." West v. Atkins , 487 U.S. 42, 56, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) ; see also Carswell v. Bay County , 854 F.2d 454, 456-57 (11th Cir. 1988).[17]
As the foregoing applies here, Sheriff Glanz's control over CHC providers at the jail in October 2011 leaves little doubt they were subordinates whose constitutional violations could be the basis for *997 supervisory and municipal liability. Under the contract between TCSO and CHC, "TCSO is charged with the responsibility for administering, managing[,] and supervising the health care delivery system" at the jail. App. at 11824. CHC providers worked at the jail only with TCSO's permission, and TCSO sometimes revoked this permission for policy violations. Moreover, TCSO (1) could require CHC to terminate medical providers; (2) "own[ed] and retain[ed] custody and control of all medical records," id. at 11828; (3) allocated space for CHC medical providers to work; and (4) provided equipment to CHC staff. In an email sent before Mr. Williams's death, Assistant District Attorney Andrea Wyrick recommended an audit of CHC's performance in the jail and said, "The bottom line is, the Sheriff is statutorily ... obligated to provide medical services." Id. at 12278. Finally, TCSO Detention Chief Deputy Michelle Robinette testified that CHC employees providing care at the jail "work for [her]." Id. at 9696.
2) Supervisory liability under § 1983
Ms. Burke based the claim against Sheriff Glanz in his individual capacity on supervisory liability. Section 1983 does not authorize respondeat superior liability for a supervisor based solely on the actions of his subordinates. See Monell v. Dep't of Soc. Servs. , 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "[T]he three elements required to establish a successful § 1983 claim against a defendant based on his or her supervisory responsibilities [are]: (1) personal involvement[,] (2) causation, and (3) state of mind." Schneider v. City of Grand Junction Police Dep't , 717 F.3d 760, 767 (10th Cir. 2013) ; see also Dodds , 614 F.3d at 1199.
Under the first element, the plaintiff "must show an 'affirmative link' between the supervisor and the constitutional violation." Estate of Booker v. Gomez , 745 F.3d 405, 435 (10th Cir. 2014) (quotations omitted). The plaintiff can show such a link by establishing "the [supervisor] promulgated, created, implemented[,] or possessed responsibility for the continued operation of a policy," Brown v. Montoya , 662 F.3d 1152, 1164 (10th Cir. 2011), or "the establishment or utilization of an unconstitutional policy or custom," Dodds , 614 F.3d at 1199, provided the policy or custom resulted in a violation of the plaintiff's constitutional rights.
"The second element requires the plaintiff to show that the defendant's alleged action(s) caused the constitutional violation by setting in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." Estate of Booker , 745 F.3d at 435 (quotations omitted).
As to the third element, "in the context of a Fourteenth Amendment claim" involving injuries to an inmate, a plaintiff can "establish the requisite state of mind by showing that [a supervisor] 'acted with deliberate indifference.' " Perry v. Durborow , 892 F.3d 1116, 1122 (10th Cir. 2018) (quotations omitted).[18] " '[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Bd. of Cty. Comm'rs v. Brown , 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). "[A] local government policymaker is deliberately indifferent when he deliberately or consciously fails to act when presented *998 with an obvious risk of constitutional harm which will almost inevitably result in constitutional injury of the type experienced by the plaintiff." Hollingsworth v. Hill , 110 F.3d 733, 745 (10th Cir. 1997) (quotations omitted).
3) Municipal liability under § 1983
Ms. Burke's § 1983 official-capacity claim against the Sheriff (first Glanz, then Regalado) "represent[s] only another way of pleading an action against an entity of which an officer is an agent." Monell , 436 U.S. at 690 n. 55, 98 S.Ct. 2018 ; see also Douglas v. Beaver Cty. Sch. Dist. Bd. , 82 F. App'x 200, 203 (10th Cir. 2003) (unpublished) ("[I]n an official-capacity suit, however, the real party in interest is not the named official but rather the governmental entity itself.").[19] Under Monell , a municipality "is a 'person' subject to § 1983 liability." McDonald v. Wise , 769 F.3d 1202, 1215 (10th Cir. 2014). This is why the official-capacity claim here is effectively a claim against Tulsa County and also why, when Sheriff Glanz left office in 2015, the official-capacity claim transferred to his successor, Sheriff Regalado.
As with supervisory liability, a municipality may be liable only if a municipal actor committed a constitutional violation. Martinez , 563 F.3d at 1092 (rejecting the argument that "the county can be liable, even if no individual government actor is liable"). And like supervisory liability, the plaintiff must prove "(1) official policy or custom[,] (2) causation, and (3) state of mind." Schneider , 717 F.3d at 769. The custom or practice giving rise to liability must be "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." Bordanaro v. McLeod , 871 F.2d 1151, 1156 (1st Cir. 1989) ; see Cannon v. City & Cty. of Denver , 998 F.2d 867, 878 (10th Cir. 1993) (recognizing that a practice "so permanent and well settled as to constitute a custom or usage with the force of law" can give rise to municipal liability (quotations omitted)); David W. Lee, Handbook of Section 1983 Litigation § 3.02 (2019-3 Supp.) ("An official policy can also be a persistent, widespread practice for the city officials and employees, which, although not authorized by officially adopted or promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy.").
4) Supervisory and municipal liability-Same elements in this case
Supervisory and municipal liability differ in that the former is imposed on an individual and the latter on an entity. But as one leading commentator put it, "A claim asserted against a supervisory official in both her individual and official capacities can serve as the basis for imposing both personal liability against the supervisor, and municipal liability (the official-capacity claim) if the supervisor is a municipal policymaker." Martin A. Schwartz, Section 1983 Litigation Claims and Defenses § 7.19 (4th ed. 2019-1 Supp.).
Our cases support this point. In Brown , for supervisory liability we required the supervisor to have "promulgated, created, implemented[,] or possessed responsibility for the continued operation of a policy" that resulted in a violation of the plaintiff's constitutional rights. 662 F.3d at 1164. And in Schneider , for municipal liability we required "a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately *999 indifferent training or supervision." 717 F.3d at 770.
Ms. Burke does not allege and the record does not show that Sheriff Glanz personally participated in an underlying constitutional violation. Supervisory liability here is therefore predicated on his maintaining a policy or custom that resulted in the underlying violation. The same policy-or-custom element is required for municipal liability. Both supervisory liability and municipal liability also require (1) a causal relationship between the policy or custom and the underlying violation and (2) deliberate indifference. See id. at 768-70. Accordingly, the elements for supervisory and municipal liability are the same in this case.
ii. Analysis
The trial evidence supported the jury's verdict that Sheriff Glanz maintained a policy or custom of insufficient medical resources and training, chronic delays in care, and indifference toward medical needs at the jail, and that he did so knowing of an urgent need for reform. This evidence was sufficient for a reasonable jury to find against the Sheriffs on both the individual supervisory and the official-capacity claims.
1) Supervisory liability-Sheriff Glanz
Because a reasonable jury could conclude that one or more of Sheriff Glanz's subordinates violated Mr. Williams's constitutional rights, supervisory liability for Sheriff Glanz was proper if Ms. Burke also demonstrated that (1) he maintained a policy or custom that (2) led to the underlying constitutional violation and (3) that he acted with deliberate indifference. Here, too, a reasonable jury could conclude that the evidence was sufficient.
a) Policy or custom of deficient medical care
Between 2007 and 2011, inspectors identified recurring issues with the jail's medical care. This evidence showed Sheriff Glanz maintained a policy or custom of providing deficient medical care at the jail.
First, the jail's medical operation was understaffed. The Gondles Report addressed this concern in 2009 and recommended increased staffing. Ms. Gondles also stated that the lack of well-qualified nurses required better pay. But there was no evidence the jail acted on these recommendations in any meaningful way.
Second, the staff were inadequately trained. Ms. Gondles addressed this concern. Jail management had told her it was frustrated at having to rely on nurses without correctional training. In 2010, the NCCHC put the jail on probation because, among other issues, "[t]raining for custody staff [regarding suicidal inmates] ha[d] been limited." App. at 11653. The issue recurred in the 2011 CRCL inspection, which found a lack of training had resulted in the perforation of an inmate's appendix.
Third, jail personnel failed to timely address or follow-up on inmates' medical issues. This theme appeared repeatedly in jail inspection reports. In 2007, the NCCHC audit revealed that "health needs identified during receiving screening ... are not addressed in a timely manner." Id. at 12062. In 2009, the jail asked Ms. Gondles to help address a failure to provide timely health appraisals to inmates. In 2010, the NCCHC again placed the jail on probation in part because "diagnostic tests and specialty consultations are not completed in a timely manner and are not ordered by the physician." Id. at 11643. Delays in follow-up care were communicated to Sheriff Glanz one month before Mr. Williams's death. In September 2011, he was briefed on the CRCL inspection, *1000 which "[f]ound two ICE detainees with clear mental/medical problems that have not seen a doctor." Id. at 11834. Further, in 2010 an inmate died after the jail failed to follow up on his required medications.
b) Causation
A reasonable jury could find these deficiencies resulted in Mr. Williams's death. Despite the serious injury Mr. Williams sustained in the early hours of Saturday morning, no physician saw him until Tuesday. After his initial screening with Dr. Harnish, no other jail physician checked on Mr. Williams's condition. After Nurse Hughes first encountered Mr. Williams in holding cell #10 and determined, solely through an external visual examination, that nothing was wrong with his neck, jail personnel left him alone for 10 hours. When Nurse Hughes later observed Mr. Williams through his cell door and noticed he was not moving and had spittle on his cheek, she never followed up or reported the issue to her supervisors. For days, Mr. Williams received no medical screening or testing even as nurses came by his cell to record their observations that he could not move or walk.
These events were consistent with the chronic deficiencies identified above. A reasonable jury could infer that understaffing, inadequate training, or poor follow-up-or a combination of all three-explained why jail personnel left Mr. Williams in holding cell #10 for ten hours, took three days to send a physician to examine him, and declined for more than a day to enter his cell to examine him. Likewise, a reasonable jury could find one or more of these deficiencies, especially lack of training, contributed to (1) Nurse Luca's failure to act on Mr. Williams's complaints of pain and paralysis, (2) Nurse Hughes's incorrect conclusion that Mr. Williams was not injured solely based on an external physical examination, and (3) Officers Smith's and Rich's refusal to allow Nurse Hughes to enter Mr. Williams's cell upon request.
c) Deliberate indifference
As to state of mind, a reasonable jury could conclude Sheriff Glanz was deliberately indifferent to the risk that deficient medical care would result in a constitutional violation like the one Mr. Williams suffered.
The evidence that Sheriff Glanz neglected to remedy deficient medical care would permit a reasonable jury to find he was deliberately indifferent to the risk that poor care would result in Mr. Williams's constitutional injury. Between 2007 and Mr. Williams's death in 2011, outside auditors and consultants informed Sheriff Glanz, the official responsible for the jail's medical care, of understaffing, inadequate training, or poor follow-up on at least four occasions:
(1) the NCCHC's 2007 audit report;
(2) Ms. Gondles's 2009 report, which opined that the issues with medical staff "[were] a result of the lack of understanding of correctional healthcare issues by jail administration and contract oversight and monitoring of the private provider," id. at 12090;
(3) the 2010 audit report placing the jail on probation; and
(4) the CRCL inspection highlighting similar issues in late 2011.
Sheriff Glanz repeatedly told auditors he planned to improve the quality of the jail's medical care, but at trial he could not point to any changes that were made. In short, Sheriff Glanz and the TCSO-which was contractually responsible for supervising medical care at the jail-allowed numerous deficiencies to go unaddressed for years. A reasonable jury could find those same deficiencies *1001 contributed to Mr. Williams's death.
* * * *
We must affirm the district court's denial of the motion for judgment as a matter of law unless the evidence allowed "no reasonable inferences which may support the nonmoving party's position." Elm Ridge , 721 F.3d at 1216 (quotations omitted). It was reasonable for the jury to find (1) Sheriff Glanz was responsible for "an unconstitutional policy or custom," Dodds , 614 F.3d at 1199, of poor training, inadequate staffing, and lack of urgency surrounding jail medical care; (2) that this policy or conduct resulted in a violation of Mr. Williams's right to adequate medical care under the Fourteenth Amendment; and (3) Sheriff Glanz acted with deliberate indifference toward the risk that the policy or conduct of providing inadequate medical care would result in an injury like Mr. Williams's. Accordingly, the evidence was sufficient to support the jury's verdict against Sheriff Glanz holding him liable for supervisory liability.
2) Municipal liability-Sheriff Regalado
For substantially the same reasons that we find sufficient evidence of supervisory liability, a reasonable jury also could find official capacity liability. See Larez v. City of Los Angeles , 946 F.2d 630, 646-47 (9th Cir. 1991) (relying on evidence of a police chief's inadequate investigation of officers' use of force to support liability for the chief in his individual and official capacities). Sheriff Glanz-then the Tulsa County official charged with managing the jail-furthered a "policy or custom," see Schneider , 717 F.3d at 769, of deficient medical care at the jail characterized by inadequate training, understaffing, and chronic delays. A reasonable jury could find his continuous neglect of these problems "was the moving force behind the injury alleged." Brown , 520 U.S. at 405, 117 S.Ct. 1382. And as explained above, Sheriff Glanz acted with deliberate indifference toward the risk that the policy or custom of providing inadequate medical care would result in an injury like Mr. Williams's.
* * * *
We affirm the district court's denial of the motion for judgment as a matter of law.
2. Qualified Immunity
Sheriff Glanz contends the district court erred in failing to grant him qualified immunity at summary judgment or after trial regarding the individual-capacity claim against him. Much of this argument repeats the Sheriffs' contention on appeal that there was insufficient evidence to show any subordinate violated Mr. Williams's constitutional rights. We affirm.
First, the court denied summary judgment on qualified immunity due to disputed issues of fact. Sheriff Glanz thus cannot "appeal an order denying summary judgment after a full trial on the merits," Ortiz v. Jordan , 562 U.S. 180, 183-84, 131 S.Ct. 884, 178 L.Ed.2d 703 (2011) ; see Haberman v. Hartford Ins. Group , 443 F.3d 1257, 1264 (10th Cir. 2006) ("[T]he denial of summary judgment based on factual disputes is not properly reviewable on appeal from a trial judgment issued after trial.")
Second, to the extent Sheriff Glanz argues for qualified immunity based on the trial evidence, he failed to preserve this argument in his post-trial motions.
a. Legal background
i. Qualified immunity
"Individual defendants named in a § 1983 action may raise a defense of qualified immunity, which shields public officials from damages actions unless their *1002 conduct was unreasonable in light of clearly established law." Henderson v. Glanz , 813 F.3d 938, 951 (10th Cir. 2015) (quotations, citations, and ellipses omitted). A defendant's motion for summary judgment based on qualified immunity imposes on the plaintiff "the burden of showing both (1) a violation of a constitutional right; and (2) that the constitutional right was clearly established at the time of the violation." Felders ex rel. Smedley v. Malcom , 755 F.3d 870, 877 (10th Cir. 2014). "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.' " Mullenix v. Luna , --- U.S. ----, 136 S. Ct. 305, 308, 193 L.Ed.2d 255 (2015) (quoting Malley v. Briggs , 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) ).
ii. Waiver
When, as here, a district court denied qualified immunity at the summary judgment stage because there were disputes of material fact, a defendant must preserve the issue of qualified immunity for appeal based on the trial evidence by raising it in a post-trial motion under Federal Rule of Civil Procedure 50. Ortiz , 562 U.S. at 190, 131 S.Ct. 884.
In Ortiz , an inmate sued jail officials under § 1983 for failing to prevent her sexual assault by a corrections officer and for retaliating against her when she reported the assault. Id. at 182-83, 131 S.Ct. 884. The officials moved for summary judgment, claiming qualified immunity. The district court denied the motion, "[f]inding that the qualified immunity defense turned on material facts genuinely in dispute." Id. at 183, 131 S.Ct. 884. A jury returned a verdict for the plaintiff. Id. The officials had sought judgment as a matter of law under Federal Rule of Civil Procedure 50(a) before the jury returned its verdict but did not renew their motion after judgment under Rule 50(b). Id. at 187, 131 S.Ct. 884.
The Supreme Court held that, without raising qualified immunity in a Rule 50(b) motion, the defendants had not preserved their qualified immunity argument. "Questions going to the sufficiency of the evidence are not preserved for appellate review by a summary judgment motion alone ...." Id. at 190, 131 S.Ct. 884 (quotations and alteration omitted). The Court reasoned that because the district court denied qualified immunity on factual grounds, "the officials' claims of qualified immunity hardly present 'purely legal' issues" that would otherwise be susceptible to appellate review. Id. ; see also id. at 191, 131 S.Ct. 884 ("What was controverted, instead, were the facts that could render [the defendants] answerable for crossing a constitutional line.").
Thus, "[f]ailure to renew a summary judgment argument-when denial was based on factual disputes-in a motion for judgment as a matter of law ... at the close of all the evidence is considered a waiver of the issue on appeal." Copar Pumice Co. v. Morris , 639 F.3d 1025, 1032 (10th Cir. 2011) (quotations omitted). In Copar Pumice , the defendants' withdrawal of their 50(b) motion meant they had not adequately raised the qualified immunity issue post-trial to preserve it for review. Id. ; see also Tortu v. Las Vegas Metro. Police Dep't , 556 F.3d 1075, 1083 (9th Cir. 2009) ("When a qualified immunity claim cannot be resolved before trial due to a factual conflict, it is a litigant's responsibility to preserve the legal issue for determination after the jury resolves the factual conflict.").
b. Analysis
By failing to raise the issue of qualified immunity in his Rule 50(a) or 50(b) motions, Sheriff Glanz waived any argument for qualified immunity on appeal.
*1003 i. Denial of summary judgment based on disputed issues of fact not appealable
The district court denied Sheriff Glanz's motion for summary judgment based on factual disputes, not a "purely legal" ground. It held:
[A] reasonable jury could find that, in the years prior to Mr. Williams's death in 2011, then-Sheriff Glanz was responsible for knowingly continuing the operation of a policy or established practice of providing constitutionally deficient medical care in deliberate indifference to the serious medical needs of Jail inmates like Mr. Williams.
App. at 4055. The summary judgment order repeatedly referenced factual determinations a reasonable jury could make, including about Sheriff Glanz's state of mind regarding deficient medical care at the jail-one of the core disputes in the case. As noted above, Sheriff Glanz may not challenge this summary judgment ruling on appeal after a merits trial. Ortiz , 562 U.S. at 183-84, 131 S.Ct. 884.
ii. Failure to raise qualified immunity in Rule 50 motions
Sheriff Glanz failed to preserve a qualified immunity argument based on the trial evidence because he did not raise it in a post-trial motion. At the close of evidence, the Sheriffs jointly moved for judgment as a matter of law under Rule 50(a). They argued Ms. Burke's evidence "has not supported the cause of action" under § 1983 and the evidence at most could establish "medical malpractice." Id . at 10525. The motion did not mention qualified immunity. After trial, the Sheriffs filed a joint motion under Rule 59(a) asking the court to order a new trial or reduce the compensatory damages verdict based on inflammatory statements made during Ms. Burke's counsel's closing argument. The motion did not reference any arguments made in the Sheriffs' Rule 50(a) motion. It also did not mention qualified immunity. Sheriff Glanz's separate motion under Rules 50(b) and 59(a) likewise did not address qualified immunity.[20]
Thus, at no point after the district court's summary judgment decision did Sheriff Glanz renew his request for qualified immunity. Although Sheriff Glanz, by filing a Rule 50(b) motion, did more than the defendants in either Ortiz or Copar Pumice , he did not address qualified immunity. He preserved his argument that there was insufficient trial evidence of a constitutional violation. But he did not argue for qualified immunity. As a result, he has waived any qualified immunity argument on appeal. See Haberman v. Hartford Ins. Grp. , 443 F.3d 1257, 1264 (10th Cir. 2006) (explaining that denial of summary judgment based on factual disputes is not properly reviewable on an appeal from a final judgment after trial).
B. New Trial
1. Challenges to Pretrial Order
The Sheriffs contend the district court denied them due process when, through its pretrial order, it "permitted Plaintiff to expand the basis of her supervisory and official capacity claims beyond the individuals, actions, and policies identified in the Second Amended Complaint." Aplt. Br. at 14-15. We discern no error.
a. Additional procedural background
Ms. Burke's complaint, filed in April 2012, named as defendants Sheriff Glanz (in both his individual supervisory and official *1004 capacities), CHC, Nurse Chappell, Nurse Luca, Nurse Hightower, four Owasso Police officers, and "Does I through X." (the "Doe Defendants"). Ms. Burke alleged that each of the Doe Defendants "was employed by the Tulsa County Sheriff's Department, CHMO/CHC/CHM and/or the OPD/City of Owasso" and that each "was deliberately indifferent to Mr. Williams' medical needs and safety, violated his civil rights, negligently and wrongfully caused his death, and/or encouraged, directed, enabled and/or ordered other Defendants to engage in such conduct." App. at 145. Dr. Harnish and Officer Fike were the only other subordinates working at the jail who were mentioned by name in the complaint.
The complaint alleged deliberate indifference by four subordinates: "Defendants ... Chappell, Luca, and Hightower[ ] ... and Captain Fike's deliberate indifference to Mr. Williams's serious medical needs was in furtherance of and consistent with ... policies which Sheriff Glanz promulgated, created, implemented, or possessed responsibility for the continued operation of; ...." Id. at 152. It also alleged that "Tulsa County Jail personnel and employees and/or agents of [CHC] were clearly on notice of Mr. Williams'[s] acute suicidal tendencies, serious mental health issues and possible head and/or neck injuries." Id. at 141. It continued, "[T]he Tulsa County Jail personnel and [CHC] disregarded the known, obvious and excessive risks to Mr. Williams' health and safety." Id. The Defendants did not move to dismiss the complaint.
In September 2014, the district court dismissed the Doe Defendants. Following Ms. Burke's settlement with CHC, it dismissed CHC and the nurses. In July 2016, the district court granted summary judgment for the Owasso Police officers but denied summary judgment for Sheriff Glanz and Sheriff Regalado. Again, the Sheriffs did not move to dismiss the complaint.
On January 20, 2017, in preparation for trial, Ms. Burke submitted a proposed pretrial order.[21] It included issues of law and fact to be covered during the trial as well as lists of planned exhibits and witnesses. The Sheriffs objected to Ms. Burke's proposed order, contending it included issues of law that were broader than the allegations in the complaint. In particular, they objected to Ms. Burke's proposed issue of law presenting whether "any agent of the Tulsa County Sheriff"-rather than those subordinates named in the complaint-had been deliberately indifferent to Mr. Williams's medical needs. Id. at 4163-64. They claimed Ms. Burke was "attempt[ing] to try this matter by variance from the pleadings, surprise and ambush concerning which agents were deliberately indifferent towards [Mr.] Williams." Id. at 4164.
At the pretrial conference, Ms. Burke's counsel said he intended to argue that "every individual at that jail that came into contact with Mr. Williams after ... he began complaining that he was paralyzed, that they were all deliberately indifferent." Id. at 6678. The Sheriffs complained this theory of deliberate indifference provided them insufficient notice to make a defense.
The district court did not strike the language Ms. Burke had proposed. The final pretrial order listed as a question of law "[w]hether any agent of the Tulsa County Sheriff was deliberately indifferent *1005 to Mr. Williams' serious medical needs by completely denying Mr. Williams care although presented with recognizable symptoms which potentially created a medical emergency." Id. at 4656.
b. Standard of review
We have not previously stated the standard of review for a challenge to a district court's acceptance of a party's proposed pretrial order over an opposing party's objection. In an unpublished decision addressing the appellant's argument that the district court had erroneously allowed the appellee to broaden its claims in the pretrial order, we applied "the standard of review of a district court's grant of a motion to amend"-abuse of discretion. Okland Oil Co. v. Knight , 92 F. App'x 589, 602 (10th Cir. 2003) (unpublished); accord Ahmad v. Furlong , 435 F.3d 1196, 1202 (10th Cir. 2006) (reviewing for abuse of discretion a court's ruling on whether to allow a constructive amendment at the summary judgment stage); Tyler v. City of Manhattan , 118 F.3d 1400, 1403 (10th Cir. 1997) ("Because the district court is in the best position to interpret its pretrial order, our standard of review on appeal is abuse of discretion."). We hold abuse of discretion is the proper standard of review and apply it here.
c. Legal background
Federal Rule of Civil Procedure 16(e) provides that a district "court may hold a final pretrial conference to formulate a trial plan, including a plan to facilitate the admission of evidence." Fed. R. Civ. P. 16(e). "An order entered pursuant to Rule 16(e) supersedes the pleadings and controls the subsequent course of litigation .... [T]he pretrial order measures the dimensions of the lawsuit, both in the trial court and on appeal." Tyler , 118 F.3d at 1403 (quotations and citations omitted); see also Vaughn v. King , 167 F.3d 347, 352 (7th Cir. 1999) ("Pretrial orders supersede the pleadings.").
Although the pretrial order supersedes the pleadings, this court has stated it does not "normally expect to see claims or defenses not contained in the pleadings appearing for the first time in the pretrial order." Wilson v. Muckala , 303 F.3d 1207, 1215 (10th Cir. 2002). Introduction of new claims or theories at the pretrial order stage "deprives one's adversary of fair notice, possibly discovery, and the opportunity for motion practice, and is subject to abuse by those who employ a sporting theory of justice. The laudable purpose of Fed[eral] R[ule of] Civ[il] P[rocedure] 16 is to avoid surprise, not foment it." Id. at 1215-16. In Evans v. McDonald's Corp., 936 F.2d 1087 (10th Cir. 1991), this court said, "As a general rule, a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover, provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits." Id. at 1090-91 (quotations omitted).
Objections to pretrial orders prompt an inquiry into whether the objecting party received adequate notice. See Wilson , 303 F.3d at 1215-16. Although pleadings are one source of notice, see Matthews v. Bergdorf , 889 F.3d 1136, 1144 (10th Cir. 2018), the Okland Oil panel recognized that the discovery process can also provide adequate notice of factual allegations not specifically mentioned in a complaint. Okland Oil , 92 F. App'x at 602 (relying on the plaintiff's response to an interrogatory as notice of specific theories of misrepresentation that had not been mentioned in the amended complaint).
d. Analysis
The Sheriffs argue on appeal "[t]he pretrial conference order represented *1006 a substantive departure from the allegations in the [complaint]." Aplt. Br. at 15. They contend the district court's approval of Ms. Burke's proposed pretrial order deprived them of due process[22] by allowing Ms. Burke to "continually expand her claims" without providing the Sheriffs adequate notice of which subordinates she intended to prove had violated Mr. Williams's constitutional rights. Id. at 16.[23]
The district court did not err. The Sheriffs engaged in extensive discovery in the five years the case was pending before trial and never challenged the specificity of the complaint.[24] The Sheriffs knew or should have known from Ms. Burke's discovery responses and summary judgment briefing whose actions she would say violated Mr. Williams's constitutional rights.
i. No objections to the complaint
We have said that a "complaint must isolate the allegedly unconstitutional acts of each defendant; otherwise the complaint does not provide adequate notice as to the nature of the claims against each and fails for this reason." Matthews , 889 F.3d at 1144 (quotations omitted). But the Sheriffs voiced no lack-of-notice objections to the complaint at the pleading stage.[25] Although the Sheriffs protested at the pretrial conference that a claim alleging "anybody ... who worked at the jail who touched Mr. Williams ... [was] deliberately indifferent. ... would be dismissed out of hand at the motion to dismiss stage," App. at 6681, they never filed a motion to dismiss the complaint.
*1007 When presented with Ms. Burke's statement in opposition to summary judgment that there was "ample evidence that Sheriff Glanz's subordinates were deliberately indifferent," id. at 1959, Sheriff Glanz did not object or attempt to limit discussion to the individuals mentioned by name in the complaint. Instead, he defended the actions of all staff members who encountered Mr. Williams, appearing to accept and defend against Ms. Burke's approach to proving her case. See, e.g. , App. at 3879. ("[N]o one at the jail consciously, knowingly disregarded the medical needs of Mr. Williams or subjectively believed that he was actually paralyzed, then refused him treatment.").
The Sheriffs waited until the eve of trial to raise their notice concerns. By that point, what the Sheriffs learned in discovery and their failure to challenge the sufficiency of the complaint belied their assertion that they were surprised by the proposed pretrial order.
ii. Adequate notice of allegations in the pretrial order
Beyond the Sheriffs' failure to object to the complaint on notice grounds, the discovery process and summary judgment briefing before the proposed pretrial order provided them with adequate notice. Comparing the pretrial order with the complaint and examining the issues explored during discovery shows the Sheriffs received fair notice. See Okland Oil , 92 F. App'x at 601 (examining the discovery record for notice of allegations made in pretrial order).
First, the complaint alleged not only that certain subordinates violated Mr. Williams's constitutional rights, it also alleged that "Tulsa County Jail personnel and employees and/or agents of [CHC] were clearly on notice of Mr. Williams's acute suicidal tendencies, serious mental health issues and possible head and/or neck injuries." App. at 141 (emphasis added). The complaint went on to claim that "Tulsa County Jail personnel and [CHC] disregarded the known, obvious and excessive risks to Mr. Williams' health and safety." Id. (emphasis added). As to supervisory liability, it linked Sheriff Glanz's role in promulgating certain jail policies to "the aforementioned acts and/or omissions of Defendants in being deliberately indifferent to Mr. Williams's serious medical needs." Id. at 159. Use of "Defendants" in the complaint refers not only to subordinates named as defendants-Nurses Luca, Chappell, and Hightower-but also to the Doe Defendants, each an employee of TCSO or CHC.[26]
Second, the Sheriffs had two years of discovery to learn which subordinates Ms. Burke planned to prove had violated Mr. Williams's constitutional rights. The McKelvey Report-a TCSO document at the Sheriffs' disposal from its inception-listed every individual whose interview Officer *1008 McKelvey used in his report. That list included 39 TCSO and CHC employees. Officer McKelvey also named counselor John Bell, a member of the jail's mental health staff, as someone he did not interview. Additionally, Ms. Burke's initial disclosures under Federal Rule of Civil Procedure 26, filed on June 14, 2013, included a list of potential witnesses. Accordingly, the subordinates were not anonymous. They were identified in documents, and their names repeatedly arose throughout discovery. The Sheriffs had reason to expect their actions could form a basis for supervisory liability, and they had ample opportunity through interrogatories, depositions, and other discovery tools to obtain additional information.
Third, the parties' summary judgment briefing provided details about Mr. Williams's time in custody. The "Statement of Material Facts Not in Dispute" portion of Sheriff's Glanz's motion for summary judgment named 11 subordinates who encountered Mr. Williams at the jail or were informed of his condition by another subordinate.[27] Instead of limiting his factual assertions to individuals mentioned by name in the complaint, Sheriff Glanz asserted that "[n]o one at the jail consciously knew Williams was actually paralyzed." Id. at 1568. In her response, Ms. Burke mentioned by name 11 additional subordinates who encountered Mr. Williams.[28] The subordinates were not only known, they were central to both parties' court filings. The Sheriffs did not move to reopen discovery after the district court denied summary judgment.
In sum, the complaint did not cabin its supervisory and municipal liability claims to those subordinates it mentioned by name. As a result, the pretrial conference order was not, as the Sheriffs claim, a "substantive departure from the allegations in the [complaint]." Aplt. Br. at 15. Moreover, those TCSO officers and CHC providers who interacted with Mr. Williams during his five-day incarceration represent the closed set of subordinates who might have violated his constitutional rights. These two dozen individuals-described in the parties' summary judgment briefing-were discoverable, if not already known, to the Sheriffs long before the pretrial conference. And the subordinates' interactions with Mr. Williams were documented in nursing notes, detention officers' shift reports, and a TCSO Internal Affairs investigation. A group this size may have presented a challenge to defending against allegations of deliberate indifference, but the Sheriffs did not lack notice as to the members of the group.
As a result, the district court did not abuse its discretion in approving the proposed pretrial order or refusing to strike the issues of law asking whether "any agent" of TCSO had acted with deliberate indifference as a predicate for the claims against the Sheriffs.
2. Challenge to Jury Instructions
The second part of the Sheriffs' "collective liability" argument contends the jury instructions erroneously invited the jury to find the Sheriffs liable without identifying a particular subordinate named in the complaint who violated Mr. *1009 Williams's constitutional rights. We conclude the jury instructions properly stated the law.
a. Additional procedural background
Before trial, the Sheriffs submitted a proposed jury instruction asking the jury to determine whether Sheriff Glanz, Nurse Chappell, Nurse Luca, Nurse Hightower, or Officer Fike acted with deliberate indifference to Mr. Williams's serious medical needs. They thereby sought to limit the jury's consideration of whether there was an underlying constitutional violation to the acts of Sheriff Glanz and four subordinates.[29] The Sheriffs also submitted a proposed special verdict form asking the jury to find whether Nurse Chappell, Nurse Luca, Nurse Hightower, or Officer Fike violated Mr. Williams's civil rights, and to apportion fault among them, CHC, and the Sheriffs.
The district court rejected the Sheriffs' proposed instructions. The instructions it read to the jury did not name any individual subordinates and allowed the jury to return a verdict for Ms. Burke only if she proved, among other things:
• an "underlying violation of Mr. Williams's Constitutional rights by one or more agents or employees of Tulsa County" (Instruction 16)
• "one or more employees or agents of Tulsa County , including detention and medical staff , were deliberately indifferent" (Instruction 16)
• "that an act or acts by an employee or agent of Tulsa County, including detention and medical staff at the Jail , violated Elliott Williams's Constitutional rights" (Instruction 19)
• "that an act or acts by an employee or agent of Tulsa County, including detention and medical staff at the Jail , violated Elliott Williams's Constitutional rights" (Instruction 21)
App. at 5114-19 (emphasis added) (quotations omitted).
Echoing their objections to the pretrial order, the Sheriffs asserted the proposed instructions were so vague that they did not "know whose conduct at this point in time [they were] supposed to be defending." Id. at 10567. They argued the instructions would "impose[ ] liability for us for people we don't have no control [sic] over and they're not identified." Id. at 10569.
b. Standard of review
"We review a district court's decision to give a particular jury instruction for abuse of discretion, but we review de novo legal objections to the jury instructions." Lederman v. Frontier Fire Prot., Inc. , 685 F.3d 1151, 1154 (10th Cir. 2012) (quotations omitted). "We review de novo whether, as a whole, the district court's jury instructions correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards." Martinez v. Caterpillar, Inc. , 572 F.3d 1129, 1132 (10th Cir. 2009) (quotations omitted).
c. Legal background
The only defendants at trial were Sheriff Glanz in his individual supervisory capacity and Sheriff Regalado in his official capacity as Tulsa County Sheriff. As discussed above, supervisors and municipalities can be liable under § 1983 for the actions of their subordinates only if one of *1010 those subordinates committed an underlying constitutional violation. See Brown , 662 F.3d at 1164 (requiring that the supervisor's implementation of a municipal policy caused a constitutional harm). "[T]he plaintiff need not sue the individual tortfeasors at all, but may proceed solely against the municipality." Askins v. Doe No. 1 , 727 F.3d 248, 253 (2d Cir. 2013) ; see also Davis v. Samuels , 608 F. App'x 46, 48 (3d Cir. 2015) (evaluating a supervisor's liability where the plaintiff did not name any of the subordinates "directly responsible for the acts described in his claim" in his complaint); Geter v. Wille , 846 F.2d 1352, 1354 (11th Cir. 1988) (evaluating municipality's liability where plaintiff did not sue any individual subordinates).[30]
We have held that neither a supervisor nor a municipality may be held liable based on an unconstitutional policy where there is no evidence of a constitutional violation by any individual subordinate. Martinez , 563 F.3d at 1087, 1092 (rejecting the argument that "the county can be liable, even if no individual government actor is liable"). As a result, "even if ... the policies, training, and supervision of the individual county defendants were unconstitutional, the county cannot be held liable where ... the officers did not commit a constitutional violation." Id. at 1091 (brackets and quotations omitted).
d. Analysis
We find no error regarding the jury instructions. Taken "as a whole," Caterpillar, Inc. , 572 F.3d at 1132, they did not permit the jury to find supervisory or municipal liability without finding that one or more individual subordinates acted with deliberate indifference to Mr. Williams's serious medical needs.
Each reference to "staff" in the instructions was preceded by the limiting language of "one or more employee or agent." Instruction 16 required Ms. Burke to prove an "underlying violation of Mr. Williams's Constitutional rights by one or more agents or employees of Tulsa County" and stated "[a] county or supervisory official may not be held liable without proof of an underlying constitutional violation by a subordinate official ." App. at 5114 (emphasis added) (quotations omitted). Instruction 19 required Ms. Burke to prove "that an act or acts by an employee or agent of Tulsa County ... violated [Mr.] Williams's Constitutional rights." Id. at 5117 (emphasis added). Instruction 21 likewise required "an act or acts by an employee or agent of Tulsa County" to show an underlying constitutional violation." Id. at 5119 (emphasis added). Accordingly, to the extent supervisory or municipal liability requires an underlying constitutional violation by at least one subordinate, the jury instructions adequately stated that requirement.
The Sheriffs argue the jury instructions reflected Ms. Burke's theory of "collective indifference that failed to examine the mens rea of any individual." Aplt. Br. at 65. We disagree. Instruction 20 stated that "[a] finding of deliberate indifference requires that the official was aware of facts from which an inference could be drawn that a substantial risk of serious harm exists." App. at 5118 (emphasis added). The instruction explained that "where such a risk is obvious so that a reasonable man would realize it, it may be inferred that jail *1011 personnel did in fact realize it." Id. In light of the other instructions, this explanation adequately directed the jury to consider each subordinate's state of mind in determining whether an underlying violation of Mr. Williams's constitutional rights occurred. Accordingly, the district court did not err in instructing the jury.
3. Evidentiary Rulings
The Sheriffs challenge seven of the district court's evidence rulings. We find no ground for reversal.
"We review legal interpretations of the Federal Rules of Evidence de novo. We review evidentiary decisions for abuse of discretion." United States v. Silva , 889 F.3d 704, 709 (10th Cir. 2018), cert. denied , --- U.S. ----, 139 S. Ct. 1319, 203 L.Ed.2d 572 (2019) (citation omitted). "A district court abuses its discretion when it renders an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." Id. (quotations omitted).
When a district court has improperly admitted or excluded evidence, we reverse "only if the error affects a substantial right of the party." Fed. R. Evid. 103(a). This occurs when the error "had a substantial influence" or "leaves one in grave doubt as to whether it had such an effect on the outcome." McInnis v. Fairfield Cmtys., Inc. , 458 F.3d 1129, 1142 (10th Cir. 2006) (quotations omitted); see United States v. Charley , 189 F.3d 1251, 1270 (10th Cir. 1999) (noting errors in admitting or excluding evidence are harmless unless they affect a party's substantial rights). "Framed differently, we must reverse unless we find that this jury's verdict more probably than not was unaffected by the error." Abraham v. BP Am. Prod. Co. , 685 F.3d 1196, 1202 (10th Cir. 2012) (quotations and brackets omitted). "When determining whether an error was harmless, we review the record as a whole." Hill v. J.B. Hunt Transp., Inc. , 815 F.3d 651, 659 (10th Cir. 2016) (quotations omitted).
a. Investigative reports and interview transcripts
The Sheriffs contend the district court erred in admitting four exhibits about the events leading to Mr. Williams's death: (1) a report that Officer Billy McKelvey wrote while he was a TCSO internal affairs investigator ("the McKelvey Report"), (2) a report prepared by the Oklahoma State Bureau of Investigation ("OSBI Report"), (3) the transcript of an interview with jail inmate Derek Latham, and (4) the transcript of an interview with jail inmate Andrew Johnson. The McKelvey Report summarized and quoted from both interview transcripts. We affirm on this issue because (1) the Sheriffs have inadequately briefed their argument about the McKelvey Report, (2) the Sheriffs forfeited their argument about the OSBI Report, and (3) admission of the transcripts, even if error, was harmless.[31]
i. Additional procedural background
The district court admitted this evidence in four steps.
First, Ms. Burke sought to question Officer McKelvey about his report, which included an executive summary; App. at 11876-77, a statement of "undisputed facts," id. at 11880-92, and summaries of and quotations from interviews with TCSO employees, OPD officers, CHC medical providers, and inmates.[32]
*1012 The Sheriffs' counsel noted the report had not yet been admitted and objected, arguing the McKelvey Report "contains hearsay by people who are not agents of" TCSO. Id. at 6880. The court asked, "Nurses aren't agents?" Id . The Sheriffs responded, "They're at the jail but they're not agents of the [TCSO]. So I think there's a hearsay problem with this and so we've objected on that basis." Id. at 6881.
Ms. Burke's counsel countered with three arguments. First, he said the McKelvey Report was admissible under Federal Rule of Evidence 801(d)(2)(D) as a statement by an opposing party's agent offered against the opposing party. Counsel then stated, "It does not matter that the statement contains other statements or summaries of statements ... of other persons so long as the requirements of Rule 801(d) are met." Id. at 6882. Second, counsel argued the McKelvey Report was admissible under Rule 803(8) because "public records offered against the party who created them are admissible even when they contain double or even triple hearsay." Id. Third, he said that the report was admissible under Rule 803(6) as a business record.
The Sheriffs' counsel restated his argument that "the problem is that [the McKelvey Report] contain[s] hearsay from individuals who are not agents of the Tulsa County Sheriff's Office," including statements of "inmates," "Owasso police officers," and "nurses." Id. at 6883. This prompted Ms. Burke's counsel to say, "[I]t does not matter that the [McKelvey Report] contains other statements or summaries of statements of other persons so long as the requirements of [ Rule] 801(d)(2) are met, and clearly that's the case." Id. at 6884.
The court then accepted Ms. Burke's three arguments:
All right. I'm going to overrule the objection specifically related to the Federal Rule of Evidence 801(d)(2)(D) and as supported by 803(8), public records. It sets out in a civil case or against the government-factual findings does [sic] not show that the source of information or circumstances indicate a lack of trustworthiness. And there was one other, which was [Rule] 803(6), records of regularly conducted activity.
Id. It admitted the report and Officer McKelvey's testimony about it.
Second, Ms. Burke offered the OSBI Report for admission. Similar to the McKelvey Report, the OSBI Report contained summaries of interviews with TCSO employees, CHC providers, OPD officers, and Mr. Williams's relatives. It also included summaries of inmates' interviews other than those of Mr. Latham and Mr. Johnson.
The Sheriffs' counsel objected, saying the report "contains just complete hearsay. It's after-the-fact interview. ... It contains interviews with many detention officers. They're unsigned. They're just blatant-it's just hearsay." Id. at 6986. In response, Ms. Burke's counsel cited Rule 803(8)(A)(iii) to argue that factual findings from a legally authorized investigation were admissible as an exception to hearsay. The Sheriffs' counsel then said, "That's not a problem. Factual findings might be admissible; it's the interviews themselves that are not." Id. at 6987. The court overruled the objection, citing Rule 803(A)(8)(iii).
Third, Ms. Burke offered the transcript of an interview Officer McKelvey conducted with Mr. Latham, a jail inmate. The Sheriffs' counsel objected, citing hearsay and arguing Mr. Latham was not a TCSO agent. Ms. Burke's counsel countered, citing *1013 (1) Rule 803(8) to argue that the transcript set forth the factual findings of an investigation under authority granted by law and (2) Rule 801(d)(2) to argue that Mr. Latham was an agent of TSCO, making his statements not hearsay. The court overruled the objection without explanation.[33]
Fourth, Ms. Burke offered the transcript of an interview Officer McKelvey conducted with Mr. Johnson. The Sheriffs' counsel objected, arguing that the Sheriffs should be permitted to cross-examine the inmate and that testimony about Mr. Johnson's interview had merely repeated what was already in the McKelvey Report.[34] The court admitted the transcript.
ii. Additional legal background
This section presents background on (i) hearsay, (ii) waiver and inadequate briefing, and (iii) forfeiture.
1) Hearsay
"Hearsay is not admissible unless [a federal statute, rule of evidence, or other rule prescribed by the Supreme Court] provides otherwise ...." Fed. R. Evid. 802. Federal Rule of Evidence 801 defines hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). The Rule excludes from this definition several categories of statements, including statements "offered against an opposing party" that were "made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D).
Federal Rule of Evidence 803 sets forth exceptions to the rule against admission of hearsay that apply "regardless of whether the declarant is available as a witness." Two are relevant here.
Rule 803(6) excepts certain business records if:
(A) the record was made at or near the time by-or from information transmitted by-someone with knowledge;
(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
(C) making the record was a regular practice of that activity;
(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
(E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.
Fed. R. Evid. 803(6).
Rule 803(8) excepts a "record or statement of a public office if":
(A) it sets out:
(i) the office's activities;
(ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or *1014 (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and
(B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.
Fed. R. Evid. 803(8).
2) Waiver and inadequate briefing
"Issues not raised in the opening brief are deemed abandoned or waived." In re W. Pac. Airlines, Inc. , 273 F.3d 1288, 1293 (10th Cir. 2001) (quotations omitted). Relatedly, an appellant may waive an issue by inadequately briefing it. See United States v. Brinson , 772 F.3d 1314, 1321 (10th Cir. 2014). "The rules of appellate procedure are designed to facilitate efficient appellate review by allowing one's adversary to respond to focused argument supported by authority." MacArthur v. San Juan Cty. , 495 F.3d 1157, 1160 (10th Cir. 2007). Accordingly, Federal Rule of Appellate Procedure 28(a)(8)(A) "requires the argument section to contain appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Id. (quotations omitted). "Cursory statements, without supporting analysis and case law" are inadequate to preserve an issue. Bronson v. Swensen , 500 F.3d 1099, 1105 (10th Cir. 2007). Although we have discretion to reach the merits of an issue "insofar as the record permits," MacArthur , 495 F.3d at 1161 (quotations omitted), we may "decline[ ] to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief." Bronson , 500 F.3d at 1104.
3) Forfeiture
"[I]f the theory [a party urges on appeal] simply wasn't raised before the district court, we usually hold it forfeited." Paycom Payroll , 758 F.3d at 1203 (quotations omitted). A party forfeits an evidence objection by failing to timely object or move to strike or by failing to "state[ ] the specific ground, unless it was apparent from the context." Fed. R. Evid. 103(a)(1)(B). "The specific ground for reversal of an evidentiary ruling on appeal must be the same as that raised at trial." United States v. Ramirez , 348 F.3d 1175, 1181 (10th Cir. 2003) (quotations and ellipsis omitted). To urge reversal of a forfeited issue, a party must argue plain error. Id. "[F]ailure to argue for plain error and its application on appeal[ ] surely marks the end of the road for an argument for reversal not first presented to the district court." Richison , 634 F.3d at 1131.
iii. Analysis
We affirm the district court's rulings. First, the Sheriffs inadequately briefed their argument that the district court should have excluded the McKelvey Report. Second, they forfeited in district court the argument about the OSBI report they make here, and they have failed to argue plain error. Third, admission of the two transcripts of inmate interviews did not affect their substantial rights because the transcripts were cumulative of the McKelvey Report.
1) The McKelvey Report-Waiver
In response to the Sheriffs' objection at trial, Ms. Burke's counsel argued the McKelvey Report was admissible (1) under Rule 801(d)(2)(D) because Officer McKelvey was an agent of TCSO, regardless of whether it contained hearsay statements of others; (2) under Rule 803(8) as factual findings of a legally authorized investigation even if it contained hearsay; and (3) as a business record under Rule 803(6). The district court accepted all three arguments to overrule the Sheriffs' objection. To prevail on appeal, therefore, the Sheriffs need to show the court erred on each one of *1015 these grounds. Because they challenge only the second ground on appeal, they fail. See United States v. Cerno , 529 F.3d 926, 933 (10th Cir. 2008) ("[A] court need only identify one legitimate basis for its [evidence] ruling ...."); Paul C. Giannelli, Understanding Evidence § 33.01 (3d ed. 2009) (explaining that Rule 803 exceptions may be argued in the alternative).[35]
The Sheriffs' fatal problem is waiver. They fail to address the court's acceptance of Ms. Burke's argument that the statements of an opposing party's agent-here, Officer McKelvey-were admissible against the party even if they contain hearsay statements of others-principally, the CHC medical providers. Nor do the Sheriffs argue that the court erred in admitting the McKelvey Report as a business record. Even assuming the Sheriffs' argument about Rule 803(8) has merit, they have left unchallenged the court's separate reliance on Rules 801(d)(2)(d) and 803(6).[36] We decline to address these bases for the court's ruling because the Sheriffs failed to brief them. See United States v. Burkholder , 816 F.3d 607, 620 n.11 (10th Cir. 2016) ("In our adversary ... system, courts properly answer only the questions that the parties present to them ....").
2) The OSBI Report-Forfeiture
The Sheriffs forfeited their appellate argument on the OBSI Report because they did not make it in district court. They objected in district court that the report contained hearsay statements by "detention officers." App. at 6986. But on appeal, the Sheriffs do not mention detention officers and argue instead the report should have been excluded because it contained summaries of interviews with CHC medical providers, OPD officers, and inmates, and "[n]one of the Owasso police officers, CHC employees[,] or inmates are agents of TCSO." Aplt. Br. at 46. They did not mention these others in district court. The Sheriffs' objection failed to alert the court to the hearsay issue they now argue. See Ramirez , 348 F.3d at 1181. We may therefore review only for plain error. Id. But the Sheriffs "have not sought plain-error review, so we do not undertake that analysis." Equal Emp't Opportunity Comm'n v. JetStream Ground Servs., Inc. , 878 F.3d 960, 963 (10th Cir. 2017).
Even if the Sheriffs' argument was preserved and meritorious, we are not convinced this evidence affected the Sheriffs' substantial rights under Federal Rule of Evidence 103(a). Of the 24 people interviewed for the OSBI Report, 15 had interviews summarized in greater detail in the McKelvey Report. Many of the OSBI Report's summaries were therefore cumulative. The nine OSBI interviewees who were not interviewed for the McKelvey Report included an OPD officer, Mr. Williams's relatives, jail staff, a jail inmate, and CHC medical providers. These interviewees made statements favorable to the Sheriffs,[37] unrelated to Mr. Williams's *1016 medical condition or treatment,[38] or cumulative of the McKelvey Report.[39]
3) Transcript of interview with Mr. Latham
Any error in admitting the transcript of Officer McKelvey's interview with Mr. Latham did not affect the Sheriffs' substantial rights under Federal Rule of Evidence 103(a). According to Mr. Latham's interview, a nurse told Mr. Williams to "quit 'f'ing' faking," App. at 11966, and nurses laughed about how Mr. Williams was faking.[40] Although the McKelvey Report is less detailed, it relates that a nurse told Mr. Williams to "quit faking," id. at 11953, and it faithfully paraphrased other details from the transcript. Compare id. at 11967 (Mr. Latham stating, "They ... told him to get up off the gurney and when he didn't, they just lifted the gurney and dumped him off of it."), with id. at 11953 (McKelvey Report stating, "[T]he detention staff told [Mr.] Williams to get up off the gurney and when he didn't, they just lifted the gurney and dumped him off of it inside the shower.").[41]
4) Transcript of interview with Mr. Johnson
We reach the same conclusion about the transcript of Mr. Johnson's interview. It described a nurse placing food through an opening in Mr. Williams's cell:
[S]he sat it in the bean hole and said "come get it ... come get your dinner[.]" And he said, "I can't get up. I can't get up." ... And she was like, "well, that's a refusal." ... "[T]hat's a refusal [']cause we can't go in and feed him. ..."
Id. at 11978. The McKelvey Report accurately paraphrased Mr. Johnson's account: "Johnson stated that Williams said[,] 'I can't get up[;] I'm thirsty.['] Johnson stated that Nurse Bell said[,] 'Well, that's a refusal' and 'it's against policy to open the door[.]' " Id. at 11952. Because the transcripts and the McKelvey Report are similar and we affirm admission of the report, any error in admitting the transcripts did not "affect[ ] a substantial right" of the Sheriffs. See Fed. R. Evid. 103(a).
*1017 b. Sheriff Glanz's misdemeanors
After Mr. Williams's death, Sheriff Glanz was convicted of two misdemeanors related to his misuse of an official vehicle.[42] The Sheriffs contend the district court erred in admitting "irrelevant and prejudicial" evidence about one of the convictions. Aplt. Br. at 49. But they do not contest on appeal that the conviction was for a crime of dishonesty.
i. Additional procedural background
At trial, Ms. Burke's counsel asked Sheriff Glanz whether he considered himself a "truthful and honest person." App. at 7888. Sheriff Glanz responded, "Absolutely." Id. Counsel then asked, "Could you please explain to the jury, in your own words, whether you have been convicted of a crime involving your dishonesty in your role as a Tulsa County sheriff within the last ten years?" Id.
The Sheriffs objected. Citing Federal Rule of Evidence 609, Ms. Burke's counsel explained that he sought to use one of Sheriff Glanz's convictions to impeach his character for truthfulness. The court requested information about the convictions. Ms. Burke's counsel said about one of them, "I received a copy from the Tulsa County courthouse today of a certified copy of Mr. Glanz's plea in that matter. I've provided it to defense counsel at the side bar and he's reviewing it, and I'd ask the court to please review the same." Id. at 7890.
The Sheriffs' counsel argued the conviction "has to do with [Sheriff Glanz's] misunderstanding the use of a county vehicle," id. , and was "not [a] crime or conviction on your character for truthfulness," id. at 7891. The court disagreed, saying, "it's [Rule] 609(a)(2)[,] and I think it applies." Id.
Ms. Burke's counsel repeated his question, and Sheriff Glanz responded, "I pled guilty to a charge of using a county-owned vehicle while I was doing police work, and it was interpreted by a Grand Jury that I should have been driving a car that was-I was funded to drive while I was attending county meetings." Id.[43]
ii. Additional legal background
Federal Rule of Evidence 609 provides for the admission of certain criminal convictions to "attack[ ] a witness's character for truthfulness." The court "must " admit evidence of a conviction "if the court can readily determine that establishing the elements of the crime required proving-or the witness's admitting-a dishonest act or false statement." Fed. R. Evid. 609(a)(2) (emphasis added). "[C]rimes such as perjury or subor[ ]nation of perjury, false statement, criminal fraud, [or] embezzlement" and "those crimes characterized by an element of deceit or deliberate interference with the truth" are per se crimes of dishonesty or false statement. United States v. Mejia-Alarcon , 995 F.2d 982, 989 (10th Cir. 1993) (quotations omitted). "[C]rimes like burglary, robbery, and theft" fall outside the per se category. Id. ; see also United States v. Dunson , 142 F.3d 1213, 1215 (10th Cir. 1998). But "we have suggested that the trial court may look beyond the elements of an offense that is not considered a per se crime of dishonesty to determine whether the particular conviction rested upon facts establishing dishonesty or false statement." Mejia-Alarcon , 995 F.2d at 989-90.
*1018 Federal Rule of Evidence 402 provides that "[i]rrelevant evidence is not admissible." Rule 401 defines relevant evidence as evidence that "has any tendency to make" a "fact ... of consequence in determining the action" "more or less probable than it would be without the evidence." Under Rule 609, evidence of a witness's prior conviction is relevant because it bears on the witness's credibility. See United States v. Howell , 285 F.3d 1263, 1268 (10th Cir. 2002) (referring to Rule 609(a)(1) ).
Federal Rule of Evidence 403 provides, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." This rule does not apply to evidence of prior convictions admitted under Rule 609(a)(2), which states, "[T]he evidence must be admitted if the court can readily determine that establishing the elements of the crime required proving-or the witness's admitting-a dishonest act or false statement." "Most courts [have] held that the trial court lacked discretion under Rule 403 to exclude crimes of dishonesty." 4 Mark S. Brodin et al., Weinstein's Federal Evidence § 609.04[1] (2d ed. 1997 & 2019 update); see also United States v. Guardia , 135 F.3d 1326, 1329 (10th Cir. 1998) (providing Rule 609(a)(2) as an example of "when the drafters of the federal rules of evidence alter the 403 balancing test or make it inapplicable to certain evidence").
iii. Analysis
The Sheriffs argue the district court's ruling permitted "irrelevant and prejudicial matters before the jury in violation of [ Rules] 401 and 403." Aplt. Br. at 49. In describing the procedure in district court, the Sheriffs say the court "seemingly agree[d] with [Ms. Burke] that the crime was one of 'dishonesty.' " Id. If that is so, the court must have determined that the conviction was for a crime of dishonesty when it admitted the evidence under Rule 609(a)(2). Because the Sheriffs do not dispute this determination in their opening brief, we must regard Sheriff Glanz's conviction as having required proof or admission of "a dishonest act or false statement." Fed. R. Evid. 609(a)(2).[44]
The Sheriffs urge only that the evidence was irrelevant and prejudicial. These arguments fail. Rule 609(a) provides that evidence of a conviction "must be admitted if the court can readily determine that establishing the elements of the crime required proving-or the witness's admitting-a dishonest act or false statement." Fed. R. Evid. 609(a)(2) (emphasis added). The conviction is relevant to Sheriff Glanz's "character for truthfulness" under Federal Rule of Evidence 401.
As for the Sheriffs' prejudice point, admission of evidence under Rule 609(a)(2) is not subject to the Rule 403 balancing test.
*1019 See Guardia , 135 F.3d at 1329 (providing Rule 609(a)(2) as an example of a "rare instance[ ]" of a Federal Rule of Evidence providing that Rule 403 does not apply); 4 Brodin et al., Weinstein's Federal Evidence § 609.04[1]. Accordingly, the Sheriffs have not shown the district court erred.
c. Mr. Williams's background
The Sheriffs argue the district court erred by refusing to admit evidence about Mr. Williams's mental health history and alleged childhood abuse. They contend this evidence should have been admitted under Federal Rule of Evidence 405 as "specific instances of conduct" to prove Mr. Williams's character. Aplt. Br. at 51. We affirm because the Sheriffs forfeited this argument in district court and waived it here by failing to argue plain error.
i. Additional procedural background
Ms. Burke called Mr. Williams's brother Kevin Williams to testify. Kevin testified that he was close with Mr. Williams, who "loved his family." App. at 9031. He testified that his brother had served in the military, was hardworking, was active in his church, and wanted to become a minister. He concluded by saying his brother was "blessed." Id. at 9036. The Sheriffs did not object to this testimony.
At the end of Kevin's direct examination, the parties conferred with the court at a bench conference. The Sheriffs' counsel argued the direct examination had opened the door to evidence about Mr. William's alleged history of mental illness and suicide attempts, troubled family relationships, and discharge from the military for psychiatric reasons. The Sheriffs further contended such evidence was within the scope of cross-examination and was relevant to damages because it implicated Mr. Williams's earning capacity. They sought to "refute the idea that he could retire at 40," "that he was a pastor in a church," and "that he was a generous leader." Id. at 9056. The Sheriffs did not cite Rule 405. The district court denied this proposed cross-examination.[45]
ii. Additional legal background
Federal Rule of Evidence 611(b) provides, "Cross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility. The court may allow inquiry into additional matters as if on direct examination."
Federal Rule of Evidence 405 addresses methods of proving character. It provides that "[o]n cross-examination of [a] character witness, the court may allow [an] inquiry into relevant specific instances of the ... conduct" of the person about whose character the witness has testified. Fed. R. Evid. 405(a).
iii. Analysis
The Sheriffs have waived their argument on this issue by failing to urge on appeal the arguments they made in the district court and by making a new argument here without arguing plain error.
In district court the Sheriffs argued that their proffered evidence was: (1) relevant to damages and (2) within the scope of direct examination. On appeal, they do not argue the evidence's relevance to damages and thus have waived this argument. See United States v. Yelloweagle , 643 F.3d 1275, 1280 (10th Cir. 2011) ("[W]here [an appellant] raises an issue *1020 before the district court but does not pursue it on appeal, we ordinarily consider the issue waived."). And although they refer to the district court's denial of "cross-examination," Aplt. Br. at 52, they fail to cite Rule 611(b) or any other authority regarding permissible cross examination based on the scope of direct examination and thus have waived their second district court argument due to inadequate briefing. See MacArthur , 495 F.3d at 1160.
In their opening brief to this court, the Sheriffs cite only Federal Rule of Evidence 405. See Aplt. Br. at 52. But in district court, they did not refer to character evidence or cite this rule, much less describe its application to their proffered evidence. "When a district court restricts cross-examination at trial, the party seeking to cross-examine forfeits a challenge on appeal by failing to state the ground for objection, stating a different ground at trial than on appeal, or by failing at trial to object to the limitation at all." United States v. Roach , 896 F.3d 1185,1192 (10th Cir. 2018) (citations omitted). Accordingly, the Sheriffs must argue plain error, see id. , but they have not, "so we do not undertake [a Rule 405 ] analysis." Equal Emp't Opportunity Comm'n , 878 F.3d at 963 ; see also Roach , 896 F.3d at 1192.
d. Insurance coverage
The Sheriffs argue the district court (1) improperly admitted evidence about CHC's "indemnification" in violation of Federal Rule of Evidence 411, which forbids reference to insurance to prove negligence or wrongful action, and then (2) improperly denied a mistrial. The testimony at issue referred to a non-party's insurance coverage. Even if the district court erred in admitting the evidence, the error did not affect the Sheriffs' substantial rights under Rule 103(a). We also conclude the court did not err in denying a mistrial.
i. Standard of review
In addition to the standard of review set forth above, "[w]e review the district court's denial of a motion for mistrial for abuse of discretion. In deciding whether the court abused its discretion, we assume that the trial judge is in the best position to determine whether an incident was so serious as to warrant a mistrial." Rios v. Bigler , 67 F.3d 1543, 1550 (10th Cir. 1995) (quotations and citations omitted).
ii. Additional procedural background
At trial, Officer McKelvey testified that he "steered" the investigation into Mr. Williams's death "to put blame towards the medical provider." App. at 7215. Ms. Burke's counsel asked, "[D]o you know why that ... was something ... [TCSO] wanted to achieve during these investigations ...?" Id . Officer McKelvey answered that steering the investigation to assign blame to CHC was "[f]or indemnification purposes." Id. at 7216. Ms. Burke's counsel then sought clarification:
Q. So that they didn't have to pay for it, the medical provider did-
MR. FORTNEY: Objection; speculation.
Q. ...-if there was liability. Is that what you mean by-
THE COURT: Sustained.
Q.... Can you tell the jury what you mean by "indemnification"?
A. My understanding-
MR. FORTNEY: Objection.
THE COURT: Overruled.
A. My understanding is that is where the insurance company has a-the medical company has an insurance provider that if blame[ ] [is] found *1021 to be with the medical provider, their insurance would pay damages.
Id.
After this exchange, the parties conferred at the bench with the court. The Sheriffs' counsel said, "I don't know that I have an objection." Id. at 7217. But he then objected, citing grounds other than Rule 411. The court overruled the objection. After a lunch break, the Sheriffs moved for a mistrial, arguing that Ms. Burke had deliberately elicited evidence inadmissible under Rule 411. The court denied the motion without explanation but said it would consider a limiting instruction.
iii. Additional legal background
Federal Rule of Evidence 411 provides: "Evidence that a person was or was not insured against liability is not admissible to prove whether the person acted negligently or otherwise wrongfully. But the court may admit this evidence for another purpose, such as proving a witness's bias or prejudice or proving agency, ownership, or control." "This rule has its basis in the belief that such evidence is of questionable probative value or relevance and is often prejudicial." Charter v. Chleborad , 551 F.2d 246, 248 (8th Cir. 1977). Specifically, the rule vindicates "the feeling that knowledge of the presence or absence of liability insurance would induce juries to decide cases on improper grounds." Fed. R. Evid. 411, advisory committee's notes to 1972 proposed rules.
"Inadvertent references to insurance ... are not generally grounds for mistrial or reversal." Rios , 67 F.3d at 1550 (quotations omitted). But a mistrial is warranted where "counsel's comments were ... a deliberate strategic choice to try to influence and enhance damages by referencing an impersonal deep-pocket insurer." Ventura , 825 F.3d at 885 (quotations omitted) (describing repeated efforts to introduce evidence of insurance at trial and reference to insurance in closing argument).
The First Circuit has held that a mistrial was not warranted when the testimony about insurance did not relate to a party's insurance coverage and did not refer to a type of insurance that "could, even implicitly, go to [the adverse party's] negligent or wrongful actions." Pinkham v. Burgess , 933 F.2d 1066, 1072 (1st Cir. 1991).
iv. Analysis
Even if we assume (1) the Sheriffs preserved their Rule 411 objection and timely moved for a mistrial, and (2) the district court erred in admitting the insurance testimony, we affirm.
The Sheriffs contend that prejudice to them "is readily apparent in the jury's award of $10,000,000." Aplt. Br. at 53. We disagree. Officer McKelvey's testimony suggested that CHC, a non-party, was insured, not that the Sheriffs were. The Sheriffs do not explain why the jury would have awarded a larger verdict against them because CHC had insurance. Nothing in the record suggests the jury did so. Any error did not "affect[ ] a substantial right" of the Sheriffs. See Fed. R. Evid. 103(a).
We further conclude the district court did not err in denying a mistrial. Because Officer McKelvey testified to a non-party's insurance and because counsel's questions about insurance were not part of a repeated effort to introduce the issue of insurance to the jury, the district court did not abuse its discretion in determining that the testimony was insufficiently "serious as to warrant a mistrial." Rios , 67 F.3d at 1550 (quotations omitted).
e. Branstetter email
The Sheriffs contend the district court erred in admitting hearsay in an *1022 email from an outside federal agency describing conditions in the jail. They have waived this issue due to inadequate briefing.
i. Additional procedural background
Ms. Burke's counsel sought to admit an email that Paul Branstetter, an ICE officer, sent to TCSO Undersheriff Brian Edwards several weeks before Mr. Williams's death. It summarized a "closeout" meeting after staff from the Department of Homeland Security's Office for Civil Rights and Civil Liberties "came to the jail [and] did an inspection." App. at 7843. The email noted several deficiencies in the jail's medical care.
The Sheriffs objected, arguing the email was inadmissible hearsay and was not covered by any exception. The court overruled the objection, saying that the email "provide[s] notice to the Tulsa County Sheriff's Office of findings of widespread indifference in medical staff just shortly before Mr. Williams'[s] death .... And it also comes in as a business record under 803(6)." Id. at 7846.
After the email was admitted, Ms. Burke's counsel asked Sheriff Glanz about it:
Q. So about a month before [Mr. Williams's] death, we've got the federal government telling you that there's a 'prevailing attitude of indifference among the clinic staff.' Correct?
A. Yes, sir. They also say, facility is generally clean and well kept. Nothing of immediate danger, but found some things needed corrected-need corrected.
Id. at 7847. Ms. Burke's counsel then asked whether the email prompted any policy changes. Sheriff Glanz stated that the email prompted TCSO to hire an outside physician-Dr. Howard Roemer-to evaluate the medical care at the jail.
ii. Analysis
The district court admitted the email on the independent grounds that it (1) provided notice to the Sheriffs of problems with the jail's medical staff and (2) qualified for Rule 803(6) 's business record hearsay exception. The Sheriffs do not dispute that the email was relevant to notice, nor do they discuss Rule 803(6) in their opening brief except to provide procedural background.[46] Rather, they argue, "There is no exception to the hearsay rule [that] would allow the introduction of the email or examination of its contents." Aplt. Br. at 54. Evidently anticipating an alternative ground for affirmance, the Sheriffs assert that "[i]t is not a public record" under Rule 803(8), id. , and that Sheriff Glanz was "not a proper witness to lay any foundation for the admission" of the email, Aplt. Reply Br. at 15. The Sheriffs' briefing on this issue is inadequate. See MacArthur , 495 F.3d at 1160.
f. Wyrick memo and testimony
The district court admitted an email Assistant District Attorney Andrea Wyrick wrote to Josh Turley in TSCO's "Risk Management" office. Ms. Wyrick then testified about the email. The email urged that TCSO "conduct an internal audit/investigation of [CHC] in our own jail to make sure they are complying with the contract." App. at 12278. She recommended against "ignor[ing] any and all signs we receive of possible issues or violations of our agreement with them for services in the jail." Id.
The Sheriffs argue the email was a privileged attorney-client communication and *1023 the district court erred in admitting it and Ms. Wyrick's related testimony. Because the Sheriffs have failed to show the email was privileged, we affirm.
i. Additional procedural background
Before Ms. Wyrick took the stand, the Sheriffs anticipated Ms. Burke would examine her about the email and objected to Ms. Burke's "calling of [Ms. Wyrick] with regard to any attorney-client issues or discussions about" her email to Mr. Turley. Id. at 8551. Ms. Burke's counsel responded that any privilege had been waived because CHC-not the Sheriffs-had produced the email in discovery. The court instructed the parties to proceed with questioning Ms. Wyrick.
While questioning Ms. Wyrick, Ms. Burke moved for admission of the email. The Sheriffs' counsel stated, "We object per my objection at the bench," referring to the conference before Ms. Wyrick took the stand. Id. at 8557. The court overruled the objection. After the court admitted the email, the Sheriffs continued to object to questions about it until the district court admonished them. Ms. Burke's counsel asked Ms. Wyrick to explain the context of the email. Ms. Wyrick generally answered that she could not recall.
ii. Additional legal background
In federal court, federal common law "governs a claim of privilege" regarding a federal claim or defense. See Fed. R. Evid. 501. The attorney-client privilege aims "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." United States v. Jicarilla Apache Nation , 564 U.S. 162, 169, 131 S.Ct. 2313, 180 L.Ed.2d 187 (2011) ; see also In re Grand Jury Proceedings , 616 F.3d 1172, 1182 (10th Cir. 2010). "A party claiming the attorney-client privilege must prove its applicability, which is narrowly construed." In re Foster , 188 F.3d 1259, 1264 (10th Cir. 1999).
"[A] party waives the privilege when he voluntarily discloses to a third party material or information that he later claims is protected." In re Grand Jury Proceedings , 616 F.3d at 1184 ; see also United States v. Bump , 605 F.2d 548, 551 (10th Cir. 1979). "Any voluntary disclosure by the client to a third party waives the privilege not only as to the specific communication disclosed, but often as to all other communications relating to the same subject matter." United States v. Jones , 696 F.2d 1069, 1072 (4th Cir. 1982) ; see also United States v. Cote , 456 F.2d 142, 144-45 (8th Cir. 1972).
iii. Analysis
The district court did not err. Ms. Burke claimed she obtained the email from CHC, which indicates that the Sheriffs disclosed it to a third party. The Sheriffs in turn failed to show they had kept the email confidential. Ms. Burke's counsel's questions to Ms. Wyrick were within the scope of the Sheriffs' waiver of attorney-client privilege.[47]
g. Redirect examination of Chief Robinette and memo about Dr. Adusei
The jury heard testimony from TCSO Detention Chief Deputy Michelle *1024 Robinette, who until shortly before trial, oversaw "the operations of the day-to-day runnings of the [jail]." App. at 9671. During her testimony, the court admitted a memorandum alleging misconduct against Dr. Andrew Adusei, who replaced Dr. Phillip Washburn as the jail's medical director after Mr. Williams's death. Ms. Burke's counsel asked Chief Robinette about the memorandum. The Sheriffs argue the testimony and the memorandum were "highly prejudicial" and should have been excluded under Federal Rules of Evidence 403, 404, and 407. Aplt. Br. at 56.
i. Additional procedural background
On cross-examination of Chief Robinette, the Sheriffs' counsel asked about CHC's March 2012 "Corrective Action Review" concerning the attitudes of medical staff in the jail, including indifference:
Q. When you were in the jail interacting with the medical staff, did you ever see an attitude of indifference?
A. No, sir.
App. at 10180. Counsel then asked whether Dr. Harnish or Dr. Washburn exhibited indifference toward patients. Chief Robinette said no.
On redirect, Ms. Burke's counsel asked whether Chief Robinette remembered "in the middle of 2012 that [she] had to have the medical director[, Dr. Adusei,] investigated for stabbing inmates in the neck with placebo injections because he thought they were faking psychosomatic issues." Id. at 10181. The Sheriffs' counsel objected, arguing that Dr. Adusei was not hired until after Mr. Williams's death. Counsel also pointed to the district court's prior ruling that evidence of Dr. Adusei's actions was irrelevant. Ms. Burke's counsel argued that the cross-examination questions about attitudes of indifference opened the door to impeachment of Chief Robinette with questions about Dr. Adusei. Id. at 10188-89. The court overruled the objection. Id. at 10189.
During redirect examination, Ms. Burke moved to admit a memorandum addressed to Chief Robinette and describing Dr. Adusei's alleged misconduct.[48] The memo said Dr. Harnish, the jail's psychiatrist, reported that Dr. Adusei "has been giving inmates injections in their jugular veins" and that he gave an inmate a placebo injection, gave methadone to a pregnant inmate, and released an inmate from suicide watch without consulting Dr. Harnish. Id. at 12276. The court admitted the memo over the Sheriffs' objection.
ii. Additional legal background
"Any party, including the party that called the witness, may attack the witness's credibility." Fed. R. Evid. 607. "Impeachment can be accomplished in a number of ways, including contradiction, which occurs when an opposing party endeavors to show that a fact to which the witness has testified is not true." Cerno , 529 F.3d at 934. Evidence is relevant for this purpose when "the jury could ... infer[ ]" from it that the witness's statement was false. Id. The contradiction may be "indirect[ ]." Id.
Evidence admitted to contradict a witness's testimony, rather than to prove action in conformity with a character trait, is not subject to exclusion under Federal Rule of Evidence 404. Id. at 936-37. A limiting instruction may nonetheless be appropriate. Id . Evidence contradicting a witness's statement is subject to exclusion under Federal Rule of Evidence 403. See id. at 935.
*1025 Federal Rule of Evidence 407 provides, "When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove" negligence or culpable conduct.
iii. Analysis
The testimony and memorandum about Dr. Adusei's actions were relevant to impeaching Chief Robinette's statement that she had never seen attitudes of indifference among the medical staff. The jury could infer from the memo that Dr. Adusei's attitude of indifference was so pronounced that Chief Robinette would have seen it in her role supervising "day-to-day" operations of the jail. Although reasonable jurists could debate this point, it was not an abuse of discretion for the district court to determine that the memo provided indirect evidence of contradiction. See Cerno , 529 F.3d at 934.
The Sheriffs did not cite Rules 403, 404, or 407 in district court, let alone describe their application to the memo or Chief Robinette's testimony about it. Nor do they argue plain error. Accordingly, we do not consider the Sheriffs' argument that these rules barred admission of the testimony. See Richison , 634 F.3d at 1131.
If we thought the district court erred in admitting the memorandum and permitting Ms. Burke's questions about it, we would nonetheless conclude that the Sheriffs' substantial rights were not affected. See Fed. R. Evid. 103(a). The memo and the testimony concerned the actions of a doctor who was not working at the jail when Mr. Williams died. Further, Dr. Adusei's reported actions-giving jugular injections, prescribing placebos, and methadone, and failing to consult with the jail's psychiatrist-were unlike the claims of neglect that Ms. Burke presented to the jury.
* * * *
We affirm the evidentiary rulings the Sheriffs challenge on appeal.
4. Closing Argument
The Sheriffs also argue they are entitled to a new trial because Ms. Burke's counsel engaged in improper closing argument. Although some of counsel's comments may have been improper, the district court did not abuse its discretion when it denied the Sheriffs' motion for a new trial on this ground.[49]
a. Additional procedural background
i. Counsel's allegedly improper statements during closing argument
On appeal, the Sheriffs challenge several of opposing counsel's closing argument statements. They contend the statements (1) encouraged the jury to award damages to deter future constitutional violations, (2) contradicted the evidence, (3) urged the jury to disregard the court's instructions, (4) asked the jury to imagine themselves in Mr. Williams's position, and (5) expressed counsel's personal opinions. We describe the contested statements in our analysis below.
ii. District court ruling
After trial, the Sheriffs jointly filed a motion under Federal Rule of Civil Procedure 59(a) arguing Ms. Burke's counsel's inflammatory closing argument had improperly influenced the verdict. The *1026 district court denied the motion. It "disagree[d]" that "plaintiff's counsel improperly inflamed the jury during closing argument." App. at 6651. It said that even if the remarks had been improper, three jury instructions defused any prejudice: (1) counsel's arguments were not evidence; (2) compensatory damages could be awarded only for injuries "the Plaintiff has proven by a preponderance of the evidence" that "were the direct result of conduct by a Defendant in violation of Mr. Williams's Constitutional rights"; and (3) compensatory damages "may not be based on speculation or sympathy." Id. (quoting jury instructions). The court stated it had "no reason to conclude that any juror failed to heed those instructions." Id.
b. Standard of review
We review the denial of a Rule 59(a) motion for abuse of discretion. Hill , 815 F.3d at 657. "A district court abuses its discretion if it made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." Id. (quoting ClearOne Commc'ns, Inc. v. Biamp Sys. , 653 F.3d 1163, 1178 (10th Cir. 2011) ).
c. Legal background
"[C]ourts must exercise great caution in setting aside a jury's verdict due to an improper argument." Racher v. Westlake Nursing Home Ltd. P'ship , 871 F.3d 1152, 1168 (10th Cir. 2017) (quotations omitted). "Even if some statements exceeded the bounds of permissible argument, a judgment will not be disturbed unless it clearly appears that the challenged remarks influenced the verdict." Id. (quotations omitted). In Whittenburg v. Werner Enterprises , 561 F.3d 1122 (10th Cir. 2009), we identified "three separate factors, long used to mark the boundaries between when a new trial is and is not required." Id. at 1131.
In general, these three factors require courts to compare the propriety of the challenged remarks against the weight of the evidence adduced at trial. See Ventura v. Kyle , 825 F.3d 876, 885 (8th Cir. 2016) (applying Whittenburg framework). An attorney's improper commentary does not end the inquiry. See Whittenburg , 561 F.3d at 1131. Rather, the inappropriate remarks must be substantial enough to undermine our faith that the jury's verdict was fairly obtained. See id. ("That counsel's closing remarks were improper is one thing; that they rise to the high level required to merit reversal under our case law is quite another.").
First, we consider the extent of the improper remarks: "[A] stray improper remark in closing is no basis for upsetting a trial and requiring the parties and district court to redo their ordeal." Id . By contrast, counsel's "repeated efforts" to use improper arguments to increase a damages award will weigh in favor of a new trial. See Ventura , 825 F.3d at 885. For example, in Whittenburg , we ordered a new trial because the plaintiff's counsel recited an "imagined letter" in which the defendants confessed to "improperly [taking] this case to trial" and "spen[ding] vast sums of money to avoid responsibility." 561 F.3d at 1129. Through this "letter," counsel improperly "devot[ed] approximately a quarter of his closing argument ... to vituperative attacks on defendants and their counsel." Id.
Second, we consider whether the district court took curative action: "We have held curative instructions-issued promptly after the improper argument and specifically addressing the precise impropriety complained of-can go far in erasing prejudice occasioned by an improper remark." Id.
Third, in evaluating whether improper comments warrant a new trial, we consider whether the apportionment of liability *1027 and size of the damage award-whether it is "large or excessive"-indicate the remarks had a prejudicial effect. Id . at 1132. In Racher , we held a new trial was not warranted for counsel's improper statements that asked for a verdict based on deterrence. 871 F.3d at 1171. We explained, "the jury could have found that [the victim] was abused on a daily basis for a period of approximately three and a half years" and "the evidence might also have supported a much larger verdict [than $1.2 million]." Id. at 1172.
Whether the comments were so egregious as to warrant a new trial "is not based on any one of these factors singly, but rather their combination after considering the argument as a whole." Whittenburg , 561 F.3d at 1133. Courts also consider "the weight of the evidence" as part of this analysis. Ventura , 825 F.3d at 885 (applying Whittenburg framework). In Ventura , the Eighth Circuit held a new trial was warranted after counsel repeatedly made improper references to the defendant's insurance coverage, the judge did not offer a curative instruction, and, although the damages award was "not beyond the bounds of rationality," the case was so close that the jury could not reach a unanimous verdict. Id.
d. Analysis
Applying the Whittenburg factors, the following (1) identifies the statements that may have been improper[50] and their pervasiveness, (2) evaluates the district court's curative actions, and (3) analyzes the size of the verdict relative to the statements. Balancing these factors, we conclude the district court did not err when it denied a new trial.
As previously explained, Ms. Burke presented sufficient evidence of subordinates' violations of Mr. Williams's constitutional rights and Sheriff Glanz's prolonged failure to remedy deficient medical services at the jail, together resulting in Mr. Williams's death. Based on this evidence, the Sheriffs face an uphill battle to demonstrate the damages verdict was so "large or excessive," Whittenburg , 561 F.3d at 1132, to be the product of counsel's improper comments and to warrant a new trial.
i. First Whittenburg factor-Extent of improper remarks
The first Whittenburg factor concerns the pervasiveness of improper remarks. In this section, we provide additional legal background on the types of statements the Sheriffs allege were improper, describe the statements, determine which ones may have been improper, and examine their pervasiveness.[51]
1) Statements urging the jury to award damages for deterrence
The Sheriffs argue Ms. Burke's counsel "ask[ed] the jury to base the damages *1028 award on the core concepts of retribution and deterrence." Aplt. Br. at 21. We conclude that many of the statements the Sheriffs point to under this category were not improper and assume without deciding that several others may have been improper.
2) Additional legal background
"We recognize the potential prejudice posed by arguments that invite the jury to award damages based on punishment or deterrence when only compensatory damages are at issue." Racher , 871 F.3d at 1169. "But such arguments are appropriate when the law and the evidence place the issue of punitive damages before the jury." Id. ; see Spulak v. K Mart Corp. , 894 F.2d 1150, 1155-56 (10th Cir. 1990) ; see also Settlegoode v. Portland Pub. Schls. , 371 F.3d 503, 519 & n.13 (9th Cir. 2004) (finding proper a remark in which counsel asked the jury "to use this opportunity to give some power, some breathing room to those who want to make things better" because punitive damages were at issue (quotations omitted)).
3) Contested statements
In closing argument, Ms. Burke's counsel discussed the jury's role in ensuring future inmates would not be subjected to the treatment Mr. Williams suffered. Counsel stated,
• "Your job is to send a message with compensatory damages that no one ever has to experience that again." App. at 10617.
The Sheriffs did not object.
• "You can act on that power, you can make a decision, you can prevent this, you can deter this from happening with your decision so that somebody doesn't have to go through what Elliott Williams went through, so another family like Elliott Williams' family doesn't have to sit here and listen ...." Id. at 10629.
The district court sustained the Sheriffs' objection.
• "This case is about something that is repulsive to decent minds. This is a case about society, civilized society, versus cruelty. Society versus the reprehensible." Id. at 10702.
The Sheriffs did not object.
• "The only way to [hold the County accountable] is to award a verdict of historical significance." Id. at 10704.
The Sheriffs did not object.
• "When you're back in your room deliberating, I would ask that you remember this passage from Psalms: Commit your way to the Lord. Trust in him, and he will act. He will make your vindication shine like the light and the justice of your cause as the noonday." Id. at 10704.
The district court overruled the Sheriffs' objection.
• "Vindication and justice is what we seek from you here today." Id. at 10704.
The district court overruled the Sheriffs' objection.
• "And you, as the jury, must do something that Elliott Williams was unable to do. Leave his legacy. And how do you leave a legacy for Elliott Williams? .... You do it by rendering a verdict commensurate with the injustice that has incurred [sic]. A jury award of five or ten million dollars will not have an impact on the Tulsa County Sheriff's Department." Id. at 10705.
The district court overruled the Sheriffs' objections.
• "[The] Administration will continue to pass the buck down the line .... They will continue to avoid responsibility[, *1029 ] lie when it is convenient[,] and have convenient amnesia when anyone attempt to elicit the truth from them. The good ol' boy system will prevail, and people will continue to suffer and die in vain." Id. at 10708-09.
The district court overruled the Sheriffs' objections.
• "You are the only people with an opportunity to fix this broken system. ... Make your decision here part of your legacy." Id. at 10709.
The district court overruled the Sheriffs' objection.
Counsel later asked the jury to award $51 million in damages for pain and suffering-$1 million for every hour Mr. Williams spent in Medical Cell 1.
d) Analysis
Most of counsel's remarks in this category were not improper. Counsel asked the jury to recognize and compensate for the severe harm Mr. Williams suffered. He highlighted the "cruelty" of his treatment, called for "vindication" and "justice," id. at 10704, and requested a verdict "commensurate with the injustice that has incurred [sic]," id. at 10705. These comments invoked themes-"justice" for a wrongdoer and "vindication" for a victim-that are commonplace in courtroom argument. "[C]losing argument need not, nor should, be a sterile exercise devoid of passion. Parties are entitled to have someone speak with eloquence and compassion for their cause. Arguments may be forceful, colorful, or dramatic, without constituting reversible error." Whittenburg , 561 F.3d at 1133 (quotations and citations omitted).[52] Nonetheless, some of counsel's comments arguably went further.
Counsel asked the jury to use their award not only to compensate for Mr. Williams's injuries but also to deter future constitutional violations. In general, references to deterrence and systemic correction are not necessarily improper when, as here, the jury was instructed to consider whether to award punitive damages. See Racher , 871 F.3d at 1169. We have not previously addressed the limits of permissible comments in this circumstance. A few of counsel's remarks may have crossed the line.
In particular, counsel appeared to ask the jury twice to base its award of compensatory damages on deterrence. Counsel stated, "Your job is to send a message with compensatory damages that no one ever has to experience that again," App. at 10617 (emphasis added); and, "A jury award of five or ten million dollars will not have an impact on the Tulsa County Sheriff's Department ." Id. at 10705 (emphasis added). The first statement explicitly linked deterrence to compensatory damages rather than punitive damages. The second urged deterrence against the TCSO, which, as a municipal entity, is immune from punitive damages. See City of Newport v. Fact Concerts, Inc. , 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). We assume without deciding that these two remarks were improper.
4) Statements contrary to the evidence
The Sheriffs also contend Ms. Burke's counsel "took liberties with the evidence," Aplt. Br. at 25, to paint Mr. Williams in a favorable light. We conclude the contested statements were not improper. In closing argument, "counsel must confine comments to evidence in the record *1030 and to reasonable inferences from that evidence." Whittenburg , 561 F.3d at 1128-29. The Sheriffs point to the following passages in which Ms. Burke's counsel described Mr. Williams:
• "[Mr. Williams] really wanted to preach. He wanted to serve the ministry. He was in the process of doing that. He wanted to be with his family at their church. ... He was 37 years old when this happened. He had never been convicted of a felony. His mom had stage 4 cancer." App. at 10603.
The Sheriffs objected and the district court told Ms. Burke's counsel to "[m]ove on." Id.
• "He certainly wasn't a raving lunatic as the defense tried to portray in their opening statements. He was just a guy who had eight siblings and a mom and a dad and a wife who he had been having a hard relationship with." Id. at 10604.
The Sheriffs' objection-that counsel's statement was "not in evidence"-was sustained. Id.
The Sheriffs have not shown these comments about Mr. Williams's background were improper. The remarks were consistent with testimony from Mr. Williams's brother Kevin, that Mr. Williams "wanted to go full-time into the ministry to help [his] mother and father." Id. at 9032. Kevin also related that their mother had been diagnosed with "stage IV cancer," that Mr. Williams had undertaken ministry and service activities at his family's church, and that "[Mr. Williams] rushed his plan to go full-time into ministry" to "be there for [his mother]." Id. at 9031-35.
As to Mr. Williams's family relationships, Kevin Williams testified that "he was having problems with his wife" and had "fallouts with his father." Id. at 9034. Despite the district court's sustaining the Sheriffs' objection that these statements were "not in evidence," we find support in the record for counsel's remarks. See id. at 9031-36. Accordingly, we conclude these statements were not improper.
5) Statements urging the jury to disregard the court's instructions
Courts have held that counsel may not "[a]sk[ ] the jury to totally disregard instructions given by the court." State v. McCorkendale , 267 Kan. 263, 979 P.2d 1239, 1252 (1999) ; see also Ceja v. Adams , No. 1:17-cv-00291-LJO-SKO (HC), 2018 WL 5921320, at *41-42 (E.D. Cal. Nov. 13, 2018) (recognizing that counsel may not urge the jury "to disregard the law or instructions," but may "emphasize that, when evaluating the evidence ... the jury not lose sight of their common sense").
At trial, Ms. Burke's counsel stated to the jury:
Now, you've been read a set of jury instructions and you're going to take those jury instructions back with you, and they're going to confuse you, I promise, because they confuse 99 percent of the attorneys out there, and that's what we do every day. Don't get overwhelmed with the jury instructions. ... It doesn't take a lot to know that Mr. Williams' civil rights were violated in this case.
App. at 10703. The Sheriffs' objection was overruled.
Although some attorney commentary on jury instructions may be proper, see, e.g. , Ceja , 2018 WL 5921320, at *41-42, we assume without deciding that this remark was improper.
6) Statements violating the Golden Rule
Under the "Golden Rule," it is impermissible "(1) to ask jurors how much the loss of the use of their legs would mean to them, ... ; (2) to tell jurors 'do *1031 unto others as you would have them do unto you,' ... ; or (3) to tell jurors, in a reverse golden rule argument, 'I don't want to ask you to place yourself in [the plaintiff's] position.' " Caudle v. District of Columbia , 707 F.3d 354, 359 (D.C. Cir. 2013) (citations and quotations omitted); see also, e.g. , Beene v. Ford Motor Co. , 513 F. App'x 755, 761-62 (10th Cir. 2013) (unpublished) (asking the jury to "put themselves in Plaintiff's position" violates the "Golden Rule").
The Sheriffs allege the following statement violated the Golden Rule:
I mean, I can't imagine the nightmare that would be, to not be able to move, to be lying in your own feces, and not have the use of your hands and your arms, not be able to situate your body, to roll, to move, something, to make your pain a little less. ... I can't imagine a more terrifying situation than that.
App. at 10616-17. The Sheriffs did not object.
Counsel did not directly invite the jurors to imagine themselves in Mr. Williams's position. This passage instead could be read as permissible comment on Mr. Williams's injuries. See id . at 10606. Also, the Sheriffs' failure to object may have forfeited this issue. We nonetheless assume without deciding that the statement was improper.
7) Statements expressing counsel's own opinion
"A lawyer shall not in trial state a personal opinion as to the justness of a cause, the credibility of a witness, or the culpability of a civil litigant." Whittenburg , 561 F.3d at 1130 (quotations and alterations omitted); see also Polansky v. CNA Ins. Co. , 852 F.2d 626, 627-28 (1st Cir. 1988) (holding statements from counsel such as "in my opinion," "it wasn't convincing to me," and "I don't believe" were improper). But not every attorney opinion is necessarily improper. See United States v. Grabiec , 96 F.3d 549, 550 (1st Cir. 1996) (explaining that a prosecutor's assertion that the defense's case "doesn't pass the laugh test" was "within the ordinary rough and tumble" of proper closing argument).
The Sheriffs argue Ms. Burke's counsel improperly injected his personal opinions into closing argument, but they cite only page numbers in the trial transcript and do not identify the specific statements they view as improper.[53] To determine which statements the Sheriffs contest, we rely on the detailed motion they filed in the district court. See MacArthur , 495 F.3d at 1161 ("Where an appellant has provided defective briefs, the court in its discretion may scrutinize the merits of the case insofar as the record permits." (quotations and brackets omitted)). In their district court briefing, the Sheriffs listed the following statements:
• "[T]he whole time I'd rather just be talking to you about what I think is so wrong with the situation here, but I have to follow a formal process that's really uncomfortable for me." App. at 10600.
• "I can't imagine my family sitting through a trial with a death like this and to have these insults said about my loved one. It's the embodiment of indifference." Id . at 10608.
• "I think what happened in the shower in the medical unit is truly one of *1032 the most disgusting, vial [sic] stories I've ever heard." Id. at 10609.
• "But I want to talk with you about this idea of indifference because it's one of the only cases I've ever been involved in where you don't have to determine it by circumstantial evidence necessarily." Id. at 10613.
• "I can't imagine lying there on the floor with people staring over me, me telling them I'm injured." Id. at 10616.
• "I can't imagine the thoughts that were going through his mind." Id.
• "I mean, I can't imagine the nightmare that that would be, to not be able to move, to be lying in your own feces, and not have the use of your hands and your arms, not be able to situate your body, to roll, to move, to make your pain a little less. It's so hard, even after the years of working on this case, for me to get my head around it, what that must have been like. I can't imagine a more terrifying situation than that." Id. at 10616-17.[54]
• "In my short career, I've never seen anything like it, never heard anything like it." Id. at 10620.
This last statement was the only one to which the Sheriffs objected, and the district court sustained the objection. Id .[55]
The line between proper and improper statements in this area is unclear. Compare Polansky , 852 F.2d at 627-28 (statements such as "in my opinion," "it wasn't convincing to me," and "I don't believe" were improper), with Grabiec , 96 F.3d at 550 (assertion that defense's case "doesn't pass the laugh test" was not improper). Moreover, the Sheriffs provide no authority to demonstrate these statements and those in the previous two categories-violating the Golden Rule and urging disregard of the jury instructions-fell on the improper side of the line. In doing so, the Sheriffs may have waived this argument by inadequate briefing. See MacArthur , 495 F.3d at 1160 (explaining that a litigant had inadequately briefed several issues by failing to "cite a single case relevant to the underlying argument"). As we explain, however, even if they have preserved their challenge, and even if some of the comments exceeded permissible bounds, these statements along with the others do not merit reversal.
8) Pervasiveness of improper comments
As previously discussed, the Sheriffs contest some comments that were not improper, and we do not include them in our further analysis. The remaining statements include (1) two comments urging the jury to award compensatory damages for deterrence purposes, (2) one comment potentially urging the jury to disregard the jury instructions, (3) one comment perhaps transgressing the Golden Rule, and (4) seven comments arguably expressing counsel's opinion.
Even if these comments were more than "minor aberrations," Whittenburg , 561 F.3d at 1131, they were not as pervasive as the improper remarks in Whittenburg . There, counsel's recitation of an imaginary letter containing fictitious incriminating *1033 statements by the defense consumed half of closing argument. Id. at 1129. And "attacks on defendants and their counsel" delivered in the imaginary letter amounted to a quarter of the argument. Id. ; see also id. at 1131 (stating that the improper remarks "were the heart and soul of the argument"). By comparison, the comments at issue here appeared sporadically during the argument, which consumes more than 40 pages of the Joint Appendix. Many of the remaining comments in question are brief references, and several of the personal opinion statements were at most borderline improper.[56]
ii. Second Whittenburg factor-Curative action
The Sheriffs argue the second Whittenburg factor favors reversal because the district court overruled their objections during closing argument. We disagree.
Although the district court did not give curative instructions to the jury contemporaneously with its rulings, the Sheriffs did not object to some of the remaining statements in question, and the court's later jury instructions helped dispel any prejudicial effect of improper comments. See Racher , 871 F.3d at 1171 (holding new trial was not warranted where judge overruled objection to improper argument but properly instructed the jury on the difference between compensatory and punitive damages). The instructions clarified that compensatory damages should "fairly and justly compensate for any injury you believe that Elliott Williams actually sustained as a direct consequence of the Defendant's conduct." App. at 5126. They further explained that "[c]ompensatory damages must not be based on speculation or sympathy," id ., and that "[a]rguments and statements by lawyers are not evidence," id. at 5102. "We generally presume that juries follow the instructions given to them notwithstanding what has been said in court." Cavanaugh v. Woods Cross City , 718 F.3d 1244, 1250 (10th Cir. 2013).
iii. Third Whittenburg factor-Size of the verdict
Finally, the third Whittenburg factor-the size of the verdict-weighs against the Sheriffs. When analyzing the third Whittenburg factor, we have not always compared the jury's award to awards in other cases.[57] See Racher , 871 F.3d at 1171-72. But we find the jury's $10 million verdict here to be on par with cases involving similar conduct. See, e.g. , Gutierrez-Rodriguez v. Cartagena , 882 F.2d 553, 557 (1st Cir. 1989) (awarding $4.5 million in compensatory damages in 1989 for jailer's supervisory role in constitutional violation);
*1034 Glover v. Vest , No. CIV-14-936-F, 2015 WL 13344116, at *2 (W.D. Okla. Dec. 23, 2015) (outlining facts of jail sexual assault which resulted in $6.5 million compensatory damages verdict against jail supervisor in his official capacity).[58]
iv. Balancing the Whittenburg factors
Whether Ms. Burke's counsel's comments were so egregious as to warrant a new trial "is not based on any one of these factors singly, but rather their combination after considering the argument as a whole." Whittenburg , 561 F.3d at 1133. Under Whittenburg 's first factor, the comments we assumed were improper appeared sporadically over the course of 40 pages of closing argument. Although counsel made more than one "stray improper remark," id. at 1131, we cannot say the remarks were "repeated and emphasized throughout closing argument," id. This factor thus does not weigh in favor of the Sheriffs. Under the second Whittenburg factor, although the district court did not take contemporaneous curative action, its later jury instructions helped cure the prejudicial effect of the improper remarks. This factor also does not weigh in the Sheriffs' favor. Under the third factor, the damages verdict was not so "large or excessive" to suggest it was the product of the improper remarks rather than the evidence. The amount of the damages was commensurate with cases involving similar conduct. Accordingly, that factor weighs against the Sheriffs.
To succeed on appeal, the Sheriffs need to show it "clearly appear[ed]" that improper comments influenced the verdict. Racher , 871 F.3d at 1168 (quotations omitted). Given the strength of the evidence, that is a tall order. The district court did not err in finding they have not filled it. As discussed in detail above, "the weight of the evidence" supported the jury's damages verdict. See Ventura , 825 F.3d at 885. That evidence included three weeks of testimony and exhibits detailing the constitutional harms Mr. Williams suffered, including video evidence of the last days of his life on the floor of a jail cell. Even if some of counsel's closing remarks were improper, they did not displace the strength of the evidence.
In sum, though we do not condone all of Ms. Burke's counsel's remarks, the Sheriffs have not shown that they improperly influenced the verdict in this case. The district court thus did not err in denying the Sheriffs' motion for a new trial based on plaintiff's counsel's closing argument.
C. Compensatory and Punitive Damages
5. Remittitur as to Compensatory Damages
The Sheriffs argue on appeal that they are entitled to remittitur of the $10 million compensatory damages award because it was excessive. We disagree and affirm the district court's denial of remittitur.
a. Additional procedural background
In their post-trial motion for a new trial under Rule 59(a), the Sheriffs asked in the alternative for remittitur of the $10 million compensatory damages award. They argued that compared to non-economic damages awards in this circuit, $10 million is "unprecedented, clearly excessive and should shock the judicial conscience." App. at 5807. They contended the award was "fueled by a desire to punish, not compensate for concrete losses." Id. at 5808.[59]
*1035 The district court denied the Sheriffs' motion. In support of its conclusion that the evidence supported the compensatory damages award, the court detailed Mr. Williams's injuries:
Mr. Williams[ ] was paralyzed shortly after entering the jail; experienced severe mental and physical pain and suffering thereafter; was dumped off a gurney into a shower after defecating on himself; was left, helpless, in the running water for up to three hours; was berated and treated with indifference by jail staff despite his paralysis; and ultimately died. ... [H]e begged for water, suffered from dehydration, could not feed himself or handle a cup of water, and he spent his last days lying on the floor of a jail cell in his own waste ....
Id. at 6650. The court pointed to jury instructions (1) limiting the jury's award of compensatory damages to those injuries Ms. Burke had proved and (2) prohibiting the jury from awarding compensatory damages based on "speculation or sympathy." Id. at 6551. In light of those instructions, the district court concluded the amount of compensatory damages was a product of the evidence rather than the jury's desire for punishment.
b. Standard of review
We review a trial court's decision to deny remittitur of compensatory damages for abuse of discretion. Hill , 815 F.3d at 668 ; see also Sheets v. Salt Lake Cty. , 45 F.3d 1383, 1390 (10th Cir. 1995) ("The trial court's denial of a motion for remittitur is entitled to considerable deference on appeal."). "As the reviewing court, we must view the evidence in the light most favorable to the prevailing party." Hill , 815 F.3d at 668 (quotations and alterations omitted).
c. Legal background
To determine whether remittitur is appropriate, courts must evaluate whether the evidence supports the verdict. See Therrien v. Target Corp. , 617 F.3d 1242, 1258 (10th Cir. 2010) (upholding denial of remittitur where "the jury award [was] supported by sufficient evidence"); Spahr v. Ferber Resorts, LLC , 419 F. App'x 796, 807 (10th Cir. 2011) (unpublished) ("Given the evidence in this case, we cannot say the district court abused its discretion in refusing to grant a new trial or remittitur in this case"). "The jury ha[s] wide latitude to choose an award based on the evidence." Hill , 815 F.3d at 668 ; see also Prager v. Campbell Cty. Mem. Hosp. , 731 F.3d 1046, 1063 (10th Cir. 2013) ("The jury, who has the first-handed opportunity to hear the testimony and to observe the demeanor of the witnesses, is clothed with a wide latitude and discretion in fixing damages ...." (quotations omitted)). Remittitur is appropriate only when "the jury award is so excessive ... as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or another improper cause invaded the trial." Murphy Oil USA, Inc. v. Wood , 438 F.3d 1008, 1021 (10th Cir. 2006) (quotations omitted).
d. Analysis
The district court did not abuse its discretion in denying the Sheriffs' request for remittitur of compensatory damages. As we previously concluded, the evidence supported a finding that at least three individuals violated Mr. Williams's constitutional rights and that the Sheriffs are liable because their policy or custom of *1036 providing constitutionally deficient medical care at the jail caused the violations.
The Sheriffs are correct-and Ms. Burke does not contest-that the damages awarded were for "purely noneconomic" injuries. Aplt. Br. at 67; see Aplee. Br. at 86-87. But we afford "wide discretion ... to juries to fix the amount of noneconomic compensatory damages." Racher , 871 F.3d at 1172. As the district court recounted, Mr. Williams endured considerable pain and suffering during his five days at the jail:
• His injury and paralysis went untreated.
• He defecated on himself.
• He was left lying face-down in a shower, unable to move without assistance.
• Detention officers and medical providers repeatedly demeaned and neglected him, leaving him unattended for days at a time.
• He was unable to eat or drink and became dehydrated.
• Detention officers dragged him from one cell to another.
• He ultimately suffocated to death, naked on the floor.
Although the $10 million verdict is large, we cannot say that it "shock[s] the judicial conscience" in light of these events. See Murphy Oil USA , 438 F.3d at 1021 (quotations omitted). As a result, it was not an abuse of discretion for the district court to deny the Sheriffs' remittitur request.[60]
6. Punitive Damages
Sheriff Glanz appeals the punitive damages awarded against him on due process grounds. We hold the award was not constitutionally excessive and that remittitur of punitive damages is not warranted. We therefore affirm the judgment as to punitive damages.
a. Additional procedural background
As noted above, the jury awarded $250,000 in punitive damages against Sheriff Glanz in his individual supervisory capacity. After trial, Sheriff Glanz moved under Federal Rule of Civil Procedure Rule 50(b) for judgment as a matter of law and under Rule 59(a) for a new trial or remittitur of the punitive damages award. He argued "there was not sufficient evidence adduced at trial to warrant punitive damages" and that the award was excessive. App. at 5930.[61]
The district court denied the motion. It explained the jury was properly instructed to award punitive damages only if it found that Sheriff "Glanz's conduct involved reckless or callous indifference to Mr. Williams's rights under the United States Constitution." Id. at 6652 (quoting jury instructions). It also concluded the evidence supported the punitive damages award. The court cited evidence that Sheriff Glanz was "notified of numerous, serious deficiencies in his jail's medical treatment of inmates in his custody, but did nothing to abate the resulting substantial risks of serious harm." Id. It said Sheriff *1037 Glanz was "on notice of constitutional deficiencies in the care of inmates with serious medical needs and that his failure to take appropriate measures to remedy those deficiencies constituted deliberate indifference." Id.
b. Standard of review
"Due process requires federal courts to perform an 'exacting' de novo review of the constitutionality of punitive damages awards to ensure 'that an award of punitive damages is based upon an application of law, rather than a decisionmaker's caprice.' " Lompe v. Sunridge Partners, LLC , 818 F.3d 1041, 1061 (10th Cir. 2016) (quoting State Farm Mut. Auto. Ins. Co. v. Campbell , 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) ).
c. Legal background
"The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." Jones v. United Parcel Serv., Inc. , 674 F.3d 1187, 1206 (10th Cir. 2012) (alteration and quotations omitted). The Supreme Court's seminal case, BMW of North America Inc. v. Gore , 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), provides the constitutional test for whether punitive damages are excessive. It instructs courts to:
consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.
State Farm , 538 U.S. at 418, 123 S.Ct. 1513 (citing Gore , 517 U.S. at 575, 116 S.Ct. 1589 ).
i. Degree of reprehensibility
The degree of reprehensibility of a defendant's conduct is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." Gore , 517 U.S. at 575, 116 S.Ct. 1589. In evaluating reprehensibility, courts should consider the following factors:
(1) whether the harm caused was physical as opposed to economic; (2) whether the defendant acted with indifference or a reckless disregard for the health or safety of others; (3) the financial vulnerability of the plaintiff; (4) whether the defendant's wrongful conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident.
Jones , 674 F.3d at 1207.
"[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade , 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) ; Hardeman v. City of Albuquerque , 377 F.3d 1106, 1120-21 (10th Cir. 2004).
We have not addressed whether a jury may award punitive damages under § 1983 against supervisors who were not directly involved in subordinates' violations of an inmate's constitutional rights. All but one of our sibling circuits to address the issue have approved of punitive damages in such circumstances.[62] We join those courts.
*1038 ii. Relationship to actual harm
The second Gore factor examines the "[d]isparity" between compensatory and punitive damages. Jones , 674 F.3d at 1207. "[T]he amount of compensatory damages awarded plays a role in determining whether a punitive damage award is appropriate." Id.
"[I]n practice, few awards exceeding a single-digit ratio between punitive and compensatory damages ... will satisfy due process." State Farm , 538 U.S. at 425, 123 S.Ct. 1513. For example, in Gore , the Supreme Court vacated a $2 million punitive damages award that was "500 times the amount of [the plaintiff's] actual harm as determined by the jury." 517 U.S. at 582, 116 S.Ct. 1589. By contrast, we upheld a punitive damages award of $295,000 in a sexual harassment case where the jury awarded $5,000 in compensatory damages-a ratio of 59 to 1-because "where the injury is primarily personal, a greater ratio [between punitive and compensatory damages] may be appropriate." Deters v. Equifax Credit Info. Servs. , 202 F.3d 1262, 1272-73 (10th Cir. 2000).
iii. Comparison to similar cases
Under the third Gore factor, in contrast to the compensatory damages remittitur analysis, we must evaluate "the disparity between the punitive damages award and the civil penalties authorized or imposed in comparable cases." State Farm , 538 U.S. at 428, 123 S.Ct. 1513 (quotations omitted). "The fundamental question is whether [the Defendant] had reasonable notice that [its conduct] could result in such a large punitive award." Cont'l Trend Res., Inc. v. OXY USA Inc. , 101 F.3d 634, 641 (10th Cir. 1996).
In Gutierrez-Rodriguez v. Cartagena , the First Circuit upheld a $150,000 punitive damages award against a police superintendent who implemented a system of inadequate personnel reviews and failed to discipline an officer who repeatedly used unjustified violence. 882 F.2d at 581-82. The compensatory damages award was $4.5 million. Id. at 557. The court held the superintendent's conduct was sufficiently reprehensible because, although he had not participated in the officer's violence, he "failed to take proper remedial and disciplinary action concerning [the officer] despite the number of past complaints against him" and presided over a "disciplinary system that was going through the procedural motions without any real objective of finding the truth." Id. at 581-82. In Rodriguez v. County of Los Angeles , 891 F.3d 776, 806 (9th Cir. 2018), the Ninth Circuit upheld a combined punitive damages award of $210,000 against five supervisors who planned and executed a scheme to extract inmates from their cells by force. The total compensatory damages award in the case was $740,000. Id.
*1039 d. Analysis
We affirm the district court's denial of Sheriff Glanz's motion for remittitur of punitive damages.
The punitive damages award was proper notwithstanding Sheriff Glanz's having no "day-to-day control/participation in Williams' care." See Aplt. Br. at 80. As stated above, we hold that a jail or prison supervisor may be assessed punitive damages for his or her conduct even when the supervisor is not directly involved in the subordinates' violations of an inmate's constitutional rights. As to the amount of damages, the evidence supported a finding that Sheriff Glanz's conduct was reprehensible, the punitive damages award was only a fraction of the total damages, and the amount was not unprecedented in cases involving supervisory liability for § 1983 violations.
The three Gore factors support our conclusion. Under the first, "most important," factor, Gore , 517 U.S. at 575, 116 S.Ct. 1589, at least three of the five reprehensibility considerations were met in this case:
(1) The harm that Mr. Williams suffered "was physical as opposed to economic." Jones , 674 F.3d at 1207. Mr. Williams experienced physical suffering for five full days while jail personnel repeatedly ignored his complaints of paralysis, thirst, and pain. He ultimately suffered respiratory failure and death.
(2) As detailed above, Sheriff Glanz "acted with indifference or a reckless disregard for the health or safety of others." Id. The evidence showed that Sheriff Glanz was deliberately indifferent for years to the substantial risk that deficient medical care at the jail would result in disastrous health outcomes for inmates. He did nothing to abate that risk and one witness testified that Sheriff Glanz even tried to thwart the auditing process on one occasion by allowing officials to hide troubling inmate medical records.
(3) Sheriff Glanz's conduct "involved repeated actions." Id. He received multiple warnings about the failing medical care at the jail over the course of four years, but he took no significant remedial steps. While reforms went unimplemented, several inmates died.
Accordingly, Sheriff Glanz's conduct was sufficiently reprehensible to justify the $250,000 punitive damages award.
Gore 's second factor also favors our upholding the punitive damages award. Although we have harbored concern when punitive damages have exceeded the damages for a plaintiff's harm, see, e.g. , id. at 1207-08, we have upheld punitive damages in such circumstances, see, e.g. , Deters , 202 F.3d at 1272-73. In any event, the $250,000 award here is only a fraction of the jury's valuation of Mr. Williams's actual harm-it represents only 2.5 percent of the $10 million compensatory damages award.
As to Gore 's third factor, the $250,000 award against Sheriff Glanz is not unprecedented for cases involving similar conduct. For example, the First Circuit's decision in Gutierrez-Rodriguez upheld a $150,000 a punitive damages award (about $300,000 in 2017 dollars) against a sheriff for supervisory liability where he was not personally involved in a subordinate's constitutional violation. 882 F.2d at 581-82 ; see CPI Inflation Calculator , Bureau of Labor Statistics, https://data.bls.gov/cgi-bin/cpicalc.pl (last visited Jun. 30, 2019). The court upheld the award because the superintendent had failed to conduct adequate personnel reviews to discipline a deputy who repeatedly resorted to improper violence. Gutierrez-Rodriguez , 882 F.2d at 581-82 ; see also Rodriguez , 891 F.3d at 806 (upholding a combined punitive damages *1040 award of $210,000 against five prison supervisors). Sheriff Glanz had "reasonable notice that [his conduct] could result in such a large punitive award." Cont'l Trend Res. , 101 F.3d at 641.
Based on the evidence of reprehensible conduct, the ratio between the compensatory and punitive damages awards, and the presence of similar awards in § 1983 cases, the $250,000 punitive damages award against Sheriff Glanz does not violate the due process prohibition on excessive punitive damages.[63]
7. Setoff
The district court declined to apply a setoff to reduce the jury's compensatory damages award by the amount CHC paid Ms. Burke in settlement and declined to order discovery of the settlement agreement. Ms. Burke argues the Sheriffs waived their setoff argument. The Sheriffs disagree and argue the district court's rulings were wrong.
We hold (1) the Sheriffs preserved this issue for appellate review, (2) the district court abused its discretion in denying a setoff without knowing the terms or amount of the CHC settlement, and (3) the court erred in denying disclosure of the settlement agreement. We reverse and remand for further consideration.
a. Legal background
We start with the applicable law to give context to the procedural history of the setoff issue in this case. The following addresses (a) whether setoff is an affirmative defense that is waived if not pled in a party's answer, (b) setoff law for § 1983 cases, and (c) the Oklahoma setoff statute.
i. Preservation and waiver of setoff defense
As a general rule, a defendant waives an affirmative defense by failing to plead it. See Bentley v. Cleveland Cty. Bd. of Cty. Comm'rs , 41 F.3d 600, 604 (10th Cir. 1994). Federal Rule of Civil Procedure 8(c) states that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense." The rule enumerates a non-exclusive list of such defenses. See Fed. R. Civ. P. 8(c). Setoff is not among them. See id. Courts have disagreed as to whether a setoff is an affirmative defense.[64]
*1041 Even if setoff is an affirmative defense, "[w]hen an issue is set forth in a pretrial order, it is not necessary to amend previously filed pleadings" to preserve the issue. Expertise, Inc. v. Aetna Fin. Co. , 810 F.2d 968, 973 (10th Cir. 1987) (holding that statute-of-limitations affirmative defense omitted from the defendant's responsive pleadings "was not waived because it was included in the pretrial order"). "An order entered pursuant to [Federal Rule of Civil Procedure] 16(e) supersedes the pleadings and controls the subsequent course of litigation. ... [T]he pretrial order measures the dimensions of the lawsuit, both in the trial court and on appeal." Tyler , 118 F.3d at 1403 (quotations and citations omitted).[65] Setoff is therefore not waived if it is asserted in the pretrial order.
ii. Setoff law in § 1983 cases
A claimant generally may not recover compensatory damages for more than actual loss. See Clappier v. Flynn , 605 F.2d 519, 529 (10th Cir. 1979). When a plaintiff's pretrial settlement with one defendant and a jury's damages award against another defendant "represent common damages" for a single injury, the nonsettling defendant can seek a setoff to reduce the damages award by the settlement amount. See F.D.I.C. v. United Pac. Ins. Co. , 20 F.3d 1070, 1082 (10th Cir. 1994). Special rules apply to setoffs in the § 1983 context.
The § 1983 statute itself "does not contain any provision as to the propriety of offsetting an actual damages award because of a settlement." Big Elk v. Bd. of Cty. Comm'rs of Osage Cty. , 3 F. App'x 802, 808 (10th Cir. 2001) (unpublished). Nor does it supply procedures for awarding setoffs. But guidance comes from 42 U.S.C. § 1988, which states that civil rights cases should be governed by
the laws of the United States so far as such laws are suitable to carry the same into effect; but in all cases where [federal laws] are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause ....
42 U.S.C. § 1988(a).
Under § 1988, courts "undertake a three-step process" to determine the rule of decision governing an issue. See *1042 Berry v. City of Muskogee , 900 F.2d 1489, 1502 (10th Cir. 1990) (citing Wilson v. Garcia , 471 U.S. 261, 267, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985) ). First, a court determines whether federal law addresses the issue or is "deficient." Id. Second, "[i]f no suitable federal rule exists," the court turns to the law of the forum state to determine whether it addresses the issue at hand. Arnold v. Duchesne Cty. , 26 F.3d 982, 984 (10th Cir. 1994) (quotations omitted). Third, assuming state law addresses the issue, "courts are to apply state law only if it is not inconsistent with the Constitution and laws of the United States." Id. (quotations omitted).
iii. Oklahoma setoff statute
Oklahoma law provides for a damages verdict to be reduced by the amount of a plaintiff's prior settlement with a joint tortfeasor:
When a release, covenant not to sue, or a similar agreement is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death :
1. It does not discharge any other tort-feasor from liability for the injury or wrongful death unless the other tort-feasor is specifically named; but it reduces the claim against others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is greater ; and
2. It discharges the tort-feasor to whom it is given from all liability for contribution to any other tort-feasor.
Okla. Stat. § 12-832(H) (emphasis added). This statute provides for pro tanto-that is, dollar-for-dollar-setoffs. See Restivo v. Hessemann , 846 F.3d 547, 585 (2d Cir. 2017) (construing similar language in part of a New York statute to allow for pro tanto setoffs).
b. Additional procedural background
i. Settlement and dismissal of CHC defendants
After the close of discovery, Ms. Burke moved to dismiss CHC and Nurses Chappell, Luca, and Hightower (the "CHC defendants") after reaching a settlement agreement with CHC (the "CHC settlement"). The district court granted the motion over Sheriff Glanz's objection.[66] It explained, "If the liability of the settling defendants is presented to the jury, the issue of offset will be addressed at an appropriate time; i.e., post-judgment, if that time comes." App. at 4001. The court also stated that Sheriff Glanz had preserved the "right to assert liability of the settling defendants." Id. The district court and the Sheriffs did not know the amount or terms of the confidential settlement agreement.
ii. Pretrial order and motion at trial
The pretrial order described the issues each party sought to address at trial. The Sheriffs submitted the legal issue of "[w]hether the Defendants Glanz and Regalado are entitled to a set off of any amount awarded by the jury of any amounts previously collected by the Plaintiff from [CHC]." Id. at 4662.
At trial, the Sheriffs moved to compel Ms. Burke to disclose and for the court to admit the settlement agreement. They argued Ms. Burke's case had focused on CHC employees' actions and reminded the district court it had stated that the Sheriffs could present CHC's liability to the jury. The court denied the motion, stating *1043 setoff was a "judicial function" rather than a jury question. Id. at 10487.
iii. Post-trial motions for disclosure of the settlement and a setoff
After the jury found for Ms. Burke and the court entered judgment, the Sheriffs asked the district court to reduce the $10 million compensatory damages award by CHC's settlement payment. They filed motions (1) to disclose the confidential settlement agreement and (2) to amend the judgment under Federal Rule of Civil Procedure 59(e) by applying a dollar-for-dollar, or pro tanto, setoff in the amount of the CHC settlement. The Sheriffs argued the damages award was based on the same injury Ms. Burke had alleged against CHC. They insisted Ms. Burke would "receive a windfall" without a setoff. Id. at 5900.
The district court denied the Sheriffs' motions. As to disclosure of the settlement agreement, the court said the Sheriffs had not cited a discovery rule or case authority for disclosure, but it decided to consider their arguments for setoff to determine whether the settlement should be disclosed. The district court first said the Sheriffs waived setoff by failing to plead it as an affirmative defense. But it then "decline[d] to find waiver" because the Sheriffs relied on the court's statements that they had not waived the issue. Id. at 6656.
Turning to the merits, the district court stated the three-step § 1988 analysis: " § 1988 indicates that [ (1) ] if federal law is deficient, [ (2) ] then the court will apply state law, [ (3) ] assuming that it is consistent with the Constitution and other federal law." Id. at 6658. It then jumped to step three, holding the relevant Oklahoma setoff statute, Oklahoma Statutes Title 12 § 832(H), "which would require a dollar-for-dollar reduction of the amount paid in settlement, is inconsistent with § 1983 's policy of deterring future constitutional abuses by officials acting under color of law." Id.
By skipping the first two steps, the district court implicitly determined or assumed without analysis that federal law is deficient[67] and that § 832(H) would require a setoff in this case. Then at step three, the court, quoting and relying on the Second Circuit's decision in Restivo v. Hessemann , concluded that § 832(H) categorically conflicts with § 1983 's policy goals.
The district court next asked whether the Sheriffs were entitled to a proportional reduction of the damages verdict under principles of federal common law. It noted the Sheriffs had not moved for a proportional reduction, the issue of proportional liability was not presented to the jury, and their failure to include the issue in the pretrial order waived it. Nonetheless, the court analyzed the evidence and the jury instructions to reject a proportional reduction.[68]
*1044 Finally, in light of its decision that the Sheriffs were not entitled to a setoff, the district court denied their motion to "compel release of the settlement agreement ... and motion to alter or amend the judgment to setoff the amount paid in settlement." Id. at 6667.
c. Standard of review
Regarding waiver, we have said that "[g]enerally, whether a party has waived an affirmative defense is a mixed question of law and fact, requiring us to accept the district court's factual conclusions unless clearly erroneous but review the application of the facts to the law under a de novo standard." Creative Consumer Concepts, Inc. v. Kreisler , 563 F.3d 1070, 1075 (10th Cir. 2009).
On the denial of the Sheriffs' post-trial motion for setoff, we review rulings on Rule 59(e) motions for abuse of discretion. Etherton , 829 F.3d at 1228. To reverse, we must have "a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." Id. (quotations omitted). "The abuse of discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions." Id. (quotations omitted). We therefore review for errors of law de novo.[69]
We also review the denial of the Sheriffs' motion to discover the settlement agreement for abuse of discretion. See Punt v. Kelly Servs. , 862 F.3d 1040, 1046 (10th Cir. 2017) (standard of review for denial of motion to compel is abuse of discretion).[70]
d. Analysis
Ms. Burke argues the Sheriffs waived their setoff argument. We disagree because the Sheriffs included the setoff issue in the pretrial order.
On the merits, the Sheriffs argue the district court erred in denying a setoff. The three-step framework of § 1988 governs our analysis. The district court decided this issue at step three, holding that Oklahoma setoff law was inconsistent with § 1983 's deterrence goal. We hold it was an abuse of discretion for the district court to reach that conclusion without considering the terms and amount of the CHC settlement. The court thus further erred in failing to order disclosure of the settlement agreement. We reverse and remand.
*1045 i. Waiver
The district court said the Sheriffs had not waived their setoff argument. We agree. The case law is unsettled as to whether setoff qualifies as a waivable affirmative defense under Rule 8. Compare BUC Int'l Corp v. Int'l Yacht Council, Ltd. , 517 F.3d 1271, 1277 (11th Cir. 2008), with Laethem Equip Co. v. Deere & Co. , 485 F. App'x 39, 51 (6th Cir. 2012) (unpublished). But we need not resolve that issue because even if setoff is a waivable affirmative defense, the Sheriffs have not waived it.
The Sheriffs asserted a setoff claim in the pretrial order. This sufficed to preserve the issue. See Expertise , 810 F.2d at 973 (holding a statute of limitations defense was preserved because it was "included in the pretrial order"); see also Ford Audio Video Sys., Inc. v. AMX Corp. , Nos. 97-6169 & 97-6171, 1998 WL 658386, at *5 (10th Cir. Sept. 15, 1998) (unpublished) (explaining that raising a claim in the pretrial order is "an alternative to seeking amendment of the complaint itself through a Rule 15 motion"). Accordingly, even if the setoff claim was waivable, the Sheriffs preserved it.[71]
ii. Error in application of step three of the § 1988 analysis
The district court abused its discretion by failing to consider the terms of the CHC settlement at step three of the § 1988 analysis.
1) Policy goals of § 1983
"In resolving questions of inconsistency between state and federal law raised under § 1988, courts must look not only at particular federal statutes and constitutional provisions, but also at the policies expressed in [them]." Robertson v. Wegmann , 436 U.S. 584, 590, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978) (alteration in original) (quotations omitted). "The policies underlying § 1983 include compensation of persons injured by deprivation of federal rights and prevention of abuses of power by those acting under color of state law." Id. at 590-91, 98 S.Ct. 1991 ; see also Berry , 900 F.2d at 1503 ("[I]t is clear that § 1983 was intended to provide special deterrence for civil rights violations."). Section 1983 deters by "internalizing to the violator the costs of violating federal rights"-in other words, by making defendants pay for their wrongdoing. Dobson v. Camden , 705 F.2d 759, 765 (5th Cir. 1983), on rehearing 725 F.2d 1003 (5th Cir. 1984) (en banc).[72]
*1046 2) State law consistency-Case-specific or categorical analysis
Few cases have applied the § 1988 step-three analysis to state setoff laws. They suggest two approaches to determine whether state law is inconsistent with § 1983. The first asks whether the state setoff statute categorically conflicts with § 1983 's goals. The second applies the pertinent state setoff law to the particular case.
The Second Circuit in Restivo appears to have followed the first approach. It held that the New York setoff statute was "inconsistent with the deterrent goal of [§] 1983, as it allows nonsettling tortfeasors to bear less than the full cost of the harm they inflicted if settling tortfeasors settle for more than their proportional share of liability." 846 F.3d at 586. Although this holding is ambiguous, it seems to preclude application of the New York setoff statute in every § 1983 case. The Second Circuit reasoned that the statute would allow for a setoff when the settling tortfeasors settled for more than their proportional share of liability, and that, as a result, the statute would conflict with § 1983, even if in a given case the settling tortfeasors settled for less. See id. ; see also Glover v. Johnson , No. CIV-14-936-F, 2016 WL 5854282, at *2 (W.D. Okla. Oct. 6, 2016) (following similar approach).
The Fifth Circuit's opinion in Dobson seems to use the as-applied approach. It declined to apply state setoff law, holding that "application of the Texas one-satisfaction rule to this case would contravene the deterrence policy of section 1983, and thus is impermissible under section 1988." 705 F.2d at 766 (emphasis added). Likewise, in Banks v. Yokemick , 177 F. Supp. 2d 239 (S.D.N.Y. 2001), the court refused to grant a setoff when "application of [the New York statute] to the circumstances of this case [was] inconsistent with the policies § 1983 was intended to promote." Id. at 263 (emphasis added). Following this reasoning, the larger the setoff based on a settlement, the more likely a setoff would undermine § 1983 's deterrence purpose. See, e.g. , Dobson , 705 F.2d at 766 (rejecting state-law setoff that would have allowed the nonsettling defendant officer to pay zero damages); Banks , 177 F. Supp. 2d at 254-63 (rejecting state-law setoff where the $750,000 settlement was greater than the $605,000 jury verdict).
The Tenth Circuit has not addressed the third step of § 1988 in the context of state setoff law. In the absence of binding precedent, we find the second approach preferable. The district court here relied on Restivo for its setoff decision, but Restivo 's holding is overbroad. Although it is possible that many applications of a state setoff statute would conflict with § 1983, the categorical approach fails to recognize that the state-law setoff in a given case may not conflict with § 1983 's goals, depending on the size of the settlement.[73] For example, if a plaintiff has accepted a nominal settlement, *1047 a setoff would not necessarily diminish the nonsettling defendant's deterrence.
Although not a setoff case, our decision in Berry resembles the setoff scenario and shows a preference for the case-specific approach. We held that the Oklahoma survival action was inconsistent with § 1983, reasoning that "[a]s applied to the instant case , it would provide extraordinarily limited recovery, possibly only damages to property loss, of which there were none, and loss of decedent's earnings between the time of injury and death, of which there also were none." Berry , 900 F.2d at 1504 (emphasis added). Berry therefore lends support to our holding that a case-specific inquiry is the proper approach to determine whether a state-law setoff is consistent with § 1983.[74]
3) Error in the district court's categorical rejection of setoff statute
The problem with the district court's setoff denial in this case is that neither the Sheriffs nor the court, unlike the Restivo and Dobson courts, knew the amount or terms of the settlement. This lack of relevant information prevented the court from conducting a meaningful step-three consistency analysis. We therefore remand so it can do so.
We do not see how to determine whether a setoff based on the Oklahoma statute would be inconsistent with § 1983 without knowing the amount of the proposed setoff-here, the amount of the settlement with CHC. On remand, the district court may wish to revisit the first two steps of the § 1988 analysis because it denied the setoff based on step three without analyzing the other steps.[75] Also, because the jury was not asked to apportion fault between the settling and nonsettling defendants, the court must determine, based on the information it does have, whether and to what extent a reduction of the $10 million award might contravene § 1983 's policy goals.[76]
We do not hold the district court's rejection of a setoff was necessarily wrong. Discovery of the settlement agreement may clarify that applying the CHC settlement as a setoff under Oklahoma law contravenes § 1983 's policy goals. But we do hold that failure to consider the terms and amount of the CHC settlement was an abuse of discretion. We therefore reverse and remand on this issue.
iii. Disclosure of the settlement agreement
Because it was an abuse of discretion for the district court to deny the Sheriffs' motion for setoff without knowing *1048 the terms of the CHC settlement, the court also abused its discretion by denying discovery of the settlement agreement.
The district court noted the Sheriffs failed to cite any authority authorizing post-judgment discovery of the settlement agreement. But it did not expressly rule that discovery would have been improper. The court instead determined, based on its setoff analysis, that there was no longer "any issue justifying a post-trial order compelling production of the settlement agreement." App. at 6654-55. As the foregoing analysis shows, however, there was.
Federal Rule of Civil Procedure 26 authorizes discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Under the foregoing setoff analysis, the settlement agreement is not only relevant but also is necessary to resolving the setoff issue. See Barclay v. Gressit , No. 2:12-CV-156-JHR, 2013 WL 3819937, at *3 (D. Me. July 24, 2013) (unpublished) ("Courts have readily discerned the relevance to a non-settling joint tortfeasor of information regarding a settlement agreement between a plaintiff and a settling joint tortfeasor when, pursuant to applicable state law, the non-settling defendant is entitled to a setoff of the settlement amount from any verdict in favor of the plaintiff ...."). The settlement's confidentiality does not bar discovery. See DIRECTV, Inc. v. Puccinelli , 224 F.R.D. 677, 684-85 (D. Kan. 2004) ("[A] general concern for protecting confidentiality does not equate to privilege."). The district court can take appropriate measures such as a protective order to safeguard any legitimate privacy interests in the settlement. See , e.g. , White v. Kenneth Warren & Son, Ltd. , 203 F.R.D. 364, 369 (N.D. Ill. 2001) (compelling disclosure of confidential settlement agreement subject to a protective order and with instruction the parties not discuss or further disclose the agreement absent an order from the court).
The district court thus erred when it declined to order disclosure of the settlement agreement. We leave to the district court how to compel disclosure of the CHC settlement while safeguarding the confidentiality of the agreement.
D. Disqualification
8. Disqualification of District Court Judge
The Sheriffs contend Judge Dowdell should have recused himself because, before he took the bench, his law firm sued Tulsa County and Sheriff Glanz on behalf of the City of Tulsa in a contract dispute, and he participated in discussions about the case with lawyers at his firm.[77]
a. 28 U.S.C. § 455
The statutory criteria for disqualification of a federal judge are found primarily in subsections (a) and (b) of 28 U.S.C. § 455 :
(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
(b) He shall also disqualify himself in the following circumstances:
*1049 (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
(2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;
(3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;
(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;
(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:
(i) Is a party to the proceeding, or an officer, director, or trustee of a party;
(ii) Is acting as a lawyer in the proceeding;
(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;
(iv) Is to the judge's knowledge likely to be a material witness in the proceeding.
On appeal, the Sheriffs rely only on § 455(a) as a statutory basis for recusal.[78] We will discuss judicial disqualification background law further after the following discussion of the Sheriffs' disqualification motion and the district court's denial of the motion.
b. Additional background
"Thirty-five minutes before the pretrial conference" on February 9, 2017, App. at 4233, the Sheriffs moved to disqualify Judge Dowdell under 28 U.S.C. § 455.[79] This section outlines the Sheriffs' motion, *1050 the district court's ruling, and the relevant facts as developed in both.
i. The Sheriffs' disqualification motion
The Sheriffs argued several grounds for disqualification before the district court. On appeal, however, they rely only on (1) Judge Dowdell's alleged involvement in a suit his former law firm brought against the County and Sheriff Glanz in 2008, and (2) the language and tone of Judge Dowdell's order denying summary judgment. They argue the latter demonstrated Judge Dowdell's bias from his former firm's prior representation.
1) 2008 suit against the County and Sheriff Glanz
The Sheriffs first contended that when Judge Dowdell was a practicing lawyer, his firm represented the City of Tulsa (the "City") in a suit brought in December 2008 against the County, the County's Board of Commissioners, and Sheriff Glanz. The suit concerned the contract governing funding of the jail. The City accused the County and Sheriff Glanz of "seeking to charge unlawful and excessive fees to the citizens and taxpayers living in the City of Tulsa for the City's use of the Tulsa County Jail in direct violation of the County's past representations to the public." Id . at 4382. The parties settled in May 2009.
Judge Dowdell did not appear in the 2008 case.[80] The Sheriffs obtained an affidavit from Joel L. Wohlgemuth, Judge Dowdell's former law partner. In the affidavit, Mr. Wohlgemuth said that he and Judge Dowdell typically "planned, strategized and talked about available options" in cases when one of them had not entered an appearance. Id. at 4363-64. Mr. Wohlgemuth described preparing with Judge Dowdell for a meeting involving Sheriff Glanz in the 2008 suit and later "talk[ing] to Judge Dowdell about what happened" at the meeting. Id. at 4367. He also recounted speaking with "Judge Dowdell and [their] colleagues ... daily regarding the status of the case." Id. at 4369. Finally, Mr. Wohlgemuth said that Judge Dowdell, as a law firm partner, shared in the revenues from the 2008 case.
The Sheriffs argued this conduct warranted disqualification. They claimed the 2008 suit "cover[ed] the events at issue in the instant matter," id. at 4218, and that Judge Dowdell "not only participated in strategic discussions about the ... case, but he benefitted financially from fees paid to his firm," id. at 4217. They contended that "the involvement of Judge Dowdell, and the firm, in litigation against Defendant Glanz and Tulsa County ... covering the events at issue" raised "questions as to Judge Dowdell's impartiality." Id. at 4218.
2) Summary judgment order
On July 20, 2016, six months before the Sheriffs sought to disqualify Judge Dowdell, he denied their motion for summary judgment. In an affidavit attached to the disqualification motion, Sheriff Regalado expressed his "heartfelt opinion" that Judge Dowdell's order denying summary judgment "contain[ed] factual errors, distortions and appear[ed] to sensationalize the issues in the present case." Id. at 4228. The Sheriffs pointed to two statements in the order as examples of Judge Dowdell's *1051 "bias and sensationalism." Id. First, the order referred to the jail cell where Mr. Williams died as a "burial crypt." Id. at 4024, 4223, 4228. Second, it "characterize[d] Dr. Harnish's offer to provide hydration [to Mr. Williams] through an IV as an act of 'threatening' administration [of fluids]." Id. at 4223.
The Sheriffs said the language in the summary judgment order and other "inexplicable rulings" in the months that followed had "prompted the [Sheriffs'] counsel on February 8, 2017[,] to initiate a call to lawyers who worked with Judge John Dowdell at his former firm ... to search for some understanding of whether the judge possessed some animus towards defense counsel or the individual named defendants." Id. at 4356-57. They claimed to have learned during these calls the extent of Judge Dowdell's involvement in the 2008 suit.
ii. District court ruling
Judge Dowdell denied the motion, first holding it was untimely. He noted that the Sheriffs' lead defense counsel had served as counsel of record for the County and Sheriff Glanz in the 2008 suit and that another member of the Sheriffs' defense team worked at Judge Dowdell's former firm in 2008. The Sheriffs' lawyers, he said, were thus aware of his former firm's involvement in the 2008 suit and could have filed a disqualification motion as soon as this case was transferred to him in January 2013.
Apart from untimeliness, Judge Dowdell denied the motion on three grounds relevant to the Sheriffs' appeal of this issue. First, he found that, contrary to the motion's assertion, the 2008 lawsuit did not involve the "matter in controversy" in this suit-namely, "the death of Mr. Williams and his treatment at the [jail] in 2011." Id. at 4560.
Second, Judge Dowdell ruled that § 455(a) did not require disqualification because his former firm's involvement in the 2008 case would not cause a reasonable person to question his impartiality. He found the Sheriffs had adduced no evidence he held any bias against Sheriff Glanz or the County as a result of his former firm's work. Judge Dowdell said Mr. Wohlgemuth's statements that he was "involved in" the prior lawsuit or developed a bias against the Sheriffs as a result were "simply not accurate." Id. at 4566. Even if he had discussed the 2008 case with Mr. Wohlgemuth, "there is no evidence supporting any reasonable inference that the undersigned acquired any bias from any such discussions." Id. at 4568. Judge Dowdell also pointed to rulings he had made in favor of the Sheriffs in other cases as evidence that he was not biased against them.
Third, Judge Dowdell ruled that the court's language in the summary judgment order "describ[ed] evidence construed in a light favorable to the plaintiff, as was required at that stage," and did not reflect ill will toward the Sheriffs. Id. at 4574.
iii. Summary of factual background
In evaluating Judge Dowdell's denial of the Sheriffs' disqualification motion, our factual record consists of (1) the parties' briefing and attached affidavits, (2) the pleadings from the 2008 suit, and (3) Judge Dowdell's order.
Based on those materials, it is uncontested that Judge Dowdell's small firm[81] represented the City against the County and Sheriff Glanz in a 2008 suit about an agreement between the City and the County for funding the jail. The suit asserted claims under state law, not § 1983. Judge Dowdell did not enter an appearance in the case.
*1052 The Sheriffs and Judge Dowdell dispute the extent of Judge Dowdell's involvement in the 2008 suit and any views about the Sheriffs he developed as a result. Mr. Wohlgemuth said in his affidavit that he and Judge Dowdell "planned, strategized and talked about available options" for major cases such as the 2008 suit. Id. at 4364. Sheriff Regalado stated in an affidavit that, "[u]pon information and belief, Judge John Dowdell had numerous discussions with the lawyers in his firm about Sheriff Glanz and the operation of the jail" as part of the 2008 suit. Id. at 4228. In his order, Judge Dowdell said that "Mr. Wohlgemuth's allegation that this Court was involved in the 2001 and 2008 matters or developed some alleged bias from NWCD's work in those cases is simply not accurate." Id. at 4566.[82] He emphasized that "the undersigned was not involved in those cases, did not appear of record in them, did not attend any hearings, or file any pleadings, and did not develop any bias or prejudice as a result of the filings, statements or meetings made or attended by other NWCD lawyers in those cases." Id. at 4570.
Even assuming the Sheriffs' description of Judge Dowdell's participation-his involvement in strategic discussions about the 2008 case-is accurate, denial of the motion for disqualification was not an abuse of discretion.
c. Standard of review and legal background
We review a district court's denial of a motion to disqualify a judge for abuse of discretion. United States v. Mendoza , 468 F.3d 1256, 1262 (10th Cir. 2006) ; Bryce v. Episcopal Church , 289 F.3d 648, 659 (10th Cir. 2002).[83] "Under this standard, we will not reverse unless the trial court has made an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." United States v. Wells , 873 F.3d 1241, 1250 (10th Cir. 2017) (quotations omitted).[84]
*1053 i. Timeliness
As noted above, the judicial disqualification statute applicable here is 28 U.S.C. § 455(a). This court has held that "[a] motion to recuse under section 455(a) must be timely filed." Willner v. Univ. of Kan. , 848 F.2d 1023, 1028 (10th Cir. 1988) (collecting cases). Most circuits require that it be brought "at the earliest moment after knowledge of the facts demonstrating the basis for such disqualification." See e.g ., Travelers Ins. Co., v. Liljeberg Enters., Inc. , 38 F.3d 1404, 1410 (5th Cir. 1994) ; see Charles Gardner Geyh, Judicial Disqualification: An Analysis of Federal Law 76-77 (2d ed. 2010); 12 Alan W. Perry & Martin H. Redish, Moore's Federal Practice § 63.61 (2019) ("In general, one seeking disqualification must do so at the earliest possible moment after obtaining knowledge of the facts demonstrating the basis for disqualification."). This requirement guards against a party's withholding "a recusal application as a fall-back position in the event of adverse rulings on pending matters." In re IBM Corp. , 45 F.3d 641, 643 (2d Cir. 1995) ; see Smith v. Danyo , 585 F.2d 83, 86 (3d Cir. 1978). The Eighth Circuit has ruled that a claim for judicial recusal under § 455 "will not be considered unless timely made." United States v. Bauer , 19 F.3d 409, 414 (8th Cir.1994) (quoting Holloway v. United States , 960 F.2d 1348, 1355 (8th Cir. 1992) ).
ii. Disqualification under § 455(a)
Turning to substantive standards, § 455 contains two disqualification sections. The first, § 455(a), provides: "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." The second, § 455(b), lists specific grounds for disqualification.[85] Section 455(a) requires disqualification for the appearance of impartiality, § 455(b)(1) for actual partiality. Geyh, Judicial Disqualification at 17. The Sheriffs rely on § 455(a).
Congress amended § 455 in 1974, adding subsection (a) "to clarify and broaden the grounds for judicial disqualification and to conform with the recently adopted ABA Code of Judicial Conduct, Canon 3C (1974)." Liljeberg v. Health Servs. Acquisition Corp. , 486 U.S. 847, 858 n.7, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988).[86] " Section 455(a) requires a judge to recuse when his impartiality can reasonably be questioned-even if he does not have actual *1054 personal bias or prejudice." 13D Charles Alan Wright & Arthur R. Miller et al., Federal Practice and Procedure § 3549 (3d ed. 2008). The trial judge must recuse when there is the appearance of bias to the reasonable person, regardless of whether there is actual bias. Nichols v. Alley , 71 F.3d 347, 350-51 (10th Cir. 1995).
The test under § 455(a) is not whether the judge believes he or she is capable of impartiality, but rather whether a reasonable person might question the judge's impartiality. United States v. Cooley , 1 F.3d 985, 993 (10th Cir. 1993) ; Hinman v. Rogers , 831 F.2d 937, 939 (10th Cir. 1987). Similarly, the test is not whether someone could conceivably question a judge's impartiality but whether a reasonable person, knowing all relevant facts, would harbor doubts. In re McCarthey , 368 F.3d 1266, 1269 (10th Cir. 2004) ; Bryce , 289 F.3d at 659 ; Cooley , 1 F.3d at 993.[87] As Justice Kennedy observed, "[U]nder § 455(a), a judge should be disqualified only if it appears that he or she harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute." Liteky v. United States , 510 U.S. 540, 558, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) (Kennedy, J., concurring in the judgment).
The party moving to disqualify a judge is ordinarily assigned the burden of proof. See Topeka Housing Auth. v. Johnson , 404 F.3d 1245, 1247 (10th Cir. 2005) (stating party urging disqualification bears "heavy burden of showing the requisite judicial bias or misconduct"); Cauthon v. Rogers , 116 F.3d 1334, 1336 (10th Cir. 1997). Relevant facts must support the moving party's belief that the judge is biased. See United States v. Mendoza , 468 F.3d 1256, 1262 (10th Cir. 2006) ; Nichols , 71 F.3d at 352.
This court has recognized that, "[U]nder § 455(a), a judge's prior representation of a witness or a party in an unrelated matter does not automatically require disqualification." David v. City & Cty. of Denver , 101 F.3d 1344, 1351 (10th Cir. 1996) ; see Nat'l Auto Brokers v. Gen. Motors Corp. , 572 F.2d 953, 958 (2d Cir. 1978). Similarly, "the mere fact that a judge, while engaged in the practice of law, was involved in litigation against a party does not ordinarily provide grounds on which a reasonable person would be apt to question the judge's ability to be impartial in a different matter involving the same party." Richard E. Flamm, Judicial Disqualification: Recusal and Disqualification of Judges 604 (3d ed. 2017).[88]
d. Analysis
"Given the circumstances of this case, the resolution of the recusal issue is determined for us by the applicable [abuse of discretion] standard of review."
*1055 Higganbotham v. Okla. ex rel. Okla. Transp. Comm'n , 328 F.3d 638, 645 (10th Cir. 2003).
On appeal, the Sheriffs argue Judge Dowdell should have granted their disqualification motion because, in 2008, his former law firm, representing the City of Tulsa, sued Tulsa County and Sheriff Glanz, alleging they had overcharged the City for its use of the Tulsa County Jail. We disagree.[89]
i. Timeliness
The Sheriffs argue their disqualification motion was timely because their "counsel only learned of Judge Dowdell's undisclosed involvement on [February 9, 2017]," and they filed their motion soon after. Aplt. Br. at 60.[90] This is the entirety of their appellate argument on timeliness, and the foundation for it in the record is weak at best.[91]
As this court has said:
[Section] 455(a) motions for recusal "must be timely filed." Although this circuit has not attempted to define the precise moment at which a § 455(a) motion to recuse becomes untimely, our precedent requires a party to act promptly once it knows of the facts on which it relies in its motion. A promptly filed motion conserves judicial resources and alleviates the concern that it is motivated by adverse rulings or an attempt to manipulate the judicial process.
United States v. Pearson , 203 F.3d 1243, 1276 (10th Cir. 2000) (citations omitted).
The Sheriffs filed their recusal motion in 2017, nine years after the 2008 case, six years after this case was filed in 2011, four years after Judge Dowdell was assigned to preside in 2013, and six months after he denied their summary judgment motion. Whether their recusal motion was untimely turns on when the Sheriffs "k[new] of the facts on which [they] rel[y] in [their] motion." Id .
The Sheriffs' lawyers knew that Judge Dowdell's former law firm had sued the County and Sheriff Glanz in 2008. Two of the Sheriffs' lawyers here were counsel for the County and Sheriff Glanz in 2008, and another was a lawyer at Judge Dowdell's former firm in 2008. In 2008, fewer than twelve lawyers worked at Judge Dowdell's former firm. Even though then-lawyer Dowdell did not enter an appearance in the 2008 case, it is difficult to see how the Sheriffs' lawyers, who themselves participated on both sides of the 2008 case, could not have at least inferred that lawyer Dowdell knew about the case and likely discussed it with the lawyers who were handling the litigation. They had sufficient information in 2013 to investigate further.
These facts suggest the Sheriffs may have waited to seek Judge Dowdell's disqualification until after they had suffered an adverse ruling on summary judgment.
*1056 See Mathis v. Huff & Puff Trucking, Inc. , 787 F.3d 1297, 1313 n.12 (10th Cir. 2015) ("Our cases acknowledge that § 455(a) contains a timeliness requirement to prevent counsel from waiting until after an adverse ruling to seek recusal."); Singer v. Wadman , 745 F.2d 606, 608 (10th Cir. 1984) (holding "motion to disqualify was not ... timely" when it "was filed about one year after the complaint was filed and after appellants had suffered some adverse rulings on interlocutory matters.").
The Sheriffs insist, however, that until they spoke with the judge's former law partner, they and their lawyers did not know the full extent of Judge Dowdell's participation in the 2008 case-"facts on which [they] rel[y] in [their] motion." Pearson , 203 F.3d at 1276. They filed their motion within days of learning this information. This argument may be plausible, but it at most makes the timeliness question debatable rather than one-sided.
We cannot say Judge Dowdell "made an arbitrary, capricious, whimsical, or manifestly unreasonable judgment" that the recusal motion was untimely given it came on the eve of trial, six years after the case was filed, four years after it was reassigned to Judge Dowdell, and after the summary judgment ruling against them. Wells , 873 F.3d at 1253 (quotations omitted). We are reluctant to rely on untimeliness, however, given that Judge Dowdell was aware of the 2008 case and its potential for presenting an appearance issue. We choose to affirm denial because Judge Dowdell did not abuse his discretion in denying the motion under § 455(a) on the merits.[92]
ii. 2008 Case
1) The 2008 case was unrelated to this case
Although the judge's firm had sued the County and Sheriff Glanz in 2008, it does not necessarily follow he would be biased or appear to be biased in this case. Disqualification may be warranted when the matter on which the judge previously represented an adverse party is related to the present case, see, e.g. , In re Steward , 529 B.R. 903, 915 (E.D. Mo. 2015), but that is not what happened here. The critical factor is that the 2008 case was unrelated to this case.
The 2008 case concerned an agreement between the City and the County for levying a sales tax to fund the jail and the County's and Sheriff Glanz's alleged actions in breach of that agreement. The suit did not allege the jail's services, particularly medical services, were deficient, or that the Sheriffs had been deliberately indifferent to the medical needs of any inmates. In addition, the 2008 suit alleged state-law contract and tort claims, not federal civil-rights claims.
The Sheriffs' disqualification motion misrepresented the 2008 suit. The motion, Sheriff Glanz's affidavit, and Mr. Wohlgemuth's affidavit all said the 2008 suit alleged that the "condition of the [jail] violated the constitutional rights of prisoners and detainees." App. at 4217, 4366. In fact, the City never made any such allegation. Rather, as background to the agreement at issue, the 2008 complaint said only that in 1994, a United States Department of Justice investigation found that "the condition of the jail violated the constitutional rights of prisoners and detainees."
*1057 Id. at 4385. It further said, after that investigation, the County built the existing jail facility and entered into an agreement with the City to share costs. The 2008 suit did not allege that the County was providing constitutionally inadequate conditions of confinement at the new jail or at any time during the contract between the City and the County.
Because the 2008 case did not concern the same or a similar matter in controversy as this case, Judge Dowdell did not abuse his discretion in concluding that his impartiality could not be reasonably questioned.[93] Several additional points reinforce this conclusion.
First, Judge Dowdell was at least a step removed from the lawyers actively litigating the 2008 case. "Stripped of the [recusal movants'] rhetorical gloss," In re United States , 158 F.3d at 31,[94] the facts show Judge Dowdell's law firm sued the County and Sheriff Glanz in 2008 and that he discussed the case with the lawyers in his firm who were litigating it. He did not enter an appearance in the 2008 case. He did not take discovery or negotiate with opposing counsel.[95]
Second, Judge Dowdell was assigned to this case in 2013, four years after the prior case was settled in early 2009. Although this passage of time is not dispositive, it mitigates whatever appearance issue the earlier litigation may have presented, especially because the 2008 suit was settled after only five months.[96] See United States v. DeTemple , 162 F.3d 279, 287 (4th Cir. 1998) (holding recusal not warranted where judge presiding over defendant's bankruptcy fraud trial represented a victim of the defendant's fraud in bankruptcy proceedings five years prior to the defendant's indictment); see also Konarski v. City of Tucson , 716 F. App'x 609, 612 (9th Cir. 2017) (unpublished) (holding recusal not warranted where judge was previously adverse to the defendants and where "the suit referenced occurred several years ago and concerned a matter unrelated to this suit").
*1058 2) The Sheriffs' other arguments
The Sheriffs' remaining arguments regarding the 2008 suit and Judge Dowdell's summary judgment order are unavailing. The Sheriffs have provided no evidence to support their statement that Judge Dowdell acquired from the 2008 case a "passionate disagreement and distaste for Defendants' policies and management of the Tulsa County Jail." Aplt. Br. at 58. As Judge Dowdell noted, many of Mr. Wohlgemuth's statements about his involvement in the 2008 case concern a meeting involving Sheriff Glanz that Judge Dowdell did not attend.
Mr. Wohlgemuth stated in 2017 that he and Judge Dowdell sought to "eliminate [the] perceived abuses by the Sheriff and his office" and "thought the meeting was in a certain sense laughable." App. at 4369. But we question, especially after the passage of nine years, the weight of Mr. Wohlgemuth's assessment of Judge Dowdell's subjective feelings and perceptions at the time of the 2008 case. See Willner , 848 F.2d at 1027 ("[A] judge ha[s] a duty not to recuse himself on unsupported speculation."); Cauthon , 116 F.3d at 1336 ("Rumor, speculation, and opinions are not sufficient.").
Finally, the Sheriffs overstate their claim that Judge Dowdell's referral in his summary judgment order to "burial crypt" and to TCSO staff "threatening" the use of IV fluids undermined "the trial judge's calm detachment necessary for fair adjudication disappeared at trial." Aplt. Br. at 61. Although less evocative words might have adequately described Mr. Williams's death, we disagree that Judge Dowdell's description evinced a lack of impartiality.
* * * *
Although we disagree with Ms. Burke that the disqualification motion was "frivolous," Aplee. Br. at 83, we affirm denial of the motion under our review for abuse of discretion.[97] See In re United States , 158 F.3d at 30 (affirming denial of recusal motion but recognizing the motion "[could] not be termed frivolous"). Judge Dowdell's pre-judgeship involvement in the 2008 case against the County and Sheriff Glanz concerned a matter unrelated to the present case, he did not enter an appearance in that case, and it settled more than four years before Judge Dowdell's assignment to this case. Under these circumstances, we cannot say denial of the motion was "an arbitrary, capricious, whimsical, or manifestly unreasonable [judgment]." Wells , 873 F.3d at 1253.
9. Reassignment on Remand
The Sheriffs ask this court to exercise its supervisory powers under 28 U.S.C. § 2106 to reassign the case to a different district court judge on remand. "Because of the extraordinary nature of such an order ... we will remand with instructions for assignment of a different judge only when there is proof of personal bias or under extreme circumstances." Niemi v. Lasshofer , 770 F.3d 1331, 1356 n.13 (10th Cir. 2014) (quotations omitted). We decline to do so here.
When, as here, there is no evidence of actual bias or prejudice against a party, this court applies a three-part test to determine whether reassignment is warranted:
(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous *1059 or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.
Mitchell v. Maynard , 80 F.3d 1433, 1450 (10th Cir. 1996). The record does not warrant reassignment.
First, the only ruling we have disturbed is Judge Dowdell's decision regarding setoff. We see no reason to question whether Judge Dowdell can fairly reconsider the one issue on which this court has reversed.
Second, based on our recusal analysis, reassignment is not "advisable." Mitchell is instructive. There, the judge commented on the merits of the plaintiff's case, expressing "on several occasions ... his view that Mr. Mitchell's Eighth Amendment claims are frivolous, a waste of the jury's time and as a matter of law fail to state a claim." Id. The judge also interrupted the plaintiff during his testimony and personally criticized the plaintiff's attorney. See id. at 1449-50. In contrast, Judge Dowdell's statements toward the Sheriffs at trial did not rise to this level. Judge Dowdell's admonitions to counsel were not one-sided. See, e.g. , App. at 7119 (admonishing Ms. Burke's counsel to "[j]ust speak, okay?" and "don't touch this"); id. at 7174 (telling Ms. Burke's counsel, "I mean, you got to ask a dang question").[98]
Third, unlike in Mitchell, reassignment would entail duplication. In Mitchell , the court explained that "because we are remanding for a new trial on Mr. Mitchell's claim, there would be little unnecessary duplication of effort in having a different judge preside over the new trial." 80 F.3d at 1450. By contrast, we are remanding only for reconsideration of the setoff issue. Reassignment would require another judge to become familiar with the rest of the case to evaluate the CHC settlement agreement and decide whether to apply a setoff.
We thus decline to order reassignment of the case on remand.
III. CONCLUSION
We affirm the district court on all grounds except for its denial of the Sheriffs' motion for a setoff. We reverse and remand for further consideration of that issue consistent with this opinion.

The facts are based on the trial record.

Dr. Harnish testified that detention officers, not medical staff, monitor the video feed from such cells.

Although CHC medical providers worked at the jail under a contract between TCSO and CHC, TCSO was "charged with the responsibility for administering, managing[,] and supervising the health care delivery system" at the jail. App. at 11824. We therefore use the term "jail personnel" to refer to both TCSO-employed detention officers and CHC-employed medical providers who worked at the jail in October 2011.

Ms. Gondles was responding to jail administration's concern that because of a nursing shortage, the jail was increasingly forced to rely on contract nurses who "do not have corrections training or experience." App. at 12084. She recommended the jail raise its hourly rate to compete with outside providers, noting "[u]ntil this happens, this problem will not be resolved." Id.

Sheriff Glanz testified, "This audit is done by the health care provider, and they're required to read it and answer all the deficiencies. And the undersheriff and the chief of the jail are responsible to make sure that any deficiencies that they find are corrected and that they receive accreditation." App. at 7814. But as stated above, he also testified that he was "ultimately responsible for the inmate health care of those inmates at the Tulsa County Jail." Id. at 7676.

In addition to Nurses Chappell, Luca, and Hightower, who were named as defendants, Officer Fike and Dr. Harnish were the only other jail subordinates mentioned by name in the complaint. They were not named as defendants. The complaint linked Officer Fike with the three nurses, however, by alleging "Defendants ... Chappell, Luca[,] and Hightower's ... and Captain Fike's deliberate indifference to Mr. Williams's serious medical needs." App. at 152. Dr. Harnish was not specifically alleged to have acted with deliberate indifference.

Ms. Burke also brought claims for negligence and wrongful death under state law against CHC, the nurses, and the unidentified individual detention officers and medical providers. But as discussed below, CHC and the medical providers were dismissed after reaching a settlement agreement with Ms. Burke. The district court dismissed the unidentified defendants on the Sheriffs' motion.

This straightforward outline of the issues should not mask the haphazard way the Sheriffs have attempted to present them in district court and on appeal. As the ensuing discussion shows, they waived or forfeited various arguments, and at least arguably waived or forfeited others. Under 10th Circuit Rule 28.1(A), briefs "must cite the precise references in the record where the issue was raised and ruled on." The Sheriffs have not consistently done so.

Six years after Lopez , the Supreme Court said the Eighth Amendment standard for excessive force claims brought by prisoners, which requires that defendants act "maliciously and sadistically to cause harm," does not apply to Fourteenth Amendment excessive force claims brought by pretrial detainees, which require showing only that the defendants' use of force was "objectively unreasonable." Kingsley v. Hendrickson , --- U.S. ----, 135 S.Ct. 2466, 2473, 2475, 192 L.Ed.2d 416 (2015). As this court recently noted, the "[c]ircuits are split on whether Kingsley alters the standard for conditions of confinement and inadequate medical care claims brought by pretrial detainees." Estate of Vallina v. County of Teller Sheriff's Office , 757 F. App'x 643, 646 (10th Cir. 2018) (unpublished).
The Sheriffs argue that Kingsley does not apply to this case. Aplt. Br. at 30 n.9. But we need not resolve this question for our circuit here because we can affirm under the Eighth Amendment standard, which is more favorable to the Sheriffs. See Perry v. Durborow , 892 F.3d 1116, 1122 n.1 (10th Cir. 2018) ("We haven't yet addressed Kingsley 's impact on Fourteenth Amendment claims like this one ( [§ 1983 supervisory liability claim against county sheriff for a subordinate detention officer's rape of a detainee] ). And in the absence of briefing from either party, we decline to do so here, where resolution of the issue would have no impact on the result of this appeal.").

The Sheriffs do not contest that the CHC medical providers were "acting under color of state law" under 42 U.S.C. § 1983. See West v. Atkins , 487 U.S. 42, 54, 57, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (holding that contract prison physician worked "under color of state law for purposes of § 1983").

By highlighting these individuals, we do not suggest other jail staffers who encountered Mr. Williams did not act with deliberate indifference. We offer these examples to show there was ample evidence for the jury to find that one or more of the Sheriffs' subordinates violated the Constitution-a predicate to establish supervisory and municipal liability. See, e.g. , Keith v. Koerner , 843 F.3d 833, 849 (10th Cir. 2016) (denying summary judgment for prison warden where supervisory liability was based on one subordinate's sexual assault of an inmate).

By contrast, Officer Glover responded to Mr. Williams's repeated yells that he couldn't feel his legs by asking a member of the nursing staff to check on him.

The Sheriffs contend the two CHC physicians who were aware of Mr. Williams's complaints-Dr. Harnish and Dr. Washburn-were not deliberately indifferent. They argue Dr. Harnish "earnestly doubted that Williams was paralyzed," Aplt. Br. at 43, and that Dr. Washburn was not aware of Mr. Williams's presence in the medical unit until the morning he died, id. at 44. We express no opinion on these arguments. As shown above, a reasonable jury could find at least three other subordinates were deliberately indifferent.

The Sheriffs also argue they were entitled to judgment as a matter of law as to Ms. Burke's "food and watering claim" because "[t]here was no evidence that the jail had a policy or practice of denying food and water to inmates." Aplt. Br. at 35. This argument misses the mark. The jury was asked to decide a claim for "deliberate indifference to the serious medical needs of inmates." App. at 5099 (emphasis added); see also id. at 5113-14. As discussed, we conclude there was sufficient evidence for the jury to find in Ms. Burke's favor on that claim.

The Sheriffs assert simply that "[t]he district court's failure to grant judgment for Defendants in the absence of evidence of an underlying constitutional violation or any policy, pattern or practice of detention officers to support the supervisory or official capacity claim was error." Aplt. Br. at 38. In the section of their brief pertaining to Sheriff Glanz's eligibility for qualified immunity, the Sheriffs state that "[a] municipality cannot be liable under § 1983 for the actions of any individual subordinate when there is no underlying constitutional violation." Id. at 31.

The Sheriffs' collective liability argument, which we address below, reflects that they regarded a CHC provider's constitutional violation as a legitimate predicate for supervisory and municipal liability. They complain that Ms. Burke tried to rely on the collective actions of all jail personnel-detention officers and CHC employees-to establish an underlying constitutional violation, but they do not argue that CHC employees should be excluded because they were not jail employees. See Aplt. Br. at 65-67. This argument acknowledges the jury could properly consider the unconstitutional actions of TCSO detention officers or CHC nurses to support supervisory and municipal liability.
In the portion of their brief contesting the district court's evidentiary rulings, the Sheriffs assert in a footnote that CHC providers were not agents of the TCSO. They do not connect this assertion to their liability under § 1983 or adequately brief this assertion.

For supervisory liability, a supervisor may be liable even if the person who committed the underlying constitutional violation was not an employee. See Schneider v. City of Grand Junction Police Dep't , 717 F.3d 760, 767 (requiring a plaintiff to show an affirmative link "between the supervisor and the constitutional violation " and that the supervisor had more than "mere knowledge of his subordinate's conduct" (emphasis added) (quotations omitted)).
For municipal liability, courts have held entities liable for the actions of independent contractors. In King v. Kramer , 680 F.3d 1013 (7th Cir. 2012), the Seventh Circuit held a county could be liable for the deliberate indifference of jail medical providers employed by an independent contractor to which the county had delegated "final decision-making authority ... over inmates' access to physicians and medications." Id. at 1020-21 ; see also Layton v. Bd. of Cty. Comm'rs of Okla. Cty. , 512 F. App'x 861, 864-72 (10th Cir. 2013) (unpublished) (reversing grant of summary judgment because county could be liable for actions of contracted jail medical providers). In Crooks v. Nix , 872 F.2d 800 (8th Cir. 1989), the Eighth Circuit explained that prison officials could be liable for the deliberate indifference of contracted medical personnel. Id. at 803-04.

The phrase "deliberate indifference" appears in two of our discussions of the applicable law. Earlier we discussed deliberate indifference as an element of a claim for failure to provide medical care. Here we use it to describe the state of mind required to impose supervisory or municipal liability.

Although not precedential, we find the reasoning of the unpublished decisions cited in this opinion to be instructive. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."); see also Fed. R. App. P. 32.1(a).

Sheriff Glanz argued he was entitled to judgment as a matter of law because Ms. Burke had failed to show (1) any individual subordinate violated Mr. Williams's constitutional rights or (2) any basis for Sheriff Glanz's supervisory liability. App. at 5930-47.

Ms. Burke's proposed pretrial order appears as a docket entry in the district court, but no document is attached. It also does not appear in the record transmitted to this court. The Sheriffs' objections to the proposed pretrial order is in the record, however, and we rely on that document's descriptions of the issues of law and fact included in Ms. Burke's proposed pretrial order.

The Sheriffs did not explicitly rely on the Due Process Clause in the district court. But their notice-based arguments sound in due process. See Pergament United Sales, Inc. v. N.L.R.B. , 920 F.2d 130, 134 (2d Cir. 1990) (explaining that in the context of complaints filed by National Labor Relations Board, "due process is satisfied when a complaint gives a respondent fair notice of the acts alleged to constitute the unfair labor practice"). We thus evaluate their arguments on appeal.

The Sheriffs do not argue the district court violated Federal Rule of Civil Procedure 16, which sets forth procedures for pretrial conferences and orders.

The Defendants' motion to dismiss the Doe Defendants did not contend that the presence of unidentified defendants gave them insufficient notice of which subordinates were alleged to have committed a constitutional violation. Rather, it argued (1) including the Doe Defendants in the suit violated Federal Rule of Procedure 10(a) because the complaint did not identify them by name and (2) any future attempts to substitute identified individuals for the Doe Defendants should not be permitted because the statute of limitations had run. Ms. Burke did not oppose the motion.

The Sheriffs present their appeal arguments as if they had challenged the complaint on notice grounds and argue what they think civil rights plaintiffs must allege against supervisors and municipalities. They cite Robbins v. Oklahoma , 519 F.3d 1242 (10th Cir. 2008), which states that a complaint against several defendants must "make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations." Id. at 1250. In response, Ms. Burke relies on Askins v. Doe No. 1 , 727 F.3d 248 (2d Cir. 2013), to show that "it suffices to plead and prove against the municipality that municipal actors committed the tort against the plaintiff and that the tort resulted from a policy or custom of the municipality. In fact, the plaintiff need not sue the individual tortfeasors at all, but may proceed solely against the municipality." Id. at 253. These cases do not address whether naming individual subordinates as defendants in a complaint for supervisory liability precludes a plaintiff, having dismissed the subordinates as named defendants, from alleging underlying constitutional violations by subordinates who were never identified in the complaint.
The Sheriffs assert that "[t]he requirements of notice and due process to the claims in a pretrial order cannot be any less than those claims asserted in a plaintiff's complaint." Aplt. Br. at 16. But they provide no authority for that contention. We address due process in our analysis above.

The Sheriffs also argue that "[t]he [Second] Amended Complaint does not contain any allegations that Williams' civil rights were violated by any failure of a detention officer or CHC medical staff to provide food and water." Aplt. Br. at 15. The pretrial order contained as an issue of law "[w]hether the deprivation of Mr. Williams' constitutional right to humane conditions of confinement, including adequate food, water, clothing, shelter, sanitation, medical care ... was 'sufficiently serious' to constitute a deprivation of constitutional dimension." App. at 4654-55 (footnote omitted). Even if this amounted to a new allegation, it does not merit reversal. Although the jury instructions explained that the Constitution "imposes a duty on prison officials to provide humane conditions of confinement, including adequate food, water, clothing, shelter, sanitation, medical care, and reasonable safety from serious bodily harm," id. at 5113, they did not permit the jury to impose liability on a theory of inadequate food and water. See id . at 5099, 5113-16.

Sheriff Glanz's motion mentioned by name Nurse Hughes, Nurse Charity Chumley, Nurse Chappell, Officer Norris, Officer Walsh, Nurse Stiles, Ms. Benoit, Mr. Bell, Officer Glover, Dr. Harnish, Dr. Limbu, and Dr. Washburn.

She named, in addition to many of those the Sheriff Glanz had mentioned, Officer Heather Byrd, Officer Jonathan Hall, Officer Monica Holloway, Sergeant Reusser, Officer Fike, Officer Ed White, Sergeant Hinshaw, Officer Leverich, Officer Smith, Officer Rich, and Nurse Luca.

The only other subordinate mentioned by name in the complaint was Dr. Harnish. The Sheriffs have focused on these four likely because the complaint alleged "Defendants ... Chappell, Luca, and Hightower's ... and Captain Fike's deliberate indifference to Mr. Williams' serious medical needs." App. at 152. Dr. Harnish was not specifically alleged to have acted with deliberate indifference.

The Sheriffs' counsel at oral argument conceded that Ms. Burke did not need to name the individual subordinates as defendants to state a claim for supervisory or municipal liability. The court asked, "Why doesn't the video on its own establish that-to identify those individuals and actually watch what they were doing?" Counsel replied, "The people who were on the video were not sued. The people who were on the video were not named defendants." The court stated, "They don't need to be." Counsel responded, "In fairness, they don't need to be." Oral Arg. at 09:30-09:55.

To the extent the Sheriffs also argue that the district court erred in admitting testimony about these exhibits, our analysis is the same.

The Sheriffs filed a motion in limine arguing the McKelvey Report and the OSBI Report contained hearsay. The court denied the motion, saying both reports were admissible and that the statements within them were not hearsay under Rule 801(d)(2)(D). On appeal, the Sheriffs challenge the grounds the court relied upon at trial to admit the reports.

After the court's ruling, the Sheriffs' counsel asked the court to reconsider. The court ruled again the transcript was admissible without explanation.

The Sheriffs evidently intended to argue in district court that the statements were inadmissible because they were not relevant to show that Officer McKelvey left important information out of his report or they were cumulative. The Sheriffs do not make this argument on appeal.

See also Shook v. Bd. of Cty. Comm'rs , 543 F.3d 597, 613 n.7 (10th Cir. 2008) ("[W]here a district court's disposition rests on alternative and adequate grounds, a party who, in challenging that disposition, only argues that one alternative is erroneous necessarily loses because the second alternative stands as an independent and adequate basis, regardless of the correctness of the first alternative.").

The Sheriffs cite Beechwood Restorative Care Center v. Leeds , 856 F. Supp. 2d 580 (W.D.N.Y. 2012), which discusses Rules 801(d)(2)(D) and 803(6). Id. at 595-96. But they do not discuss or cite the portions of the opinion relevant to these rules.

Benjamin Wolery, an OPD officer, described Mr. Williams's erratic actions leading to his arrest and Mr. Williams's marital and mental health problems. Mr. Williams's relatives, Clifton Williams and Earl Williams, Jr., described Mr. Williams's arrest, his marital problems, and his mental health problems. Officer Hall, a jail employee, related a statement from Mr. Williams's father that Mr. Williams was bipolar. Jail inmate Dolan Prejean said he did not know Mr. Williams by name but that the man who died at the jail had been standing in his cell the day before he died and had asked for medicine. All of this was helpful to the Sheriffs because it related to facts they sought to admit through other evidence or undercut the severity of Mr. Williams's condition.

Officer Donald Wood, a TSCO employee, reported that he remembered Mr. William's name but little else. Officer Jack Reusser, a TSCO employee, cursorily described Mr. Williams standing up in the jail's booking area and then laying down in a cell. These statements were at most marginally relevant to Mr. Williams's medical condition or treatment.

Officer Byrd described Mr. Williams's complaint that he could not move and CHC's response. CHC mental health counselor John Bell described Mr. Williams's deterioration and his concern for Mr. Williams. Nurse Chappel described providing care to Mr. Williams. This was cumulative of the McKelvey Report.

Even if the transcripts contain more than one level of hearsay, see Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."), our harmless error analysis still applies.

After Ms. Burke's counsel questioned Officer McKelvey about the first transcript, the Sheriffs' counsel told the district court, "There wasn't anything that I heard [the] [i]nmate ... say that was inconsistent with what was in McKelvey's report. ... [I]t's cumulative at this point ...." App. at 7133. The Sheriffs' brief does not explain why we should see Mr. Latham's interview differently from how they saw it at trial-as cumulative evidence. See Aplt. Br. at 44-48.

He pled guilty to one offense and no contest to the other.

Sheriff Glanz's testimony did not make clear the nature of the offense, and the certified copy of his plea is not in the record.

The Sheriffs' reply brief states, "A misdemeanor conviction for misuse of a county vehicle is not a crime of moral turpitude or dishonesty ...." Aplt. Reply Br. at 13-14. But an appellant generally waives an argument by waiting to make it in a reply brief. Belnap v. Iasis Healthcare , 844 F.3d 1272, 1293 n.16 (10th Cir. 2017) ; Anderson v. Spirit Aerosystems Holdings, Inc. , 827 F.3d 1229, 1236 n.2 (10th Cir. 2016), as amended (July 6, 2016). Even if the Sheriffs' argument were a timely response to an unforeseen argument Ms. Burke made in her response brief, the Sheriffs' briefing is inadequate. They cite no authority and provide no analysis for their assertion that the conviction was not for a crime of dishonesty. See MacArthur , 495 F.3d at 1160 ("Mere conclusory allegations with no citations to ... legal authority for support do[ ] not constitute adequate briefing." (quotations and brackets omitted)).

The Sheriffs state, "After a lengthy bench conference, the district court suddenly drew a line ... and directed counsel not to ask any 405(a) questions." Aplt. Br. at 51 (citation omitted). The record does not support this summary. Neither the parties nor the court mentioned Rule 405. See App. at 9053.

The Sheriffs cite Rule 803(6) in their reply brief to say that Ms. Burke concedes the exception is inapplicable. We see no such concession in Ms. Burke's brief.

The Sheriffs also contend the court erroneously permitted questions about Ms. Wyrick's thinking about the email. But attorney-client privilege does not cover "an attorney's mental impressions." Hickman v. Taylor , 329 U.S. 495, 508, 511-12, 67 S.Ct. 385, 91 L.Ed. 451 (1947). Further, the Sheriffs do not discuss the work product doctrine in their brief and failed to cite it in district court. Accordingly, they have waived any objection on this ground.

The court had previously ordered the memo was inadmissible because it was not relevant. It confronted a different relevance question in considering its admission for impeachment.

Although the Sheriffs called their joint filing a "motion for judgment as a matter of law and in the alternative motion for new trial," App. at 5777, the motion asked only for a new trial or, in the alternative, remittitur of the compensatory damages award. The Sheriffs did not cite Federal Rule of Civil Procedure 50, which provides for judgment as a matter of law. Accordingly, we treat their motion as seeking a new trial or remittitur only.

As the ensuing discussion reflects, we have not strictly applied forfeiture and inadequate briefing rules to exclude statements from our consideration. We have instead chosen to assume certain statements were improper because doing so does not affect our ultimate decision to affirm on this issue.

In evaluating counsel's closing argument, we consider and analyze those allegedly improper statements the Sheriffs have adequately brought to our attention in their appellate briefing. This includes statements the Sheriffs quote in their briefing and statements we can discern from the page number citations to the transcript. In places where the Sheriffs argue counsel "repeatedly" made certain improper remarks, we have relied only on those citations they provide. See Aplt. Br. at 25. As we explain below regarding statements allegedly expressing counsel's opinion, where the page number citations leave doubt as to which statements the Sheriffs contest, we look to those statements they quoted in their Rule 59(a) motion to the district court.

The fact that one of counsel's references to vindication and justice contained a biblical reference does not render it improper. We have recognized that "[c]ounsel may resort to poetry, cite history, fiction, personal experiences, anecdotes, biblical stories, or tell jokes." Whittenburg , 561 F.3d at 1133 (quotations omitted).

Their brief may therefore fall short of meeting Federal Rule of Appellate Procedure 28(a)(8)(A) 's requirement to provide "citations to the ... parts of the record on which the appellate relies." Fed. R. App. P. 28(a)(8)(A) ; Phillips v. James , 422 F.3d 1075, 1081 (10th Cir. 2005) ("We will not sift through the record to find support for [a party's] argument."). We nonetheless address this issue as explained above.

The Sheriffs also argue this statement violated the "Golden Rule." They do not explain how counsel can simultaneously express his own opinion about the evidence and invite the jurors to put themselves in Mr. Williams's shoes.

The Sheriffs' failure to contemporaneously object to the majority of these contested statements ordinarily means we review them for plain error. See Therrien v. Target Corp. , 617 F.3d 1242, 1258 (10th Cir. 2010). The Sheriffs raise this standard of review in their Reply Brief. Aplt. Reply Br. at 11. Whether or not the plain error standard applies, the statements do not merit reversal under the Whittenburg framework.

For example, counsel stated, "I'd rather just be talking to [the jury] about what I think is so wrong with the situation here, but I have to follow a formal process that's really uncomfortable for me." App. at 10600. The purpose of that comment is clearly to prepare the jury for the formality of the ensuing argument. And the fact that Ms. Burke's counsel finds what happened to Mr. Williams "so wrong" would come as no surprise to the jury at the close of the trial.
In addition, counsel stated, "I want to talk with you about ... indifference because it's one of the only cases I've ever been involved in where you don't have to determine it by circumstantial evidence." Id. at 10613. To the extent this statement expressed counsel's opinions on the case, counsel's view was that there was direct evidence of deliberate indifference. This statement did not express "the justness of a cause, the credibility of a witness, or the culpability of a civil litigant." Whittenburg , 561 F.3d at 1130 (quotations and alterations omitted).

The Sheriffs point to Moody v. Ford Motor Company , 506 F. Supp. 2d 823, 846 (N.D. Okla. 2007), noting the district court in that case reversed a $15 million verdict as "unprecedented under Oklahoma law." But that case involved a state-law products liability suit, not a § 1983 violation. See id.

The damages award and judgment of the court are set forth in Glover v. Vest , No. CIV-14-936-F, 2016 WL 6394229 (W.D. Okla. Sept. 23, 2016).

In the district court, the Sheriffs included their remittitur request as an alternative to their request for a new trial based on Ms. Burke's counsel's allegedly improper closing argument. As explained above, counsel's closing argument did not improperly influence the verdict. Both in the district court and on appeal, however, the Sheriffs appear to argue that the $10 million verdict was excessive regardless of whether the closing argument was improper. We thus address this issue in addition to the closing argument discussion.

The Sheriffs attempt to paint the verdict as "an outlier." Aplt. Br. at 68. But we "discourage comparisons to awards from other cases" as part of the remittitur analysis. Hill , 815 F.3d at 670. "Such comparisons yield no insight into the evidence the jurors heard and saw or how they used it during their deliberations" and "detract from the appropriate inquiry, which is whether the verdict is against the weight of the evidence." Id. at 670-71 (quotations omitted).

Sheriff Glanz's motion also pointed to the allegedly improper closing argument from Ms. Burke's counsel and cross-referenced the Sheriffs' joint motion for a new trial on that ground. For the same reasons we decline to order a new trial based on the closing argument, we conclude the closing argument does not warrant remittitur of punitive damages.

See, e.g. , Rodriguez v. County of Los Angeles , 891 F.3d 776, 792 (9th Cir. 2018) (upholding punitive damages award where supervisors "creat[ed] a jail culture in which uses of excessive force went unpunished"); Estate of Davis v. Delo , 115 F.3d 1388, 1396-97 (8th Cir. 1997) (upholding punitive damages award against prison superintendent who acted with reckless disregard for plaintiff's safety when he failed to investigate a correctional officer who had beaten plaintiff prisoner); Sockwell v. Phelps , 20 F.3d 187, 193 (5th Cir. 1994) (upholding punitive damages award where prison officials implemented policy that led to infringement of prisoners' constitutional rights, in violation of court order); Gutierrez-Rodriguez v. Cartagena , 882 F.2d 553, 581-82 (1st Cir. 1989) (same result when police supervisors were deliberately indifferent in carrying out their disciplinary obligations against officers violating the Constitution); Bordanaro v. McLeod , 871 F.2d 1151, 1163 (1st Cir. 1989) (same result when police chief and mayor provided inadequate training resulting in officers' excessive use of force). But see Meriwether v. Coughlin , 879 F.2d 1037, 1048 (2d Cir. 1989) (holding there was no basis for punitive damages because the supervisors were not personally involved in subordinates' beating inmates and because there was insufficient evidence of "evil motive or intent").

Sheriff Glanz argues that "[w]hen compensatory damages are substantial and have adequately compensated plaintiff, punitive damages are stricken." Aplt. Br. at 81. The cases he cites do not support such an expansive rule. As the brief acknowledges, see id. at 82, in each case cited, the court rejected a punitive damages award that far exceeded the amount of compensatory damages, and in some cases, the court merely reduced the punitive damages award to match compensatory damages, see Mendez-Matos v. Municipality of Guaynabo , 557 F.3d 36, 55 (1st Cir. 2009) (reducing $350,000 punitive damage award in a § 1983 case to match the $35,000 compensatory damages award); Bridgeport Music, Inc. v. Justin Combs Publ'g , 507 F.3d 470, 488-89 (6th Cir. 2007) (vacating $3.5 million punitive damages award when the plaintiff received a "substantial" compensatory award of $366,939); Boerner v. Brown & Williamson Tobacco Co. , 394 F.3d 594, 603 (8th Cir. 2005) (reducing punitive damages award of $15 million to $5 million where the plaintiff received a "substantial" compensatory damage award of more than $4 million).
Even if the $10 million verdict provided adequate compensation, punitive damages could still be appropriate. "The purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." Memphis Cmty. Sch. Dist. v. Stachura , 477 U.S. 299, 306 n.9, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986).

Some courts have considered a setoff to be an affirmative defense under such circumstances. See, e.g. , Laethem Equip. Co. v. Deere & Co. , 485 F. App'x 39, 51 (6th Cir. 2012) (unpublished) ("Entitlement to a setoff is an affirmative defense that must be pled and proven by the party asserting it."); Glover v. Johnson , No. CIV-14-936-F, 2016 WL 5854282, at *1 (W.D. Okla. Oct. 6, 2016) ; see also, e.g. , Fox v. Barnes , No. 09-C-5453, 2013 WL 2111816 at *10 (N.D. Ill. May 15, 2013) ; Banks v. Yokemick , 177 F. Supp. 2d 239, 265 (S.D.N.Y. 2001). By contrast, the Eleventh Circuit has held that where a setoff "is not invoked as a counterdemand, but rather as an equitable doctrine designed to prevent multiple recoveries by a plaintiff on its own claim and for a single injury," it does not operate as an affirmative defense. BUC Int'l Corp. v. Int'l Yacht Council Ltd. , 517 F.3d 1271, 1277 n.5 (11th Cir. 2008).

See also Ford Audio Video Sys., Inc. v. AMX Corp. , Nos. 97-6169 & 97-6171, 1998 WL 658386, at *5 (10th Cir. Sept. 15, 1998) (unpublished) ("Because a pre-trial order controls the subsequent course of an action, the Motion to Include [a new claim in the pre-trial order] served here as an alternative to seeking amendment of the complaint itself through a Rule 15 motion."); Schulman v. Saloon Beverage, Inc. , No. 2:13-CV-193, 2014 WL 1883730, at *4 (D. Vt. May 12, 2014) (holding that failure to include setoff defense in answer was not waiver when the defendant raised it in a standalone motion before trial and the plaintiffs had "ample opportunity to respond").

At that point, Sheriff Glanz was still serving as Sheriff of Tulsa County. Sheriff Regalado had not yet been substituted as a defendant on the official capacity claim. By the time of the pretrial order, Sheriff Glanz was a defendant in his individual capacity only, and Sheriff Regalado was a defendant in his official capacity.

Recent cases have said § 1983 and federal common law fail to address the availability of a setoff. They base this conclusion on the silence of § 1983 on the subject and the indeterminacy of the case law. Restivo v. Hessemann , 846 F.3d 547, 582 (2d Cir. 2017) (noting the conflict between earlier cases); see also e.g. , Banks , 177 F. Supp. 2d at 256 ("[T]he question of the appropriate rule of decision for setoff in § 1983 cases has not been dispositively settled as a matter of federal common law."); Mason v. City of New York , 949 F. Supp. 1068, 1077 (S.D.N.Y. 1996) (finding federal law deficient due to inconsistent court rulings); Hoffman v. McNamara , 688 F. Supp. 830, 833 (D. Conn. 1988) (same).

Because the Sheriffs did not move for proportionate reduction of damages, it is not clear why the district court addressed this issue. Having concluded state law should not be applied, it may have been attempting to fashion a federal rule of decision. See Restivo , 846 F.3d at 586 ("Having concluded that state law is inconsistent with federal policy, we now assess whether the district court was correct in applying a policy of proportional reduction ...."). We do not consider this issue on appeal.

See Computerized Thermal Imaging, Inc. v. Bloomberg, L.P. , 312 F.3d 1292, 1296 & n.3 (10th Cir. 2002) (conducting de novo review of "the district court's interpretation and application of Utah law" in the context of denial of a motion for reconsideration under Rules 59(e) and 60(b) ); see also McQuay v. Penn-Am. Ins. Co. , 91 F. App'x 626, 631 (10th Cir. 2003) (unpublished) (explaining that review of denial of prejudgment interest under Rule 59(e) is for abuse of discretion but that "legal interpretation or statutory analysis the district court performs in denying prejudgment interest is reviewed de novo").

Although the Sheriffs framed their post-judgment request as a "motion for disclosure" of the settlement agreement, App. at 5750, the motion resembled a motion to compel discovery in that it asked the district court to order Ms. Burke to produce a document-the CHC settlement agreement. We thus review for abuse of discretion. S.E.C. v. Merrill Scott & Assocs., Ltd. , 600 F.3d 1262, 1271 (10th Cir. 2010) ("The district court has broad discretion over the control of discovery, and we will not set aside discovery rulings absent an abuse of that discretion." (quotations omitted)).

The Sheriffs may also have relied on the district court's assurance, when it approved dismissal of the CHC defendants following settlement, that the proper time to resolve the setoff issue was after trial: "If the liability of the settlement defendants is presented to the jury, the issue of offset will be addressed at an appropriate time; i.e., post-judgment, if that time comes." App. at 4001. Although the district court did not allow the Sheriffs to ask the jury about the extent of CHC's liability, in its ruling on the Sheriffs' Rule 59(e) motion, the district court acknowledged that "it was not unreasonable for the defendants to rely upon the language used in that order to believe that they would be permitted to seek setoff, if appropriate." Id. at 6656.

The Fifth Circuit's grant of rehearing en banc vacated the panel's opinion in Dobson and rendered it non-precedential. See U.S. ex rel. Marcy v. Rowan Companies, Inc. , 520 F.3d 384, 389 (5th Cir. 2008) (citing Fifth Circuit Rule 41.3 for the proposition that a "panel opinion ... was automatically vacated when it was reheard en banc" and was therefore "not precedent"). But the Fifth Circuit has cited the Dobson panel opinion after it was vacated. See, e.g. , Slade v. City of Marshall, Tex. , 814 F.3d 263, 266 n.14 (5th Cir. 2016) ; Ratner v. Sioux Nat. Gas Corp. , 719 F.2d 801, 804 (5th Cir. 1983).
Although the Dobson panel opinion is not precedential, we cite it for its persuasive value. See Rio Grande Silvery Minnow v. Bureau of Reclamation , 601 F.3d 1096, 1133 (10th Cir. 2010) ("Moreover, since the district court's opinions will remain on the books even if vacated, albeit without any preclusive effect, future courts and litigants will be able to consult their reasoning." (quotations and brackets omitted)). The Fifth Circuit's en banc opinion did not reject the Dobson panel's reasoning that a setoff would be inconsistent with § 1983 ; instead, it held that no setoff should be awarded because there was no joint liability between the settling and nonsettling defendants. 725 F.2d at 1005-06.

To the extent Restivo could be read more narrowly to reject only the application of the New York setoff statute to the facts of that case, such a reading would support an as-applied approach to evaluate setoffs under step three of the § 1988 framework. We think the more accurate reading of Restivo is that the court rejected a state-law-based setoff in light of the possibility that the New York law generally could allow a nonsettling defendant to pay less than its proportionate share of the plaintiff's harm. See 846 F.3d at 586.

In Big Elk , 3 F. App'x at 809, this court upheld application of a setoff in a § 1983 case. Because (1) the parties contested only the amount of the setoff, and (2) the panel did not decide whether state setoff law was consistent with § 1983, see id. , Big Elk is not instructive here.

For example, is the rule against double recovery under federal common law sufficient federal law at step one of the § 1988 analysis to resolve the setoff issue? See Restivo , 846 F.3d at 593-94 (Livingston, J., concurring in part and dissenting in part).

The Sheriffs' reliance on Goad v. Macon County , 730 F. Supp. 1425 (M.D. Tenn. 1989), is misplaced. In that case, the court applied state setoff law to eliminate a $8,500 compensatory damages award based on a $10,000 settlement. Id. at 1431. It reasoned that applying a setoff would not "frustrate the goal of deterrence" because "the threat of compensating for the injuries will make the actor less inclined to perform the conduct." Id. But unlike this case, the punitive damages verdict in Goad was greater than the compensatory damages award and could provide a separate strong deterrent effect. Id. at 1432. In any event, Goad , an out-of-circuit district court decision, is not binding on this court.

As one leading commentator observed:
"[W]hether a judge should be disqualified from presiding over a particular case requires that the court balance a number of competing concerns. On the one hand, were disqualifying a judge to be made too difficult, cases would be apt to be decided-or, at least, appear to be decided, unfairly. Conversely, if removing a judge were to be made too simple, both the cost of seeking justice and the delay in obtaining justice would likely soon become intolerable."
Richard E. Flamm, Judicial Disqualification: Recusal and Disqualification of Judges 15 (3d ed. 2017).

The Sheriffs also contend that Judge Dowdell's comments and rulings at trial revealed enough bias against them to deprive them of due process. The district court did not rule on the effect of these comments and rulings, however, because the Sheriffs did not argue in their Rule 59(a) motion that they were deprived of due process at trial as a result of Judge Dowdell's alleged bias. Consequently, we would ordinarily review this issue for plain error. See Richison , 634 F.3d at 1130 ("If a newly raised legal theory is entitled to appellate review at all ... it may form a basis for reversal only if the appellant can satisfy the elements of the plain error standard of review."); accord Rush v. Smith , 56 F.3d 918, 922 (8th Cir. 1995) (holding that where a party failed to object to a judge's allegedly biased statements at trial, review is for plain error). But because the Sheriffs have not argued plain error, they have waived this argument. See Richison , 634 F.3d at 1130-31 ; United States v. MacKay , 715 F.3d 807, 831 (10th Cir. 2013) ("[T]he failure to argue for plain error and its application on appeal ... surely marks the end of the road for an argument for reversal not first presented to the district court." (quotations omitted)).

Title 28 U.S.C. § 144 also addresses recusal of judges:
Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.
The district court read the Sheriffs' motion as requesting disqualification under both § 144 and § 455. Because the Sheriffs rely only on § 455(a) in this appeal, we consider their arguments under that statute only. See Yelloweagle , 643 F.3d at 1280 ("[W]here [an appellant] raises an issue before the district court but does not pursue it on appeal, we ordinarily consider the issue waived.").

The Sheriffs stated in their disqualification motion that Judge Dowdell's "name appear[ed] on pleadings" in the 2008 suit. App. at 4217. His last name appeared in the name of the law firm, but Judge Dowdell was not listed as counsel in any of the pleadings the Sheriffs attached to their motion. See, e.g. , id. at 4404.

The Sheriffs allege the firm had fewer than 12 lawyers in 2008. This fact is uncontested.

In attachments to their reply brief in the district court, the Sheriffs added that when Judge Dowdell was a lawyer at his former firm, the firm had sued the Board of Commissioners of Tulsa County in 2001 alleging a TCSO deputy had used excessive force during an arrest. Although Judge Dowdell discussed both the 2001 and 2008 suits in his order denying the disqualification motion, the Sheriffs do not mention the 2001 suit on appeal. We therefore do not address it here. See Yelloweagle , 643 F.3d at 1280 ("[W]here [an appellant] raises an issue before the district court but does not pursue it on appeal, we ordinarily consider the issue waived.").

A judge who is the subject of a disqualification motion may transfer the matter to another judge for decision. 13D Charles Alan Wright & Arthur R. Miller et al., Federal Practice and Procedure § 3550 (3d ed. 2008); see In re United States , 158 F.3d 26, 34-35 (1st Cir. 1998) ("[T]he judge would have been well-advised either to bow out of the case or to ask that the recusal motion be assigned to a different judge for hearing."). But the judge is not required to do so, id. , and the common practice in federal courts has been for the judge who is the target of the disqualification request to decide the motion. Charles Gardner Geyh, Judicial Disqualification: An Analysis of Federal Law 78 (2d ed. 2010). Although it may not be the best practice in a given case, including this one, for a judge to decide whether a reasonable person would question the judge's own impartiality, § 455(a) does not require otherwise, and courts regard this course as the norm. Id. at 79.

The First Circuit has explained that "the district judge is allowed a range of discretion. The appellate court, therefore, must ask itself not whether it would have decided as did the trial court, but whether that decision cannot be defended as a rational conclusion supported by [a] reasonable reading of the record." In re United States , 666 F.2d 690, 695 (1st Cir. 1981) ; see also In re United States , 158 F.3d at 31 (stating "[t]he question ... is not whether we would have denied the [appellant's] recusal motion as [the district judge] did, but, rather, whether her denial of it constituted an abuse of discretion.").

For example, § 455(b)(2) calls for disqualification when a judge "in private practice [ ] served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it." Although the appellants do not rely on this provision, they argue that Judge Dowdell's former law firm sued Tulsa County and Sheriff Glanz regarding the same or a related matter at issue in this case. As we explain below, the two matters are unrelated.

Shortly before Congress amended § 455, the ABA Code of Judicial Conduct ratified in 1972 a provision that stated a judge "should disqualify himself in a proceeding in which his impartiality might reasonably be questioned." Symposium on the Code of Judicial Conduct , 1972 Utah L. Rev. 333, 340 (1972) (quoting the ABA Code of Judicial Conduct).
The Code of Conduct for the Federal Courts still closely tracks this language. Canon 3C(1) states that "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which: (a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." Guide to Judiciary Policy, Vol. 2A, Ch. 2 at 8. (rev. Mar. 12, 2019).

See also Armenian Assembly of Am. v. Cafesjian , 783 F. Supp. 2d 78, 91 (D.D.C. 2011) ("A reasonable observer must assume that judges are ordinarily capable of setting aside their own interests and adhering to their sworn duties to 'faithfully and impartially discharge and perform all the duties' incumbent upon them." (quoting 28 U.S.C. § 453 (judicial oath of office)), aff'd , 758 F.3d 265, 282-83 (D.C. Cir. 2014).

Outside the § 455(a) context, this court held in United States v. Bowling , 619 F.3d 1175, 1186 (10th Cir. 2010), that a judge who had issued a search warrant was sufficiently impartial even though he had previously been adverse to the defendant while working as a lawyer.
The Supreme Court of Ohio has held that disqualification was not required where the judge had previously represented a party adverse to the defendant in a separate, unrelated proceeding. See RHDK Oil & Gas, L.L.C. v. Dye , 142 Ohio St.3d 1249, 31 N.E.3d 647, 648-49 (Ohio 2014) ("Dye has not claimed that the two matters are related in any way; therefore, disqualification is not warranted.").

The Sheriffs argue that "[a] judge should recuse when he has a direct and personal pecuniary interest in the outcome of the litigation." Aplt. Br. at 59. But the record is devoid of evidence that Judge Dowdell stands to benefit financially from the result in this case.

Although the Sheriffs state on appeal they filed their disqualification motion on March 2, 2017, the motion itself shows a filing date of February 9, 2017.

We note the recusal motion presents two timeliness issues. The first is whether the Sheriffs' motion was timely in that Judge Dowdell was assigned to the case in 2013, the parties engaged in discovery, the court denied the motion for summary judgment, and then another six months elapsed before February 9, 2017, when the recusal motion was filed. The second timeliness issue is whether, as we discuss below on the merits of the disqualification motion, the passage of time between the 2008 case and Judge Dowdell's assignment in 2013 to this case mitigated the potential for partiality.

The significant time and resources devoted to this litigation before the Sheriffs filed their disqualification motion raises the question of whether timeliness concerns could be relevant to review of the merits determination on impartiality. We do not answer that question because we do not rely on untimeliness for our affirmance here.

By contrast, if Judge Dowdell had been a lawyer in the same or related matter in controversy as the case now pending before him, § 455(b)(2) would have required him to recuse himself. See 28 U.S.C. § 455(b)(2).

For example, the Sheriffs contend Judge Dowdell "undertook a passionate adversarial position against them in prior litigation," was "heavily involved behind-the-scenes providing input," and harbored a "passionate disagreement and distaste for Defendants' policies and management of the Tulsa County Jail." Aplt. Br. at 57-58.

The Sheriffs rely in their brief on cases that are inapposite to this one. In each case they cite, the judge either played a critical role in a prior related proceeding or had himself been sued by a party. In Williams v. Pennsylvania , --- U.S. ----, 136 S. Ct. 1899, 1903, 195 L.Ed.2d 132 (2016), a justice of the Pennsylvania Supreme Court, which was deciding whether to stay an inmate's execution, had been the district attorney who authorized his subordinates to seek the death penalty against the inmate. In Johnson v. Mississippi , 403 U.S. 212, 215, 91 S.Ct. 1778, 29 L.Ed.2d 423 (1971), a judge who charged the petitioner with contempt had "immediately prior to the adjudication of contempt [been] a defendant in one of petitioner's civil rights suits." In In re Murchison , 349 U.S. 133, 134, 75 S.Ct. 623, 99 L.Ed. 942 (1955), the judge acted as a "one-man grand jury," and when the defendants refused to answer his questions, he charged and convicted them of contempt. And in Hurles v. Ryan , 752 F.3d 768, 775, 790 (9th Cir. 2014), the judge had filed a brief in her own name opposing a defendant's interlocutory petition for special action (akin to a mandamus petition) against her before going on to preside over the defendant's criminal trial in state court.

Indeed, Sheriff Glanz was dismissed from the suit three months after the complaint was filed.

If the § 455(a) issue "lies in a zone in which the district judge's discretion holds sway ... a court of appeals ought not to interfere." See In re United States , 158 F.3d 26, 31 (1st Cir. 1998).

The Sheriffs contend the "district court admonished Defense counsel in front of the jury after numerous speaking objections by Plaintiff." Aplt. Br. at 61. But contrary to the Sheriffs' implication, the interaction cited-in which Judge Dowdell expressed frustration with defense counsel's attempt to fully articulate an objection at the bench-occurred outside the hearing of the jury.